**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE THIRD CIRCUIT**

---

Case No. 26-3067

---

CURALEAF HOLDINGS, INC., *et al.*,
*Plaintiffs-Appellees,*

v.

NEW JERSEY CANNABIS REGULATORY COMMISSION, *et al.*,
*Defendants-Appellants.*

---

Appeal from the United States District Court for the
District of New Jersey, No. 25-cv-16397
(Hon. Michael A. Shipp, U.S.D.J.)

---

**JOINT APPENDIX VOLUME II (JA070-JA321)**

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625-0106
bassam.gergi@njoag.gov

*Attorneys for Defendants-Appellants*

Stephen Ehrlich
*Deputy Solicitor General*

Bassam F. Gergi
*Deputy Attorney General*

November 20, 2026

## Table of Contents

**<u>Joint Appendix Vol. I</u>**

Notice of Appeal
August 13, 2026 (Dkt No. 65) .......................................... JA001- JA035

Final Judgment Order
August 10, 2026 (Dkt No.64) .......................................... JA036- JA038

Memorandum Opinion
May 27, 2026 (Dkt No. 55) .......................................... JA039- JA069

**<u>Joint Appendix Vol. II</u>**

Complaint
October 9, 2025 (Dkt No. 1) .......................................... JA070- JA126

Declaration of Peter Clateman
October 9, 2025 (Dkt No. 1-2) .......................................... JA127- JA130

Certification of Rachel E. Thompson
November 17, 2025 (Dkt No. 39-2) .......................................... JA131- JA159

Declaration of Michael J. Mauro
December 8, 2025 (Dkt No. 42-1) .......................................... JA160- JA213

Transcript of Oral Argument
April 28, 2026 (Dkt No. 54) .......................................... JA214- JA270

Memorandum Opinion
May 27, 2026 (Dkt No. 55) .......................................... JA271- JA301

Order
May 27, 2026 (Dkt No. 56)................................................JA302- JA303

Joint Correspondence
August 7, 2026 (Dkt No. 63)..............................................JA304- JA309

Docket Report Screenshot
as of November 11, 2026 ............................................JA310- JA321

**LITTLER MENDELSON, P.C.**
Keith J. Rosenblatt (016631997)
krosenblatt@littler.com
Alan I. Model (035511993)
amodel@littler.com
Anastasia Stylianou (198022017)
astylianou@littler.com
One Newark Center, 8th Floor
Newark, NJ 07102
973.848.4700
Attorneys for Plaintiffs
*Curaleaf Holdings, Inc.*
*and Curaleaf NJ, II, Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CURALEAF HOLDINGS, INC., a British Columbia corporation, and CURALEAF NJ, II, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NEW JERSEY CANNABIS REGULATORY COMMISSION, CHAIR DIANA HOUENOU, COMMISSIONERS KRISTA NASH and AMEILA MAPP, and ACTING EXECUTIVE DIRECTOR CHRISTOPHER RIGGS, in their official capacities,<br><br>Defendants. | Civil Action No. 2:25-cv-16397<br><br>**COMPLAINT** |

**COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF**

Plaintiffs Curaleaf Holdings, Inc., a British Columbia corporation with a principal place of business at 290 Harbor Drive, Stamford, Connecticut 06902, and Curaleaf NJ, II, Inc., a Delaware corporation with a principal place of business at 290 Harbor Drive, Stamford, Connecticut 06902 (together, "Curaleaf"), through their undersigned attorneys, asserts these claims against Defendants New Jersey Cannabis Regulatory Commission ("Commission"), located at 44 South

Clinton Avenue, Trenton, New Jersey 08609, as well as Commission Chair Diana Houenou, Commissioners Krista Nash and Ameilia Mapp, and Acting Executive Director Christopher Riggs (together, "Defendants"), in their official capacities.

## NATURE OF THE CASE

1. New Jersey law licenses and strictly regulates the cannabis industry. As part of its licensing scheme, the state requires cannabis businesses to sign "labor peace agreements" ("LPAs") with labor unions. It also limits the unions with which cannabis business can sign an LPA. And it requires the cannabis business to then negotiate a collective bargaining agreement ("CBA") with the union within 200 days of opening. N.J. Rev. Stat. § 24:61-36.c.

2. Defendants have enforced, and are threatening to further enforce, these requirements against Curaleaf. Curaleaf operates four licensed cannabis facilities in New Jersey. To comply with New Jersey's licensing scheme, Curaleaf signed an LPA with Local 360 of the United Food and Commercial Workers Union. Curaleaf signed that LPA in 2022. But the LPA has now expired. And because the LPA has expired, Defendants have levied a civil penalty of $610,000 on Curaleaf. They are also threatening to fine Curaleaf another $5,000 for each day that it does not have an active LPA. They may even revoke Curaleaf's licenses, as they have conditionally approved the renewal of one of Curaleaf's licenses upon the condition that they secure an LPA by October 31. That is the commercial equivalent of the death penalty.

3. Defendants cannot lawfully enforce the LPA requirement against Curaleaf. The LPA requirement regulates activity that is (a) arguably protected under the National Labor Relations Act ("NLRA"), (b) arguably prohibited by the NLRA, and (c) left intentionally unregulated by the NLRA. It is therefore preempted and cannot be enforced against Curaleaf. *See San Diego Bldg. and Trades Council v. Garmon*, 359 U.S. 236, 245 (1959); *Lodge 76, Int'l Ass'n*

*of Machinists & Aerospace Workers v. Wisconsin Employment Rels. Comm'n*, 427 U.S. 132, 149 (1976); *Hill v. State of Fla. ex rel. Watson*, 325 U.S. 538, 543 (1945).

4. For almost a century, labor relations have been the purview of federal law. In 1935, Congress passed the NLRA to establish a uniform, comprehensive regulatory system for labor relations. That system governs labor disputes, collective bargaining, and employee representation. It also assigns responsibility for enforcing the national system to a single agency, the National Labor Relations Board ("NLRB" or "Board"). When activity is even arguably protected (or prohibited) by the NLRA, the Board has primary jurisdiction to address the activity. States have no power to regulate the activity, either in their courts or in their administrative proceedings. *See Garmon*, 359 U.S. at 246-47 ("When an activity is arguably subject to § 7 or 8 of the [NLRA], the States . . . must defer to the exclusive competence of the National Labor Relations Board if the state interference with national policy is to be averted."); *Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 291 (1986) (states may not supplement the NLRA's comprehensive remedies). *See also Guss v. Utah Labor Rels. Bd.*, 353 U.S. 1, 10–11 (1957) (state agencies have no power to adjudicate matters committed to the Board's primary jurisdiction).

5. The NLRA's preemptive effect is broad – so broad, in fact, that it covers much conduct not explicitly regulated. When Congress enacted the NLRA, it deliberately left some subjects to the free operation of market forces. Chief among those subjects were so-called "economic weapons" available to parties to a labor dispute such as picketing, strikes, and lockouts. Those tactics are as much a part of Congress's design as any conduct the NLRA explicitly regulates. They are therefore equally off-limits for state regulators. *See Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 618–19 (1986) (city could not force business to settle labor dispute as a condition of renewing its franchise).

6. Under those principles, the LPA requirement is preempted in at least four ways. First, it requires a cannabis business to bargain with a labor organization over the terms of union organizing – a subject regulated exclusively by the NLRA. Second, it imposes additional penalties for failing to bargain in good faith – penalties not authorized by the NLRA. Third, it restricts the parties' use of economic weapons, such as picketing, boycotts, and strikes – subjects left deliberately unregulated by the NLRA. Fourth, it limits employees' choice of their exclusive bargaining representatives – a right protected unequivocally by the NLRA.

7. **Regulation of organizing.** The state licensing regime regulates union organizing by requiring Curaleaf and other cannabis businesses to bargain with a union over an LPA. An LPA is a permissive subject of bargaining under federal law, and federal law gives Curaleaf a right not to bargain over one. The licensing regime contradicts that right, forces Curaleaf to bargain, and therefore regulates a subject exclusively governed by the NLRA. *See Garmon*, 359 U.S. at 246–47.

8. **Additional penalties.** The state licensing regime also improperly supplements the NLRA's exclusive remedial scheme. If Curaleaf fails to bargain over and sign an LPA, it faces fines, penalties, and even revocation of its license. Those penalties all exceed the penalties authorized by federal law. States have no power to supplement the NLRA's remedial scheme, which is exclusive. The licensing regime's remedies are therefore preempted. *See Gould Inc.*, 475 U.S. at 291.

9. **Economic weapons.** The LPA requirement also illegally restricts the use of economic weapons. Under federal law, economic weapons are deliberately left unregulated. Congress wanted them to serve as a backstop to bargaining: if the parties couldn't agree, they could resolve their dispute through a test of economic strength. But the LPA requirement forbids

Curaleaf from doing that by requiring Curaleaf to waive its right to use economic weapons. An LPA's chief function is to prevent labor disruptions; and labor disruptions are merely the byproduct of economic weapons available to resolve a labor dispute. An LPA would therefore block Curaleaf from resorting to such economic weapons, and it therefore interferes with the market-based system Congress designed. *See Machinists*, 427 U.S. at 149. *See also Cannon v. Edgar*, 33 F.3d 880, 885-86 (7th Cir. 1994) (law requiring union and employers to negotiate over pool of workers to cover certain burial services during labor disputes preempted because it prevented parties from resort to economic weapons left intentionally unregulated by Congress).

10. **Choice of representative.** Finally, the LPA requirement interferes with employees' right to choose their representative. The NLRA gives employees an unqualified right to choose their representative for collective bargaining. It is for employees, not the state, to choose which union will bargain on the employees' behalf. The LPA requirement further restricts that right by limiting the pool of unions who are acceptable to the State of New Jersey. A union can sign an LPA only when it meets the state's statutory criteria. And when a union signs the LPA, it has an insuperable advantage in organizing the covered workplaces. The LPA therefore narrows employees' choice of representative and interferes with the free exercise of their federal rights. The LPA requirement is therefore preempted for that additional reason. *See Hill*, 325 U.S. at 543.

11. In light of this situation, Curaleaf has been forced to turn to this Court for declaratory and injunctive relief. The Court should declare that the CBA and LPA requirements are preempted. It should also declare that Defendants cannot enforce the LPA requirements or the collective-bargaining requirements against Curaleaf, as those requirements are preempted by federal law. The Court should also enjoin Defendants from enforcing these requirements against

Curaleaf or purporting to penalize Curaleaf in a manner inconsistent with federal law, including by imposing civil monetary penalties against Curaleaf for operating without an active LPA.

## JURISDICTION AND VENUE

12. This Court has jurisdiction under 28 U.S.C. § 1331 because this action arises under federal statutory and constitutional law, and § 1343(a)(3)-(4).

13. This Court may grant declaratory relief under 28 U.S.C. §§ 2201 and 2002, as well as Federal Rule of Civil Procedure 57.

14. This Court has authority to enjoin Defendants to prevent them from enforcing a state law preempted by federal law. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983).

15. A justiciable controversy exists between the parties. Defendants have levied a civil penalty of $610,000 against Curaleaf for operating without an active LPA. Defendants are also threatening to impose additional penalties or even to terminate Curaleaf's licenses. Most recently, Defendants conditionally approved Curaleaf's license renewal for its Bordentown operations subject to the company having an LPA in place by October 31. If Curaleaf loses its licenses, it will be unable to operate in New Jersey. It will lose revenue from its licensed facilities and may be forced to discharge its personnel. If it loses those personnel, it may also lose irreplaceable knowledge and expertise. It may also sacrifice its accumulated goodwill in the local market. These threats create genuine adversity between the parties.

16. Venue is proper in this district under 28 U.S.C. § 1391(b)(1)-(2) because Defendants reside in this district and the acts giving rise to this complaint occurred in the district.

## PARTIES

17. Curaleaf Holdings, Inc. is a British Columbia corporation with its principal administrative offices in Stamford, Connecticut. Curaleaf, Inc., a Delaware corporation, is a wholly owned subsidiary of Curaleaf Holdings, Inc. Curaleaf NJ II, Inc., also incorporated in

Delaware and qualified to do business in New Jersey, maintains its principal administrative offices in Stamford, Connecticut. Curaleaf, Inc. is the sole owner of Curaleaf NJ II.

18. Curaleaf is one of the world's premiere cannabis companies and a leading provider of cannabis. It operates cannabis facilities in multiple states, including New Jersey, as well as internationally. Its operations include facilities providing medicinal and adult-use cannabis. In New Jersey, it operates three licensed adult-use facilities employing a total of 236 individuals – 195 full-time and 41 part-time. Each of Curaleaf's facilities is licensed by Defendants.

19. Defendant Cannabis Regulatory Commission is an agency of the State of New Jersey. The Commission is tasked with overseeing the state's medical and adult-use cannabis markets. Among other things, the Commission grants or denies licenses to operate adult-use cannabis businesses. The Commission is headed by three commissioners, each appointed by the governor. *See* N.J. Rev. Stat. § 24:6I-24.

20. Defendant Diana Houenou is the Commission's Chair. Defendants Nash and Mapp are commissioners. In their official capacities, Defendants Houenou, Nash, and Mapp are responsible for, among other things, deciding whether to grant, extend, suspend, or revoke Curaleaf's licenses. *See id.* §§ 24:6I-24.b(8), 24:6I-34.

21. Defendant Riggs is the Acting Executive Director of the Commission. In his official capacity, he is the Commission's chief administrative officer. He is responsible for carrying out the Commission's decisions and orders.

## BACKGROUND

### The New Jersey Cannabis, Regulatory, Enforcement Assistance, and Marketplace Modernization (CREAMM) Act

22. In 2020, New Jersey voters approved a voter initiative, Public Question 1, which legalized adult-use recreational cannabis. The initiative also authorized an existing state agency, the Cannabis Regulatory Commission, to "oversee" the new market.

23. The following year, the state legislature implemented the initiative by passing the CREAMM Act. Among other things, the CREAMM Act required all adult-use cannabis businesses to obtain a license. *See* AB 21, 219th Leg., Reg. Sess. (N.J. 2020).

24. Licenses come in several forms. The most common type is an annual license. Annual licenses cover multiple types of cannabis businesses, including cultivation facilities and retail facilities. As the name implies, an annual license must be renewed each year. If the license is not renewed, the license holder can no longer operate. *See* N.J. Rev. Stat. § 24-6I-36.

25. The CREAMM Act assigns licensing authority to the Commission. It also specifies certain conditions the Commission must consider when granting licenses. Among those conditions are a "labor peace agreement" ("LPA") requirement and a collective bargaining agreement ("CBA") requirement. *See id.* § 24-6I-36.c.

26. Under the LPA requirement, when a business applies for most cannabis licenses,[1] it must submit an attestation from a "bona fide labor organization" stating that the labor organization and the business have an LPA. The business must then abide by and maintain the LPA. The LPA is an "ongoing and material condition" of the license. If the business violates the LPA or allows the LPA to lapse, the license could be suspended, revoked, or not renewed. *Id.*

---

[1] The Act excludes "microbusinesses," as well as applicants for conditional licenses and licenses to operate a distributor or delivery service. *Id.*

27. Under the CBA requirement, the business must enter "or make a good faith effort to enter" a CBA within 200 days of opening a licensed cannabis establishment. If the business fails to enter such an agreement (or make a "good faith effort" to enter an agreement), the license could be suspended or revoked. *Id.*

28. The Act does not define "good faith effort." Nor does it define "collective bargaining agreement" or "labor peace agreement." *See* N.J. Rev. Stat. § 24:6I-33 (definitions).

29. The Act does, however, define "bona fide labor organization." To qualify, a labor organization must be one in which employees participate and that exists in whole or in part to "collectively bargain[] or otherwise deal[] with medical or personal use cannabis employers concerning grievances, labor disputes, and terms or conditions of employment." *Id.*

30. The labor organization must also be "characterized" by specified criteria: (a) being a party to one or more collective-bargaining agreements with a cannabis employer; (b) having a written constitution for the prior three years; (c) filing annual financial reports with the U.S. Department of Labor in accordance with federal law; (d) filing at least one audited report in three of the last four years; (e) being affiliated with a regional or national association of unions; and (g) being a member of a "national labor organization that has at least 500 general members in a majority of the 50 states of the United States." *Id.*

**LPAS IN THE NEW JERSEY CANNABIS MARKET**

31. Those criteria effectively exclude new, small and even organic unions from the market (indeed, they mean that a new union formed spontaneously by cannabis workers would not qualify), all of which are "labor organizations" under Section 2(5) of the NLRA. Without competition from such unions, established unions have dominated the New Jersey cannabis labor market. Most prominent among those unions is the United Food and Commercial Workers and its Local 360 (collectively, "UFCW," "Local 360," or "the union").

32. UFCW markets itself as "the Cannabis Workers' Union" for New Jersey. By its own description, it has signed "hundreds" of LPAs in New Jersey alone. Local 360's website describes the terms an LPA must include. It asserts that an LPA must "ensure that the employer stays neutral during a union organizing campaign." In exchange, the LPA requires a union "to refrain from any activity that can hurt the employer economically."[2]

33. Those terms are reflected in Local 360's agreements. Agreements commonly include terms that (a) require employers to stay neutral to union organizing, (b) forbid the employer from making "negative statements" about the union, (c) require the employer to give the union access to its premises during work time, (d) allow the union to designate any potential bargaining unit, (e) require the employer to give the union employees' contact information, (f) require the employer to announce its neutral stance to employees in an open meeting, and (h) require the employer to recognize the union based on a showing of signed authorization cards.

34. Local 360's LPAs also regularly require disputes to be resolved through binding arbitration. They forbid the employer from asserting its rights before the NLRB or a court.

35. These terms are uncommon in other industries, where employers are free to oppose union organizing and rarely agree to neutrality. But they have become standard in New Jersey's cannabis industry, where Local 360 can use the LPA requirement as leverage to extract concessions from cannabis businesses.

**Curaleaf's Licenses and LPA**

36. Today, Curaleaf holds several annual licenses in New Jersey. It has held these licenses since April of 2022. The licenses cover four separate facilities: Edgewater Park, Bordentown, Winslow, and Bellmawr. Its Winslow location holds a Class 2 Cannabis

---

[2] *Id.*

Manufacturer and Medical Cannabis Manufacturer license. Its Bellmawr location holds an Alternative Treatment Center and Class 5 Cannabis Retailer license. Its Bordentown and Edgewater Park facilities hold an Alternative Treatment and Class 5 Cannabis Retailer license. Under the CREAMM Act, all of Curaleaf's licenses are subject to annual renewal.

37. To qualify for the license, Curaleaf was required to negotiate and sign an LPA with a bona fide labor organization. Curaleaf therefore negotiated and signed an LPA with UFCW Local 360 on April 6, 2022.

38. To negotiate the LPA, Curaleaf had to waive a number of rights available to it under the NLRA. Among other things, it had to agree to (a) to stay neutral to union organizing, (b) refrain from making "negative comments" about the union, union representatives, or unionization, (c) give the union access to its premises during work time and to speak with employees during non-working time, (d) allow the union to designate any potential bargaining unit and to organize at more than once location at a time, (e) give the union employees' contact information, (f) announce its neutral stance to employees in an open meeting, and (h) recognize the union based on a showing of signed authorization cards. *See* Ex. A, Labor Peace Agreement, UFCW Cannabis Workers Rising Local 360 – Curaleaf NJ II, Inc.

39. Curaleaf did not want any of these terms. Had it been free to negotiate, it would not have accepted any of them. In fact, it would have signed no LPA at all. It agreed to the terms only because it needed an LPA to qualify for a license under New Jersey law.

40. In practice, these terms restricted Curaleaf's recognized federal rights. For example, the terms barred Curaleaf from speaking its views to its employees about labor unions and collective bargaining. The right to speak about these subjects is otherwise protected by section 8(c)

of the National Labor Relations Act and the First Amendment of the United States Constitution. Because of LPA, Curaleaf could not exercise this right.

41. After the LPA was signed, Local 360 organized Curaleaf's employees in its Edgewater Park, Bordentown, Winslow, and Bellmawr facilities. The LPA required Curaleaf to recognize the union based on a showing of signed authorization cards. Curaleaf abided by the agreement and recognized the union based on such a showing. No secret-ballot election was held in any of these facilities. *See* Ex. B, Certification of Results of Card Check and Count – Edgewater Park Facility; Ex. C, Certification of Results of Card Check and Count – Bordentown Facility; Ex. D, Certification of Card Count Request Form – Winslow Facility; Ex. E, Certification of Card Count Standard Form – Bellmawr Facility.

42. In October 2022, the union asked to begin bargaining with Curaleaf for a collective bargaining agreement. The parties reached an agreement and submitted the agreement to employees for ratification. The employees voted to reject the agreement.

**Defendants Threaten to Penalize Curaleaf**

43. Curaleaf's LPA with Local 360 was set to expire in April 2025. Curaleaf therefore contacted the Local 360 and asked to extend the LPA. But the parties were unable to agree to acceptable terms. The LPA expired without being renewed.

44. On April 22, 2025, Curaleaf received an e-mail from William Wallace, Director of Labor Compliance and Education for the Commission. Wallace wrote that he had been informed that Curaleaf's LPA had expired. He emphasized that the LPA was a continuing and material term of Curaleaf's license. He instructed Curaleaf to provide "proof, through written verification of a mutual extension of the LPA." *See* Ex. F, Notice from Cannabis Regulatory Commission.

45. On May 6, 2025, the Commission issued a Notice of Violation to Curaleaf pursuant to N.J.A.C. 17:30-20.4. The Notice stated that Curaleaf's LPA had expired. It also stated that

"[m]aintenance of an LPA with a bona fide labor organization is an ongoing condition for any licensed cannabis business." *See* Ex. G, Notice of Violation, May 6, 2025.

46. The Notice advised Curaleaf that, from April 6, 2025 through May 6, 2025, Curaleaf had not maintained an LPA with any bona fide labor organization. Pursuant to the Notice of Violation, Curaleaf is required to: (1) remedy the violation within twenty (20) business days of receiving the notice; and (2) provide written confirmation to the Commission, postmarked within the same twenty (20) business-day period, detailing the corrective actions taken. The Commission reserved the right to impose sanctions on Curaleaf for these regulatory violations. *See id.*

47. On August 25, 2025, the Commission sent a Notice of Enforcement Action to Curaleaf, imposing a civil monetary penalty of $610,000.00 based on the following reasons: (1) failure to maintain an LPA as an ongoing material condition of a business' license or permit; (2) failure to provide a new and executed LPA or advise the Commission that an existing agreement that had been renewed or extended; (3) failure to provide written verification of a mutual agreement by Curaleaf and another bona fide organization; (4) Curaleaf's response to the Commissions Notice of Violation on June 2, 2025 admitting that it did not have a valid LPA with a bona fide organization; and (5) Curaleaf's failure to maintain an LPA as required by New Jersey law. *See* Ex. H, Notice of Enforcement, August 25, 2025.

48. The notice stated that Curaleaf had operated a licensed cannabis business for 122 days without an LPA. The Commission had voted to access a fine of $5,000 per day for noncompliance. The total fine was $610,000. The notice also stated that under N.J.A.C. 17:30-20.6, -20.7, and -20.8, additional sanctions could include, but were not limited to, civil monetary penalties; suspension, revocation, non-renewal, or denial of a license; referral to state or local law enforcement; or any combination thereof. *See id.*

49. On information and belief, Curaleaf alleges that Defendants plan to impose additional fines on Curaleaf if Curaleaf continues to operate without an LPA. Defendants also plan to terminate Curaleaf's license if Curaleaf continues to reject Local 360's demands and refuses to renew its LPA.

50. More recently, on September 28, 2025, in response to Curaleaf's application to renew its annual license for its Bordentown facility, the Commission provisionally granted the license application, but it did so only upon confirmation that Curaleaf secure an LPA for the facility on or before October 31, 2025.

51. Curaleaf therefore asks this Court for declaratory and injunctive relief, as set out below.

## CAUSES OF ACTION

### Preemption under the NLRA
(Article VI, cl. 2, U.S. Constitution & 29 U.S.C. §§ 151–69)

52. Curaleaf incorporates the allegations in the preceding paragraphs.

53. There are two types of NLRA preemption. First, under *San Diego Building and Trades Council v. Garmon*, 359 U.S. 236, 245 (1959), federal law exclusively governs all activity "arguably" prohibited or protected by the NLRA. Second, under *Lodge 76, International Association of Machinists & Aerospace Workers v. Wisconsin Employment Relations Commission*, 427 U.S. 132, 149 (1976), federal law forbids state regulation of any conduct Congress intended to leave unregulated. These types of preemption are known as *Garmon* and *Machinists* preemption.

54. The Supreme Court has applied *Garmon* and *Machinists* to preempt a wide array of state action, including state licensing schemes. For example, in *Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608, 619 (1986), the Court held that a city could not condition a taxi company's continued operation on its agreement to settle a strike. Similarly, in *Chamber of*

*Commerce v. Brown*, 554 U.S. 60, 62 (2008), the Court held that a state could not stop private developers from using state funds to "assist, promote, or deter union organizing."

55. Lower courts have also applied preemption principles to limit state interference in the labor field. For example, in *Metropolitan Milwaukee Ass'n of Commerce v. Milwaukee County*, 431 F.3d 277 (7th Cir. 2005), the Seventh Circuit Court of Appeals struck down a county ordinance requiring government contractors to enter into LPAs. Likewise, the District of Oregon has struck down a state law requiring cannabis businesses to sign LPAs. *See Casala, LLC v. Kotek*, No. 3:25-CV-244-SI, 2025 WL 1442792, at *6-10 (D. Or. May 20, 2025).

56. Here, the New Jersey LPA requirement is preempted for four reasons. First, it regulates union organizing, a subject exclusively regulated by the NLRA. Second, it imposes remedies for failing to bargain or sign an LPA or CBA, a topic regulated exclusively by the NLRA. Third, it restricts Curaleaf's use of economic weapons, a subject left deliberately regulated under the NLRA. Fourth, it limits the choice of employees to select their collective-bargaining representative, a right guaranteed by the NLRA.

***Regulation of Organizing***

57. The NLRA permits a union to become the exclusive bargaining representative of employees in two ways.[3] First, when a majority of the employees indicate that they want to be represented by the union, an employer may voluntarily recognize the union. That process is known as "designation." Second, when at least thirty percent of the employees indicate that they want to be represented, either the union or the employer may petition the NLRB for an election. Only the Board may conduct a union election, and only the Board may determine the winner. If the Board determines that the union has won a majority of votes, it certifies the union as the exclusive

[3] In rare cases, the Board may order an employer to recognize a union even if the union does not win an election. *See NLRB v. Gissel Packing Co.*, 395 U.S. 575, 610-12 (1969).

representative. This process is known as "certification." *See* 29 U.S.C. § 159(a); 29 C.F.R. subpt. D (procedure for determining questions concerning representation of employees). *See also NLRB v. Loc. Union No. 103, Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, AFL-CIO*, 434 U.S. 335, 344 (1978) (recognizing that it is an unfair labor practice for an employer to recognize a union as the exclusive bargaining representative when the union has been neither designated by a majority of employees nor certified by the Board).

58. The LPA requirement short-circuits that process. It does not permit Curaleaf to withhold recognition and insist on an election. Instead, as interpreted by the Commission, the LPA requirement forces Curaleaf to begin negotiating with a union whenever a majority of Curaleaf's employees "support joining" the union. If a majority supports joining the union, Curaleaf must immediately bargain with the union. Curaleaf cannot contest the union's claimed majority by demanding a secret-ballot election. *See* Ex. I at 5, Letter from Diana Houenou, N.J. Cannabis Regulatory Commission Chair, to Matthew Kalmick, Curaleaf NJ, II, Inc., March 21, 2024; N.J. Rev. Stat. § § 24-6I-36.c.

59. In other words, the requirement forces Curaleaf to choose "designation" when the NLRA gives Curaleaf the right to insist on "certification." *Compare* Ex. I, *and* N.J. Rev. Stat. § 24-6I-36.c, *with* 29 U.S.C. § 159(a), *and* 29 C.F.R. § 102.61(b) (permitting employer to respond to a demand for recognition by petitioning for a Board-supervised election).

60. The LPA requirement also regulates organizing by forcing Curaleaf to agree to a "permissive" subject of bargaining. Traditionally, an LPA governs not the relationship between an employer and its employees, but instead, the relationship between the employer and the union. So under federal law, an LPA is a "permissive" subject of bargaining, which either party can refuse to discuss, much less to agree to. *See Columbus Printing Pressmen Union No. 252*, 219 N.L.R.B.

268, 270 (1975). New Jersey law, however, denies Curaleaf that choice. It forces Curaleaf to sign an LPA as a condition of licensure. N.J. Rev. Stat. § 24-6I-36.c It therefore forces bargaining over a permissive subject and contradicts federal policy and law. *See* 29 U.S.C. § 158(d) (providing that no party need agree to any specific proposal); *520 S. Michigan Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1134 (7th Cir. 2008) (state law was preempted when it "intrude[d] on the bargaining process" regulated by the NLRA); *Cannon v. Edgar*, 33 F.3d 880, 885 (7th Cir. 1994) (holding that a law requiring cemetery management and unions to bargain in good faith over a mandatory subject, a pool of workers to provide services during a labor dispute, was preempted).

61. As a practical matter, the LPA requirement forces Curaleaf to surrender other rights as well. Again, by virtue of New Jersey's statutory qualifications, Local 360 has forced its standard terms on cannabis licensees like Curaleaf. Those terms include mandatory union access to the worksite, neutrality during an organizing campaign, limits on economic weapons, and card-check agreements. These topics are all regulated as permissive or mandatory subjects of bargaining under federal law. New Jersey cannot require Curaleaf to accept them. *See Brown*, 554 U.S. at 62; *Metropolitan Milwaukee*, 431 F.3d at 279-80. *See also 520 S. Michigan Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1134 (7th Cir. 2008) (state law regulating aspects of the otherwise protected bargaining process in the hotel industry was preempted).

62. The LPA requirement also requires a cannabis business to give a labor organization a "thing of value" – an act forbidden by federal law. Under Section 302 of the Labor Management Relations Act, an employer may not give a thing of value to any union seeking to represent the employer's workforce. It likewise forbids labor organizations from requesting or receiving a thing of value from an employer. Courts have concluded that an LPA is a thing of value when it makes valuable concessions to the union, such as card-check and neutrality agreements, as well as access

and refraining from economic weapons. New Jersey's LPA requirement effectively forces licensees to make those concessions, thereby directly conflicting with the commands of federal labor law. *See* 29 U.S.C. § 186(a)(2), (b)(1); *See Mulhall v. Unite Here Loc.*, 355, 667 F.3d 1211, 1214 (11th Cir. 2012).

63. In all of these ways, New Jersey's licensing scheme regulates the collective bargaining and union organizing processes. Those processes are the exclusive purview of federal law. The licensing scheme is therefore preempted.

***Additional Remedies***

64. When Congress enacted the NLRA, it assigned the responsibility for administering the new law to a single agency, the NLRB. Among the Board's powers were to investigate and remedy unfair labor practices. Section 10(c) of the NLRA allows the Board to remedy unfair labor practices by requiring reinstatement, back pay, and other affirmative action. 29 U.S.C. §§ 154, 160(c).

65. Courts and the Board have interpreted section 10(c) to provide for only remedial relief, not punitive relief or fines. The NLRA was designed to protect the public's interest in ensuring labor peace; it was not designed to punish private conduct. It therefore does not allow for civil penalties, fines, or other forms of punitive remedies. *See Nat'l Licorice Co. v. NLRB*, 309 U.S. 350, 362–63 (1940) (stating that Board proceedings are "not for the adjudication of private rights," but are " narrowly restricted to the protection and enforcement of public rights"); *Phelps Dodge Corp. v. NLRB*, 313 U.S. 177, 197-98 (1941) ("Making the workers whole for losses suffered on account of an unfair labor practice is part of the vindication of the public policy which the Board enforces.").

66. The NLRA's remedies are exclusive. Indeed, in the words of the Supreme Court, the Board's remedies are a "fundamental part" of the NLRA's "comprehensive scheme." *Gould*

*Inc.*, 475 U.S. at 287. So even if a state seeks to punish the same conduct for the same reasons, it has no power to do so. The only available remedies are those that the NLRA provide. *See id. See also Va. Elec. & Power Co. v. NLRB*, 319 U.S. 533, 539 (1943) (recognizing Board's discretion to fashion remedies).

67. New Jersey's scheme improperly supplements the NLRA's remedial scheme with fines and other punitive measures. It regulates conduct already regulated by the NLRA, including collective bargaining and union organizing. It explicitly requires Curaleaf and other cannabis businesses to enter LPAs and to bargain with that labor organization in good faith. It then punishes the failure to reach agreement with civil penalties, as well as license suspension, nonrenewal, or even revocation. *See* N.J. Stat. Ann. § 24:6I-36(c); N.J.A.C. 17:30-9.4(g).

68. New Jersey cannot impose these penalties on Curaleaf. Even if New Jersey's licensing scheme punishes exactly the same conduct for exact the same reasons – for example, refusing to bargain in good faith – it cannot supplement the NLRA's exclusive remedial regime. Its remedies are preempted. *See Gould Inc.*, 475 U.S. at 287. *See also Davis v. Benihana, Inc.*, No. CV 24-6569 (RMB-SAK), 2025 WL 559975, at *7 (D.N.J. Feb. 20, 2025) (state action for wrongful discharge preempted because it imposed liability under state law for conduct protected by the NLRA).

***Economic Weapons***

69. Under *Machinists*, the LPA requirement is preempted because it regulates conduct Congress intentionally left unregulated.

70. In the NLRA, Congress intentionally left parties free to resolve labor disputes by resorting to so-called economic weapons – strikes, lockouts, and other work stoppages. *See Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 315–16 (1965); *Golden Gate Transit*, 475 U.S. at 614–15.

71. The LPA prevents licensees like Curaleaf from resorting to those economic weapons. Implicit in the concept of an LPA is labor peace: the agreement preserves "peace" by preventing parties from resolving their disputes through tests of economic strength. And indeed, that is precisely how the requirement has been interpreted by the Commission.

72. The Commission has required Curaleaf to maintain an LPA precisely to prevent Curaleaf from resorting to economic weapons. In the Commission's own words, the LPA provides the Commission with "assurances" that Curaleaf's operations "will not be shut down due to labor-dispute or labor-related work stoppages." *See* Ex. I at 4-5.

73. Local 360's standard terms, which are de facto requirements of licensure, reflect the same limitations. They prevent Curaleaf from opposing a unionization drive, speaking out against union representation, or resorting to economic weapons such as a lockout to resolve unfair labor practice disputes. They likewise commit the union not to picket, boycott, strike, or otherwise disrupt Curaleaf's business operations. They therefore interfere with the parties' resort to economic weapons. And by virtue of New Jersey's licensing scheme and the conduct of Defendants, they are effectively required by New Jersey law. *See* Ex. A, Curaleaf LPA.

74. New Jersey cannot limit parties' resort to economic weapons. Those weapons are an essential part of the NLRA's scheme, which Congress left deliberately unregulated. The LPA requirement is therefore preempted. *See Golden State Transit*, 475 U.S. at 618–19 (city could not force business to forgo resort to economic weapons as condition of license)

***Choice of Bargaining Representative***

75. Finally, the New Jersey licensing scheme is preempted because it interferes with employees' unqualified right to select a representative of their own choosing for collective bargaining.

76. Under the NLRA, employees have a right to form, join, and bargain through a representative of their choice. They likewise have the right to refrain from doing those things. They have the right to make that choice free from interference – either from an employer, or a union, or a state. *See Hill v. State of Fla. ex rel. Watson*, 325 U.S. 538, 541-43 (1945).

77. New Jersey interferes with that right by effectively mandating that the employer make the choice of which union will represent them on behalf of employees. It does that through its eligibility criteria. A union can sign a qualifying LPA only if it meets the state's criteria. And the union that signs an LPA has an insuperable advantage over other unions when trying to organize and represent employees.

78. The CREAMM Act defines a "bona fide labor organization" as one in which employees participate and that exists in whole or in part to "collectively bargain[] or otherwise deal[] with medical or personal use cannabis employers concerning grievances, labor disputes, terms or conditions of employment."

79. In addition to this requirement, the New Jersey law interferes with an employee's federally protected right because it requires that the labor organization be "characterized" by specified criteria: (a) being a party to one or more collective bargaining agreements with a cannabis employer; (b) having a written constitution for the prior three years; (c) filing annual financial reports with the U.S. Department of Labor in accordance with federal law; (d) filing at least one audited report in three of the last four years; (e) being affiliated with a regional or national association of unions; and (g) being a member of a "national labor organization that has at least 500 general members in a majority of the 50 states of the United States." These requirements are far more comprehensive than the requirements for a labor organization under Section 2(5) of the NLRA, which define a labor organization as "any organization of any kind, or any agency or

employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work." 29 U.S.C. § 152(5).

80. These requirements intrude upon employees' exclusive right to choose a representative under federal law. They restrict which unions may sign an LPA. The union that signs the LPA gains preferential access to the workplace and to the employees. It also benefits from mandatory neutrality by the employer. It is therefore advantaged at the expense of other labor organizations that employees might otherwise prefer. Employees cannot exercise their choice without undue interference by the state.

81. Curaleaf is also harmed by that requirement. By restraining the universe of unions who can sign LPAs, the state limits the unions with whom Curaleaf can negotiate. Curaleaf is therefore forced to deal with Local 360 and accept Local 360's terms, even if Curaleaf's employees would prefer to be represented by a different union. This lack of choice harms both the employees and Curaleaf.

82. New Jersey cannot limit the market for union services in this way. Congress left that market open to the free, unrestrained choice of employees. States have no power to impose their own eligibility criteria. New Jersey's criteria are preempted. *See, e.g.*, *St. Thomas–St. John Hotel & Tourism Ass'n v. Virgin Islands*, 357 F.3d 297 (3d Cir. 2004).

**PRAYER FOR RELIEF**

WHEREFORE, Curaleaf asks for judgment against Defendants, and respectfully prays that the Court grant:

A. **Declaratory Relief**

1. A declaratory judgment that the CREAAM Act's LPA requirement (N.J. Rev. Stat. § 24-6I-36.c and N.J. Admin. Code § 17:30-9.4(g)) is preempted

by the NLRA and cannot be used as a basis to deny an otherwise qualified applicant or license holder a new or continuing license;

2. A declaratory judgment that the LPA requirement cannot be used as a basis for imposing civil penalties on Curaleaf for operating without an active LPA, and that the civil penalties levied by the Commission to date are unlawful and unenforceable;

3. A declaratory judgment that the CREAAM Act's CBA requirement (N.J. Rev. Stat. § 24-6I-36.c) is preempted by the NLRA and cannot be used as a basis to deny an otherwise qualified applicant or license holder a new or continuing license**;** and

B. **Injunctive Relief**

1. A declaratory judgment that the CBA requirement cannot be used as a basis for imposing civil penalties on Curaleaf for not entering into a CBA or allegedly failing to bargain in good faith.

4. An injunction forbidding Defendants from enforcing the LPA requirement against Curaleaf, including by attempting to impose civil penalties on Curaleaf or suspending, revoking, or refusing to renew Curaleaf's licenses;

5. An injunction forbidding Defendants from enforcing the CBA requirement against Curaleaf, including by attempting to impose civil penalties against Curaleaf or suspending, revoking, or refusing to renew Curaleaf's licenses.

C. Fees, costs, expenses, and disbursements, including attorneys' fees, pursuant to any applicable statute or authority.

D. Any further relief the Court deems just and appropriate.

**CERTIFICATION PURSUANT TO L. CIV. R. 11.2**

The undersigned counsel for Plaintiffs certifies that to the best of his knowledge and belief, the above-captioned controversy is not subject to any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: October 9, 2025


Attorneys for Plaintiffs
*Curaleaf Holdings, Inc.*
*and Curaleaf NJ, II, Inc*

By: */s/ Keith J. Rosenblatt*
Keith Rosenblatt
Alan Model
Anastasia Stylianou
**LITTLER MENDELSON, P.C.**
One Newark Center, 8th Floor
Newark, NJ 07102
973.848.4700
krosenblatt@littler.com
amodel@littler.com
astylianou@littler.com

Alex MacDonald (pro hac vice movant)
Stefan Marculewicz (pro hac vice movant)
**LITTLER MENDELSON, P.C.**
815 Connecticut Avenue, NW, Suite 400
Washington, DC 20006-4046
202.772.2505
amacdonald@littler.com
smarculewicz@littler.com

Dinora Orozco (pro hac vice movant)
**LITTLER MENDELSON, P.C.**
321 N Clark St., Suite 1100
Chicago, IL 60654
312.795.3232
dorozco@littler.com

Christopher S. Porrino
Peter Slocum
**LOWENSTEIN SANDLER LLP**
One Lowenstein Drive
Roseland, NJ 07068
973.597.2500
cporrino@lowenstein.com
pslocum@lowenstein.com

# EXHIBIT A

**CONFIDENTIAL**

UFCW
CANNABIS WORKERS RISING

**Labor Peace Agreement**

Curaleaf NJ II, Inc. ("the Company") and the United Food and Commercial Workers Union, Local 360 ("the Union") hereby agree to the following terms:

1. <u>Neutrality and Non-Disparagement</u>. The Company agrees to take a neutral approach to unionization of workers, meaning that the Company, which also includes any managers, agents, and representatives, will neither help nor hinder the Union's organizing effort, including making any statement or taking any action that directly or indirectly indicates or implies any opposition to workers selecting the Union as their collective bargaining representative, or directly or indirectly supporting or assisting in any way any person or group who may oppose the Union. This includes the Company refraining from making negative comments or otherwise demean by word or action the Union, Union representatives, or unionization. Nothing herein shall prevent the Company from talking to its employees about unions provided it is consistent with the spirit of this Agreement. Prior to any visits contemplated by this Agreement, the Company shall train its supervisors and managers with respect to the requirements set forth in this Agreement. The Union agrees to refrain from exercising its rights to picket, handbill and engage in other economic activities against the Company's facilities or operations; however, if the Company recognizes another union as the bargaining representative of any workers, the union's obligation will automatically cease to apply to those workers' facilities or operations.

2. <u>Bargaining Unit</u>: INCLUDED: The bargaining units for purposes of organizing and applications of this Agreement shall include all regular full and part-time store associates and leads employed by the employer at all its dispensaries and cultivation sites in the state of New Jersey. EXCLUDED: All other employees including managers, supervisors, confidential employees and guards as defined in the Act. The Union will notify the Company of the facilities and/or operations for which the Union seeks to invoke this Agreement's unionization process and, in this notice, the Union can seek to organize more than one location at a time. The Union is not limited in the number of times it can provide such notice and invoke this Agreement's unionization process for any of the listed locations.

3. <u>Access</u>. The Company grants the Union and its Union representatives access onto the Company's premises during working hours to speak with bargaining unit employees during non-working time, including meal periods and rest breaks. The Company will cooperate with the Union in making arrangements to permit these conversations to be held in areas where the employees will be able to speak to the Union representatives without monitoring by the Company. Such access shall comply with the laws of the State of New Jersey regarding access by non-badged persons to protected areas of the

dispensaries and facilities. At no time shall the Union or its Union representatives engage with employees about representation while they are working or in public areas of the dispensaries while the dispensaries are open.

4. Meeting. At the Union's request, the Company will conduct a meeting on a mutually agreeable date and time with all of the bargaining unit employees. At the meeting, the Company will read the following script: *I would like to introduce you to [Name(s)], who are representatives of the United Food and Commercial Workers, Local 360. They are here to discuss Union representation with you. Curaleaf does not object to your talking to these individuals, and will be neutral with respect to your decision on representations. It is your choice whether to join or not join a union, and if a majority of you designate a union as your exclusive bargaining representative, Curaleaf will negotiate a collective bargaining agreement. If you have any questions, feel free to speak to the Union representatives that are here, or me after the meeting. I will now leave the meeting so you may speak to the Union representatives in private. Thank you.* After the Company has introduced them and left the meeting, the Union representatives will talk with the employees about the Union.

5. Contact information. At the Union's request, the Company shall furnish to the Union the names, job classifications, home addresses, cell phone numbers, home phone numbers and email addresses, if known, of the bargaining unit employees (collectively, "contact information"). The Company further agrees thereafter to provide updated worker contact information, as reasonably requested by the Union.

6. Recognition. When a majority of bargaining unit employees designate the Union as their collective bargaining representative, the Company will recognize the Union as the exclusive representative of the bargaining unit, provided that the International Union may assign jurisdiction and representation rights to any of its affiliates. At either party's request, a neutral third party may confirm majority authorization. The Company and the Union will comply with all requirements necessary to obtain certification of the Union as the exclusive bargaining representative of these employees.

7. Elections. The Company waives the right under the National Labor Relations Act to file any petition with the National Labor Relations Board for any election in any bargaining unit subject to this agreement by itself or as part of a larger unit, and agrees to refrain from directly or indirectly supporting any such petition.

8. Bargaining. Within 20 days from the date of recognition, the parties will begin good faith bargaining for a CBA covering the bargaining unit.

9. Arbitration. The parties agree that final and binding arbitration will be the exclusive remedy for any alleged violations of this Agreement and any dispute or claim arising from or relating to the interpretation or application of any provision of this Agreement. Unless they promptly agree on an arbitrator, the parties will proceed to expedited arbitration using the American Arbitration Association's rules and procedures. The arbitrator is authorized to compel the attendance of witnesses and the production of documents at the arbitration hearing, and to award appropriate monetary, injunctive and declaratory relief. The parties agree not to challenge the arbitrator's decision in court and consent to the entry of the arbitrator's award as the order of judgment of a United States District Court, without notice. Company waives the right to challenge any aspect of this agreement before the NLRB, any other state or federal government agency, or any court.

**CONFIDENTIAL**

10. Successorship, affiliated companies and subcontractors. This agreement will be binding on the parties' successors and assigns, including all purchasers of the Company's assets or business, and in the event of a merger. This agreement is also binding on any and all corporations, partnerships, organizations and sole proprietorships affiliated with or related to the Company's business activities. If the Company intends to subcontract any work performed by bargaining unit employees, the Company agrees to require the subcontractor, in writing, to comply with this agreement.

11. Severability. If any provision of this Agreement is held illegal, void or invalid under any applicable law, the parties will meet and confer to amend the provision to make it legal, valid and binding, and the remaining provisions of this Agreement will remain binding and enforceable according to their terms and the parties' intent.

12. Term of Agreement. This Agreement is effective upon signing. This agreement shall continue for three years from the first date the Employer receives written notice from the Union that it is invoking this Agreement's process. This Agreement may be extended by mutual agreement of the parties.

13. Confidentiality. The Company and Union agree that all terms and conditions of this agreement are confidential and proprietary between the parties and shall not be disclosed to anyone else, except as may be necessary to effectuate this agreement, as required by law or court order, or as mutually agreed upon in writing prior to disclosure.

| | |
|---|---|
| Cristina Nutzman | SAM FERRAINO, JR, PRESIDENT |
| **For the Company (print name)** | For the Union (print name) |
| [signature] | [signature] |
| **Signature** | Signature |
| April 5, 2022 | 4/6/22 |
| Date | Date |
| Curaleaf, NJ II, Inc. | 856-767-4001, EXT 318 |
| Company/Company name | Phone |
| 640 Creek Road, Building 2 Bellmawr, NJ 08031 | |
| Address | |
| 312-792-3655 | |
| Phone | |

Sam Ferraino, Jr., *President*

Sherry Van Dyk, *Secretary-Treasurer*

**UNITED FOOD & COMMERCIAL WORKERS UNION — AFL-CIO**

April 6, 2022

To Cannabis Regulatory Commission:

The United Food and Commercial Workers International Union proudly represents the interests of over 1.3 million workers in the United States and Canada. Local 360 specifically represents close to 10,000 workers located throughout New Jersey and the surrounding area. Our diligent work is integral to ensuring access to quality jobs for the citizens of this great state and throughout the country.

Additionally, our work would not be possible without the support of industry participants who share our strong commitment to the fair treatment of workers in New Jersey. We have been in extensive discussions with Curaleaf NJ II, Inc. and we believe that they will be a productive and contributing member of the New Jersey community. In furtherance of their commitment to quality employment opportunities, Curaleaf NJ II, Inc. recently signed a neutrality agreement with our union, ensuring that their workers have access to comprehensive representation and fair compensation.

As you are aware, the burgeoning adult use cannabis industry has the opportunity to provide a large number of employment opportunities to the citizens of New Jersey. Curaleaf NJ II, Inc. has been a supportive partner to Local 360 and if granted a license, we believe that Curaleaf NJ II, Inc. will be a valuable asset to the local community. They have proven themselves to be a strong supporter of fair employment practices and community development and we look forward to working with them going forward.

Local 360 strongly supports Curaleaf NJ II, Inc.'s application for licensure as an adult use cannabis facility in New Jersey. With their emphasis on providing best-in-class products and services, we look forward to the potential for a long and productive partnership that will provide real, lasting benefits to the citizens of New Jersey.

Sincerely,

Sam Ferraino, Jr.
President
UFCW Local 360

SF/tl

**400 Commerce Lane & Rt. 73, West Berlin, N.J. 08091-9253 • 856-767-4001 • Fax 856-767-1460**

# EXHIBIT B

**CERTIFICATION OF RESULTS OF CARD CHECK AND COUNT**

The undersigned was jointly designated by UFCW Local 360 ("Union") and Curaleaf NJ II, Inc. ("Employer"), to determine the Union's majority status in a proposed bargaining unit of all regular full and part-time store associates and leads employed by the employer at 4237 U.S. 130 South, Edgewater Park, NJ 08010, excluding all other employees including managers, supervisors, confidential employees and guards as defined in the National Labor Relations Act. (hereinafter referred to as the "Unit").

On September 23, 2022, the Union provided me with written authorization cards signed by employees in the Unit, as of September 22, 2022, designating the Union as their collective bargaining representative.

On September 23, 2022, the Union provided me with automated confirmations of transmission of authorizations by employees in the Unit, as of September 22, 2022, designating the Union as their collective bargaining representative. The automated confirmation provided the date, name of the employee, his/her email address and phone number, recitation of the exact language authorizing representation by the Union, and instructions to correct information or rescind the authorization.

On September 23, 2022, the Employer provided me with a list of all employees in the Unit employed by the Employer, as of September 22, 2022, and had previously provided signature specimens for all such employees. As of September 22, 2022, there were 44 employees in the Unit.

On September 23, 2022, after comparing the signatures on the authorization cards presented by the Union with the signature specimens provided by the Employer, as well as tallying the digital authorization cards, the undersigned determined and hereby certifies that the Union **has** been designated by a majority of the employees in Unit as their exclusive representative for purposes of collective bargaining.

Therefore, the undersigned hereby certifies that the Union is the exclusive collective bargaining representative of the employees in the Unit.

Dated: September 23, 2022
Yorktown Heights, New York

Aaron A. Shriftman

Aaron A. Shriftman, Arbitrator

State of New York)
ss.:
County of Westchester)

I, Aaron A. Shriftman, do hereby affirm upon my Oath as Arbitrator, that I am the individual described in and who executed this instrument, which is my Certification of Results of Card Check and Count.

Aaron A. Shriftman

Aaron A. Shriftman, Arbitrator

# EXHIBIT C

# CERTIFICATION OF RESULTS OF CARD CHECK AND COUNT

Pursuant to Paragraph 6 of a Labor Peace Agreement between Curaleaf NJ II, Inc. ("Employer") and United Food and Commercial Workers Union, Local 360 ("Union"), the undersigned was designated to determine the Union's majority status in a proposed bargaining unit of all regular full-time and part-time stores associate, lead store associates, inventory coordinators, lead inventory coordinators and delivery drivers employed at 191 US 130, Bordentown, NJ, excluding all other employees including managers, supervisors, confidential employees and guards as defined in the National Labor Relations Act (hereinafter referred to as the "Unit")

On June 23, 2023, the Union provided me with written authorization cards signed by employees in the Unit, as of June 9, 2023, designating the Union as their collective bargaining representative. On the same date, the Union provided me with electronic submissions of authorization from employees in the Unit designating the Union as their collective bargaining representative. The records include the date and method of submission of the electronic authorization, the name of the employee and his/her employer, the employee's email address and phone number, recitation of the exact language authorizing representation by the Union, and instructions how to correct the provided information or rescind the authorization. The Union also submitted a declaration describing the method by which the electronic submissions were collected from employees and asserting a basis for its belief why each employee personally signed the showing of interest.

On June 23, 2023, the Employer provided me with a list of all employees in the Unit employed by the Employer, as of June 9, 2023, as well as signature specimens for all such employees. As of February 9, 2023, there were 46 employees in the Unit.

On June 23, 2023, after comparing the signatures on the authorization cards presented by the Union with those provided by the Employer and tallying the valid electronic authorizations provided by the Union, the undersigned determined and hereby certifies that the Union **has** been designated by a majority of the employees in Unit as their exclusive representative for purposes of collective bargaining.

Therefore, the undersigned hereby certifies that the Union is the exclusive collective bargaining representative of the employees in the Unit.

Dated: June 23, 2023
Yorktown Heights, New York

Aaron A. Shriftman, Arbitrator

State of New York)
ss.:
County of Westchester)

I, Aaron A. Shriftman, do hereby affirm upon my Oath as Arbitrator, that I am the individual described in and who executed this instrument, which is my Certification of Results of Card Check and Count.

Aaron A. Shriftman, Arbitrator

# EXHIBIT D

**FEDERAL MEDIATION AND CONCILIATION SERVICE**
FIELD OPERATIONS

## CERTIFICATION OF CARD COUNT – REQUEST FORM

The undersigned conducted a card count related to employees at Curaleaf, 200 Rt 73, Hammonton NJ 08037 for the purpose of determining whether a majority of those employees desire representation by the United Food & Commercial Workers Union Local 360.

The parties agreed on the composition of the bargaining unit and on the process by which the card count would be conducted.

The card count was conducted by means of a comparison between signatures submitted by the Labor organization and business records submitted by the Employer, which included a list of eligible employees in the appropriate unit and forms containing employees' signatures, or as otherwise agreed upon between the parties.

The undersigned certifies that based on the count, there

- [x] is a majority
- [ ] is not a majority

of the Employer's employees who desire representation by the United Food & Commercial Workers Union Local 360, with the following breakdown:

- Total number of employees indicating desire for representation: 69
- Total number verified: 71
- Total number of set asides: 2

By: Commissioner Walter J Bednarczyk, Neutral

Date: 10 August 2023

# EXHIBIT E

**FEDERAL MEDIATION AND CONCILIATION SERVICE**
FIELD OPERATIONS

## CERTIFICATION OF CARD COUNT – STANDARD FORM

The undersigned conducted a card count related to employees at Curaleaf-Bellmawr site for the purpose of determining whether a majority of those employees desire representation by the UFCW Local 360 .

The parties agreed on the composition of the bargaining unit and on the process by which the card count would be conducted.

The card count was conducted by means of a comparison between signatures submitted by the Labor organization and business records submitted by the Employer, which included a list of eligible employees in the appropriate unit and forms containing employees' signatures, or as otherwise agreed upon between the parties.

The undersigned certifies that based on the count, there

- ☑ is a majority
- ☐ is not a majority

of the Employer's employees who desire representation by the UFCW Local 360 .

By: Vanessa D Bullock , Neutral

Date: 8/20/24

# EXHIBIT F

**From:** Wallace, William [CRC] <William.Wallace@crc.nj.gov>
**Sent:** Tuesday, April 22, 2025 2:01:12 PM
**To:** Matt Harrell <Matt.Harrell@curaleaf.com>
**Subject:** Labor Peace Agreement

CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Matt Harrell
Vice President
Government Relations
Curaleaf

Matt:

It has been brought to the attention of the CRC that the LPA between Curaleaf and UFCW Local 360 has expired on April 6, 2025. According to the LPA, "This agreement may be extended by mutual agreement of the parties." .

Pursuant to N.J.A.C. 17:30-9.4(g), "The maintenance of a labor peace agreement with a bona fide labor organization by a licensed cannabis business, including an expanded ATC, shall be an ongoing material condition of the cannabis business's license." Failure to do so could result in sanctions, including civil monetary penalties, suspension, or revocation of a license.

The CRC is requesting proof, through written verification, of a mutual agreement of the extension of the LPA. We are requesting that both parties submit documents verifying the mutual agreement of the extension of the LPA.

Yours truly,

*William Wallace*

William Wallace
Director of Labor Compliance & Education
Cannabis Regulatory Commission
PO Box 216
Trenton, NJ 08625-0216
Office: 609-218-1285
Email: William.Wallace@crc.nj.gov
Website: https://www.nj.gov/cannabis/

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# EXHIBIT G

State of New Jersey
**CANNABIS REGULATORY COMMISSION**
P.O. BOX 216
TRENTON, N.J. 08625-0216

PHILIP D. MURPHY
*Governor*

TAHESHA L. WAY
*Lt. Governor*

DIANNA HOUENOU, *Chair*
SAMUEL DELGADO, *Vice Chair*
MARIA DEL CID-KOSSO, *Commissioner*
AMELIA MAPP, *Commissioner*
KRISTA NASH, *Commissioner*
CHRIS RIGGS, *Acting Executive Director*

May 6, 2025

**VIA CERTIFIED AND ELECTRONIC MAIL** *to: licensinggilmore@curaleaf.com*
Kevin J. Gilmore, Director , Curaleaf, Inc.
Curaleaf NJ II, Inc
420 Lexington Avenue, Suite 2035
New York, New York 10170

Re: NOTICE OF VIOLATION – **CURALEAF NJ II, INC.;** INV 83-2025

Dear Mr. Gilmore,

This letter is a Notice of Violation, issued by the New Jersey Cannabis Regulatory Commission ("NJ-CRC") in accordance with N.J.A.C. 17:30-20.4 to Curaleaf NJ II, Inc. ("Curaleaf"). An investigation which commenced on or about April 22, 2025, and remains ongoing as of the date of this Notice revealed that Curaleaf's Labor Peace Agreement ("LPA") had expired. Maintenance of an LPA with a bona fide labor organization is an ongoing material condition for any licensed cannabis business, including an expanded ATC. As the investigation remains ongoing, this Notice of Violation satisfies the NJ-CRC's responsibility to issue this Notice within seven business days following the identification of the violation, as required by N.J.A.C. 17:30-20.4. Curaleaf's failure to maintain an LPA results in the following violations:

1. **Violation 1:** N.J.S.A. 24:6I-36c.: The maintenance of a labor peace agreement with a bona fide labor organization by a licensed cannabis establishment, distributor, or delivery service, other than an establishment that is a microbusiness, shall be an ongoing material condition of the establishment's distributor's, or delivery service's license.

2. **Violation 2:** N.J.S.A. 24-6I-7a.(2)(g): The maintenance of a labor peace agreement with a bona fide labor organization shall be an ongoing material condition of maintaining the alternative treatment center's permit.

3. **Violation 3:** N.J.A.C. 17:30-9.4, Ongoing material conditions and general requirements applicable to cannabis business license holders

   (g) the maintenance of a labor peace agreement with a bona fide labor organization by a licensed cannabis business, including an expanded ATC, shall be an ongoing material condition of the cannabis business's license.

Curaleaf's prior LPA between it and UFCW Local 360 was executed on April 6, 2022, and expired on April 6, 2025. On April 22, 2025, the NJ-CRC advised Curaleaf of the expiration, and requested proof, through written verification, of a mutual agreement by the parties to extend the LPA. Curaleaf has not provided such evidence as of the date of

this Notice. Accordingly, from April 6, 2025 to the date of this Notice, Curaleaf has not been a party to any LPA with any bona fide labor union.

Within 20 business days from the receipt of the Notice of Violation, Curaleaf shall (1) Correct the violation; (2) Notify the Commission, in writing, with a postmark date that is within 20 business days of the date of receipt of the Notice of Violation, of any corrective actions taken to correct the violations, and the date of implementation of such corrective actions.

This Notice of Violation satisfies the NJ-CRC's responsibility to provide five-day notice before any enforcement action shall be taken, as required by N.J.A.C. 17:30-20.5. The ATC is notified that the above-referenced violation may result in the imposition of civil monetary penalties in accordance with the schedule set forth at N.J.A.C. 17:30- 20.7.

N.J.A.C. 17:30-20.5(a) establishes that: "In response to a violation of any provision of the Act or this chapter, the Commission is authorized to take enforcement action or impose sanctions upon a license holder. Sanctions may include, but are not limited to, civil monetary penalties; suspension, revocation, non-renewal, or denial of a license; referral to State or local law enforcement, pursuant to N.J.A.C. 17:30-20.6, 20.7, and 20.8; or any combination thereof." Corrective action taken by the ATC does not preclude the NJ-CRC from imposing penalties but may be taken into consideration when considering the penalty to be imposed for each violation. N.J.A.C. 17:30- 20.6(f)(4).

Curaleaf has acted in violation of the Jake Honig Compassionate Use Medical Cannabis Act, N.J.S.A. 24:6I-1 et seq., the Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act, N.J.S.A. 24:6I-31 et seq., and the implementing regulations, by failing to maintain a labor peace agreement with a bona fide labor organization.

**The NJ-CRC hereby orders Curaleaf to immediately conform its operations with the statute and regulation. The NJ-CRC reserves the right to impose sanctions for this regulatory violation.**

The NJ-CRC appreciates your expeditious cooperation in this matter. Any questions regarding this correspondence can be sent via e-mail to your assigned Field Monitor.

Sincerely,

Paul Thomas Urbish, Esq.
Director
Office of Compliance and Investigations
New Jersey Cannabis Regulatory Commission

Cc: Dianna Houenou, Chairwoman, NJ-CRC
Christopher Riggs, Executive Director, NJ-CRC
Dave Tuason, Chief Counsel, NJ-CRC
Michael Moore, Field Monitor, NJ-CRC
Kevin Healey, Supervisor of Compliance, NJ-CRC

# EXHIBIT H

State of New Jersey
CANNABIS REGULATORY COMMISSION
P.O. BOX 216
TRENTON, N.J. 08625-0216

PHILLIP D. MURPHY
*Governor*

TAHESHA L. WAY
*Lt. Governor*

DIANNA HOUENOU, *Chair*
KRISTA NASH, *Vice Chair*
AMELIA MAPP, *Commissioner*
CHRIS RIGGS, *Acting Executive Director*

August 25, 2025

Heather Sullivan
Curaleaf NJ II LLC
licensing@curaleaf.com

*Re:* **NOTICE OF ENFORCEMENT ACTION -** INITIAL AGENCY DECISION REGARDING IMPOSITION OF SANCTIONS AGAINST CURALEAF NJ II LLC

Dear Heather Sullivan:

The New Jersey Cannabis Regulatory Commission ("NJ-CRC" or "Commission") has imposed a civil monetary penalty of $610,000.00 against Curaleaf NJ II LLC for the reasons articulated below.

**NJ-CRC's Issuance of Notice of Violation**

Pursuant to N.J.A.C. 17:30-20.4(a), during an onsite assessment, a review of financial records, or other Commission review of the license holder and its operations, if the Commission identifies a violation of the Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act, P.L.2021, c.16, N.J.S.A. 24:6I-31 et seq., (the "Act") or the implementing Personal-Use Cannabis Rules (the "Personal-Use Regulations"), the Commission shall provide notice of the violation, including an official written report of the findings and the nature of the violation, to the cannabis business or testing laboratory within seven business days following the onsite assessment or other identification of the violation.

Pursuant to N.J.S.A. 24:6I-36(c), the maintenance of a labor peace agreement with a bona fide labor organization by a licensed cannabis establishment, distributor, or delivery service shall be an ongoing material condition of the establishment's, distributor's, or delivery service's license.

Pursuant to N.J.S.A. 24-6I-7(a)(2)(g), the maintenance of a labor peace agreement with a bona fide labor organization shall be an ongoing material condition of maintaining an alternative treatment center's permit.

Pursuant to N.J.A.C. 17:30-9.4(g), the maintenance of a labor peace agreement with a bona fide labor organization by a licensed cannabis business, including an expanded ATC, shall be an ongoing material condition of the cannabis business's license.

Curaleaf previously entered into a labor peace agreement with UFCW Local 360, a bona fide labor organization, effective April 6, 2022. As part of its periodic compliance review, the Commission found that Curaleaf's labor peace agreement had expired on April 6, 2025. Prior to the expiration of the LPA, Curaleaf had neither advised the Commission that it executed a new LPA, nor did it advise that the existing agreement had been renewed or otherwise extended.

On May 6, 2025, a Notice of Violation was issued to Curaleaf NJ II LLC ("Curaleaf") for violations related to its failure to maintain a labor peace agreement with a bona fide labor organization for any of its facilities in New Jersey (INV-83-2025).

Pursuant to N.J.A.C. 17:30-20.4(b), unless otherwise specified by the Commission, within 20 business days of receipt of the notice of violation, the cannabis business shall correct the violation(s) and notify the Commission, in writing, of any corrective actions taken to correct the violations, and the date of implementation of such corrective actions. Curaleaf responded to the Notice of Violation on June 2, 2025. Curaleaf's response admits to no longer having a labor peace agreement in place, does not correct the violation by providing a new LPA, and provides no details regarding how it plans to correct the violation.

**<u>NJ-CRC's Review of Imposition of Sanctions</u>**

Pursuant to N.J.A.C. 17:30-20.5(a), in response to a violation of any provision of the Act or the Personal-Use Regulations, the Commission is authorized to take enforcement action or impose sanctions upon a license holder. Pursuant to N.J.A.C. 17:30-20.6, -20.7, and -20.8, sanctions may include, but are not limited to: civil monetary penalties; suspension, revocation, non-renewal, or denial of a license; referral to State or local law enforcement; or any combination thereof.

Pursuant to N.J.A.C. 17:30-20.6(b), a monetary penalty imposed by the Commission on a license holder pursuant to this subchapter may not exceed $500,000 per major violation or $50,000 per any other license violation. Pursuant to N.J.A.C. 17:30-20.6(c), a violation by each entity or person per day shall constitute a separate incident for the purposes of calculating the number of violations.

Pursuant to N.J.A.C. 17:30-20.6(d), the Commission may impose greater penalties for successive violations up to the maximum amounts.

Pursuant to N.J.A.C. 17:30-20.6(f), the Commission may, in the Commission's sole discretion, consider additional factors in determining the penalty for each violation. Such factors may include, but are not limited to:

1. Any prior violations that the license holder has admitted to or was found to have engaged in;
2. Good faith measures by the license holder to self-report or prevent the violation;
3. The license holder's record of compliance with the laws and rules pertaining to personal use cannabis;
4. Corrective action(s) taken by the license holder related to the current violation or prior violations;
5. Willfulness and deliberateness of the violation;
6. Likelihood of reoccurrence of the violation; and

7. Violations involving damage or danger to the life, health, welfare, safety, or property of any person.

After completing a thorough review of Curaleaf's violations related to its failure to maintain a labor peace agreement with a bona fide labor organization, the Commission has determined to impose a civil monetary penalty of $610,000.00.

In determining the penalty, the Commission considered the facts and circumstances of the violation, including, but not limited to:

1. Maintenance of a labor peace agreement is an ongoing material condition of a business's license or permit;

2. Curaleaf's labor peace agreement with a bona fide labor organization, which was executed on April 6, 2022, expired on April 6, 2025;

3. Prior to the LPA's expiration, Curaleaf did not provide a new, executed LPA, nor did it advise the Commission that the existing agreement had been renewed or otherwise extended;

4. Despite multiple requests from NJ-CRC for written verification of mutual agreement by Curaleaf and a bona fide labor organization reflecting that the existing labor peace agreement had been extended or a new labor peace agreement had been entered into, Curaleaf did not provide such written verification;

5. Curaleaf responded to the CRC's Notice of Violation on June 2, 2025 admitting that it does not have a valid labor peace agreement in place with a bona fide labor organization; and

6. Curaleaf failed to maintain an LPA, as required by law, from April 7, 2025, through August 7, 2025, a period of 122 days.

Though the maintenance of a labor peace agreement is a material condition of licensure, the violation constitutes a "non-major," Category V violation under N.J.A.C. 17:30-20.7(a). The Commission has an established precedent of imposing a penalty of $5,000.00 per day against businesses that fail to maintain a labor peace agreement. The penalty of $5,000.00 per day for 122 days amounts to a total fine of $610,000.00. The Commission finds the imposed penalty to be fair, reasonable, and consistent with the regulations at N.J.A.C. 17:30.

**Next Steps**

Fines must be paid online by logging into the Commission's licensing portal at https://nj-crc-public.nls.egov.com/login. If you feel you cannot pay the fine within 30 days of the date of this notice, you are encouraged to contact the Commission to establish a payment plan.

Please inform your assigned investigator when payment has been made.

If you wish to contest the imposition of this penalty, you may request an adjudicatory hearing pursuant to the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq., and 52:14F-1 et seq., to contest the Commission's imposition of a civil monetary penalty for any license violation within

14 days of receipt of this notice of enforcement action. If you wish to exercise your right to a hearing, such a request must be made in writing and sent to:

Dave Tuason, Chief Counsel
New Jersey Cannabis Regulatory Commission
PO Box 216
Trenton, NJ 08625-0216
David.Tuason@crc.nj.gov

Should you have any questions regarding this correspondence, please submit your inquiry to the NJ-CRC Licensing inbox at crc.licensing@crc.nj.gov.

Sincerely,



Dianna Houenou
Chairperson
New Jersey Cannabis Regulatory Commission

# EXHIBIT I

State of New Jersey
**CANNABIS REGULATORY COMMISSION**
P.O. BOX 216
TRENTON, N.J. 08625-0216

PHILLIP D. MURPHY
*Governor*

TANESHA L. WAY
*Lt. Governor*

DIANNA HOUENOU, *Chair*
SAMUEL DELGADO, *Vice Chair*
KRISTA NASH, *Commissioner*
MARIA DEL CID-KOSSO, *Commissioner*
CHARLES BARKER, *Commissioner*
JEFF BROWN, *Executive Director*

March 21, 2024

Matthew Kalmick
Curaleaf NJ, II, Inc.
[redacted]

*Re:* **FINAL AGENCY DECISION**
*Acceptance of Expanded Alternative Treatment Center's ("Expanded ATC") Renewal Application to Operate in Personal-Use Cannabis Market*

Dear Matthew Kalmick:

Congratulations! The New Jersey Cannabis Regulatory Commission ("NJ-CRC" or "Commission") has approved your request for license renewal(s) to operate as an Expanded Alternative Treatment Center. The above-listed entity will be permitted to engage in adult, personal-use cannabis activities in New Jersey under the following licenses and at the following locations, provided it fully complies with all conditions imposed in this Final Agency Decision:

1. Class 1 Cannabis Cultivator, 200 State Highway Route 73, Winslow, New Jersey, Expiration April 17, 2025;
2. Class 1 Cannabis Cultivator, 640 Creek Road, Bellmawr, New Jersey, Expiration April 17, 2025;
3. Class 2 Cannabis Manufacturer, 200 State Highway Route 73, Winslow, New Jersey, Expiration April 17, 2025;
4. Class 5 Cannabis Retailer, 640 Creek Road, Bellmawr, New Jersey, Expiration April 20, 2025;
5. Class 5 Cannabis Retailer, 4237 South U.S. Route 130, Edgewater Park, New Jersey, Expiration April 20, 2025.

This letter serves as written notice that NJ-CRC has approved the expanded ATC to operate in the adult personal-use market, provided it abides by the conditions imposed below. Details on the

Commission's review of materials, terms and conditions of Commission approval, and next steps are provided below. Please read the following information carefully; failure to satisfy any requirement may result in penalties levied against the expanded ATC, including fines and license suspension, revocation, or renewal denial.

**NJ-CRC Review of Renewal Application Materials**

Pursuant to N.J.A.C. 17:30-9.4(m)(4), After the end of the second year of expanded ATC's licensure, the license renewal process pursuant to N.J.A.C. 17:30-7.16 shall be followed.

Pursuant to N.J.A.C. 17:30-7.16(a) A license holder holding an annual license, including an annual license converted from a conditional license, shall renew such annual license annually. Pursuant to N.J.A.C. 17:30-7.16(c), A license holder shall submit a renewal application no later than 90 days prior to the expiration of the current cannabis business license. Submission within 90 days of expiration of the current cannabis business license may result in a lapse in the cannabis business's licensure and subject the cannabis business to enforcement action.

Pursuant to N.J.A.C. 17:30-7.16(d), the following may be grounds for denial of a license renewal application:

1. Failure to provide truthful, correct, and current information;
2. Failure to maintain compliance with the Act or this chapter;
3. Failure to maintain its diversely owned business, impact zone business, social equity business, or microbusiness status;
4. The inclusion of a person or entity not deemed qualified to hold a license; or
5. The commission of three or more major violations within the preceding 12 months.

Additionally, an expanded ATC must pay the requisite renewal fees for each requested license under N.J.A.C. 17:30-7.17.

**Terms and Conditions of NJ-CRC Approval**

The Commission's approval provided herein is based and conditioned on the information provided in the entity's certification materials. It is your responsibility to ensure the entity understands and complies with all applicable regulations, regardless of whether they are expressly mentioned in this letter. Furthermore, because the approval is conditioned on evidence that the entity's adult-use cannabis activities will not negatively impact patient access to medicinal cannabis, the Commission's acceptance of the entity's certification materials is subject to the terms and conditions explained below regarding patient access, medicinal cannabis inventory, social equity, labor, and product testing.

Adherence to the entity's plans submitted to the Commission and the terms and conditions below is an ongoing requirement for licensure as an Expanded Alternative Treatment Center. Failure to adhere to the conditions and commitments in the entity's certification materials, or failure to satisfy any required terms and conditions set forth below, may result in adverse action taken against the

expanded ATC, including suspension or revocation of any issued permit or license. The NJ-CRC is authorized to take these enforcement actions pursuant to N.J.A.C. 17:30-20.5.

Plans for Patient Access

The expanded ATC must satisfy all of the following conditions:

- Have business operating hours include at least 14 patient-only hours spread over at least three (3) days per week, including at least one (1) weekend day. Patient-only hours should be held at different times throughout the week to accommodate patients and designated caregivers with different schedules;
- Provide exclusive parking options for patients and designated caregivers at all times;
- Designate points-of-sale that will be available for use exclusively by patients and designated caregivers at all times. All points-of-sale shall be available for patient use at any time. If patients are experiencing a wait time in excess of five (5) minutes, other points-of-sale must be made available to serve patients to reduce the wait time before serving personal-use cannabis purchasers;
- Provide express access to the ATC to minimize the wait time for patients and designated caregivers;
- Provide patients and designated caregivers with the exclusive ability to reserve products ahead of time so that they can be assured their order will be filled when going to the ATC;
- Provide a patient access telephone line staffed by ATC employees during all business hours to assist patients and designated caregivers trying to access the ATC;
- Within 30 days of being issued the above-listed licenses, hold at least two (2) virtual town halls with registered patients and caregivers to provide information on the ATC's patient access plan. Each virtual town hall must be conducted in a manner that complies with any applicable patient privacy laws and regulations; and
- Provide the NJ-CRC with weekly reports on patient access. Weekly reports must include, at a minimum, the following information:
    - Average wait times for patients
    - Number of patients served
    - Medicinal Cannabis Product Dispensed
    - Medicinal Cannabis Product on-hand (packaged)
    - Medicinal Cannabis Product on-hand (bulk)

Additionally, the NJ-CRC encourages, but is not requiring, each expanded ATC to provide exclusive home delivery for patients and online ordering and exclusive express curbside pick-up for patients.

The expanded ATC must cooperate with the NJ-CRC by providing weekly reports on the entity's efforts to maintain patient access to medicinal cannabis.

Plans for Ensuring Adequate Medicinal Cannabis Inventory

The expanded ATC must maintain a "Minimum Adequate Supply" of medicinal cannabis for patients, plus a "Reasonable Minimum Reserve."

A Minimum Adequate Supply shall be calculated by determining the average purchases of packaged products by patients in the preceding three (3) months at the ATC. The "Minimum Adequate Supply" should be adjusted up to account for new patient enrollment, should the ATC experience an increase in the number of patients enrolled at the ATC month over month.

> Minimum Adequate Supply = [(current patients enrolled at the ATC) ÷ (patients enrolled at the ATC 3 months prior)] × (Average amount of medical cannabis purchased over the preceding three (3) months at the ATC)

A Reasonable Minimum Reserve shall be a three-month reserve calculated by determining the average amount of medical cannabis purchased over the last three (3) months and multiplying it by three (3). To meet the Reasonable Minimum Reserve, the ATC may include packaged and bulk product. The ATC may also include flower that is drying or curing, and the raw materials for manufacturing medicinal cannabis products.

> Reasonable Minimum Reserve = [Minimum Adequate Supply] × 3

The expanded ATC must cooperate with the NJ-CRC by providing weekly reports on medicinal product availability and inventory levels.

<u>Plans for Social Equity</u>

The expanded ATC must satisfy all of the following conditions:

- In accordance with N.J.A.C. 17:30-9.4(e), make a good faith effort to employ individuals who either:
  (1) have past marijuana- or hashish-related convictions, or
  (2) at the time of employment, have lived in an Economically Disadvantaged Area for five (5) of the last ten (10) years *and* in the preceding tax year made 80% or less of the median house-hold family income.
  Any such efforts shall be conducted in compliance with P.L. 2014, c.32, P.L. 2019, c.199, and any other applicable employment or labor laws and regulations.
- Submit progress reports that include specifics on the good faith efforts being made to ensure the expanded ATC's social equity plans as presented in the entity's certifications to the NJ-CRC are being achieved. These progress reports should be prepared in accordance with guidance from the Commission's Office of Diversity and Inclusion.

The Commission may request additional information from the expanded ATC to help it determine if efforts are being made in good faith.

<u>Labor Peace and Collective Bargaining</u>

If a majority of the expanded ATC's employees express interest in a particular bona fide labor organization, as defined under N.J.S.A. 24:6I-1 through 56, the expanded ATC shall make a good faith effort to negotiate and execute a labor peace agreement with that bona fide labor organization. Labor peace agreements provide the NJ-CRC with the assurance that, should an entity be licensed,

its operations will not be shut down due to labor-dispute or labor-related work stoppages.

After entering into a labor peace agreement, if a majority of the expanded ATC's employees support joining a particular bona fide labor organization, then the expanded ATC shall, within 200 days of executing a labor peace agreement, make a good faith effort to enter into a collective bargaining agreement.

Failure of an expanded ATC to abide by its executed labor peace and collective bargaining agreements may result in adverse action against the entity, including possible suspension or revocation of an ATC's license or permit or denial of any permit or license renewal.

Laboratory Testing

The expanded ATC is required to utilize a Commission-licensed testing laboratory to test cannabis items pursuant to the Commission's regulations.

**Next Steps**

By accepting this provisional award for license renewal, the expanded ATC is agreeing to be subject to the terms and conditions stated in this letter, as well as any requirements in applicable regulation. Before the license is renewed, he expanded ATC must submit payment for the associated renewal licensing fee under N.J.A.C. 17:30-7.17 for each license. Accordingly, payment in the amount of **$150,000** is due and owed before the entity can continue to engage in any activities associated with the adult-use cannabis market for an additional year. The breakdown of fees is as follows:

- Class 1 Cannabis Cultivator (Tier VI), 200 State Highway Route 73, Winslow, New Jersey, Expiration April 17, 2025: **$50,000**
- Class 1 Cannabis Cultivator (Tier VI), 640 Creek Road, Bellmawr, New Jersey, Expiration April 17, 2025: **$50,000**
- Class 2 Cannabis Manufacturer (over 10,000 sq. Ft.), 200 State Highway Route 73, Winslow, New Jersey, Expiration April 17, 2025; **$30,000**
- Class 5 Cannabis Retailer, 640 Creek Road, Bellmawr, New Jersey, Expiration April 20, 2025; **$10,000**
- Class 5 Cannabis Retailer, 4237 South U.S. Route 130, Edgewater Park, New Jersey, Expiration April 20, 2025. **$10,000**

The NJ-CRC will email you an invoice that must be paid online using the Commission's licensing portal. If payment is not received within thirty (30) days of accepting this award, the NJ-CRC will email a final notice regarding the unpaid invoice. Failure to pay the required fees within sixty (60) days of accepting this award will result in the award automatically being rescinded and the entity's license renewal being rejected in the online licensing portal.

Additionally, as elaborated in NJ-CRC's emergency meeting held on April 17, 2023, this approval is conditioned upon compliance with the following:

1. By the next regular meeting of the Board, the entity shall provide the NJ-CRC Board with

evidence of good faith efforts between now and June 1 to negotiate a Collective Bargaining Agreement (CBA) at each of the licenses set forth below; and

2. By the next regular meeting of the Board, the entity shall attest under oath that it is not engaging in union-busting activities or tactics; and
3. By the next regular meeting of the Board, the entity shall provide additional, updated information and evidence regarding all necessary and reasonable steps to achieve employee and vendor-contractor participation, specifically for New Jersey, by persons who meet one of more of the following criteria, pursuant to N.J.A.C. 17:30-6.6:
    a. have lived in an economically disadvantaged area for five of the 10 preceding years and is, based on the preceding year's income, a member of a household that has a household income that is 80 percent or less of the average median household income in the State, as determined annually by the U.S. Census Bureau;
    b. have been adjudicated delinquent for, or convicted of, whether expunged or not, in this State, another state, or the Federal government at least two marijuana- or hashish-related disorderly persons offenses; or
    c. have been adjudicated delinquent for, or convicted of, whether expunged or not, in this State, another state, or the Federal government at least one marijuana- or hashish-related indictable offense.
4. By the next regular meeting of the Board, the entity shall produce to the NJ-CRC Board all records, documents, and testimony requested by the Board, that concern its intentions to modify their New Jersey operations. This includes any records, documents, and testimony that concern decisions on modifications to the operational capacity, physical plant, premises, or administrative office at any of the facilities/licenses set forth below; and
5. If, at the next regular meeting of the Board, or any time thereafter, the Board determines the entity failed to satisfy the conditions, the Board may take enforcement action and/or issue any penalties allowable under N.J.A.C. 17:30, including fines or revocation of the renewed license.

Congratulations once again on your successful request and thank you for your continued interest in working with the NJ-CRC to establish a safe and equitable cannabis industry for the state of New Jersey. Should you have any questions regarding this correspondence, please submit your inquiry to the NJ-CRC Licensing inbox at crc.licensing@crc.nj.gov.

Sincerely,

Dianna Houenou
Chairperson
New Jersey Cannabis Regulatory Commission

2:25-cv-16397

JS 44 (Rev. 04/21)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

Curaleaf Holdings, Inc. and Curaleaf NJ, II, Inc.

**(b)** County of Residence of First Listed Plaintiff: Fairfield County, CT
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Keith J. Rosenblatt, Alan I. Model and Anastasia Stylianou, Esqs.
Littler Mendelson, P.C., One Newark Center, 8th Fl.
Newark, New Jersey 07102; Te. 973.848.4700

**DEFENDANTS**

New Jersey Cannabis Regulatory Commission, Chair Diana Houenou, Commissioners Krista Nash and Ameila Mapp and Acting Executive Director Christopher Riggs

County of Residence of First Listed Defendant: Mercer County, NJ
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government Plaintiff
☒ 3 Federal Question *(U.S. Government Not a Party)*
☐ 2 U.S. Government Defendant
☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

FORFEITURE/PENALTY — LABOR: ☒ 720 Labor/Management Relations

(All other boxes — Contract, Real Property, Torts, Civil Rights, Prisoner Petitions, Forfeiture/Penalty, Labor, Immigration, Bankruptcy, Intellectual Property Rights, Social Security, Federal Tax Suits, Other Statutes — unchecked.)

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1 Original Proceeding ☐ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from Another District *(specify)* ☐ 6 Multidistrict Litigation - Transfer ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing **(Do not cite jurisdictional statutes unless diversity)**:
29 U.S.C. 151 et seq.; 28 USC 2201, 2002

Brief description of cause:
Declaratory and injunctive relief invalidating NJ CREAAM Act and precluding its enforcement.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.
**DEMAND $**
CHECK YES only if demanded in complaint:
**JURY DEMAND:** ☐ Yes ☒ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):* JUDGE ________ DOCKET NUMBER ________

DATE: 10.09.2025
SIGNATURE OF ATTORNEY OF RECORD: */s/ Keith J. Rosenblatt*

**FOR OFFICE USE ONLY**

RECEIPT # ______ AMOUNT ______ APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

**LITTLER MENDELSON, P.C.**
Keith J. Rosenblatt (016631997)
krosenblatt@littler.com
Alan I. Model (035511993)
amodel@littler.com
Anastasia Stylianou (198022017)
astylianou@littler.com
One Newark Center, 8th Floor
Newark, NJ 07102
973.848.4700
Attorneys for Plaintiffs
*Curaleaf Holdings, Inc.*
*and Curaleaf NJ, II, Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CURALEAF HOLDINGS, INC., a British Columbia corporation, and CURALEAF NJ, II, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NEW JERSEY CANNABIS REGULATORY COMMISSION, CHAIR DIANA HOUENOU, COMMISSIONERS KRISTA NASH and AMEILA MAPP, and ACTING EXECUTIVE DIRECTOR CHRISTOPHER RIGGS, in their official capacities,<br><br>Defendants. | Civil Action No. 2:25-cv-16397<br><br>**DECLARATION OF PETER CLATEMAN** |

I, Peter Clateman, declare as follows:

1. I am over the age of 18 and have personal knowledge of the facts stated in this declaration either through my own observations and experience or as made known to me in the course of my employment with Curaleaf, Inc.

2. I serve as the Chief Legal Officer at Curaleaf. In that capacity, I am responsible for overseeing all legal matters, ensuring compliance, managing risk, and guiding strategic decisions.

3. I make this declaration in support of Curaleaf's Complaint against Defendants New Jersey Cannabis Regulatory Commission ("Commission"), as well as Commission Chair Diana Houenou, Commissioners Krista Nash and Ameilia Mapp, and Acting Executive Director Christopher Riggs, in their official capacities, for declaratory and other relief.

4. Curaleaf is one of the world's premiere cannabis companies and a leading provider of cannabis. It operates cannabis facilities in multiple states, including New Jersey, as well as internationally. Its operations include facilities providing medicinal and adult-use cannabis. In New Jersey, it operates three licensed adult-use facilities employing a total of 236 individuals – 195 full-time and 41 part-time. Each of Curaleaf's facilities is licensed by Defendants.

5. In 2022, to qualify for a cannabis license in New Jersey, Curaleaf negotiated a labor peace agreement ("LPA") with Local 360 of the United Food and Commercial Workers' Union ("the union" or "Local 360"). That agreement is attached to the Complaint as Exhibit A. It is a true and accurate copy of the agreement.

6. After the LPA was signed, Local 360 organized Curaleaf's employees in its Edgewater, Bordentown, Winslow, and Bellmawr facilities. The LPA required Curaleaf to recognize the union based on a showing of signed authorization cards. Curaleaf abided by the agreement and recognized the union based on such a showing. No secret-ballot election was held in any of these facilities.

7. Copies of the card-check certifications in these facilities are attached to the Complaint as Exhibits B through E. They are true and accurate copies of the certifications.

8. In October 2022, the union asked to begin bargaining with Curaleaf for a collective bargaining agreement. The parties reached an agreement and submitted the agreement to employees for ratification. The employees then voted to reject the agreement.

9. Curaleaf's LPA with Local 360 was set to expire in April 2025. Curaleaf therefore contacted Local 360 and asked to extend the LPA. But the parties were unable to agree to acceptable terms. The LPA expired without being renewed.

10. On April 22, 2025, Curaleaf received an e-mail from William Wallace, Director of Labor Compliance and Education for the Commission. Wallace wrote that he had been informed that Curaleaf's LPA had expired. He emphasized that the LPA was a continuing and material term of Curaleaf's license. He instructed Curaleaf to provide "proof, through written verification of a mutual extension of the LPA."

11. A copy of Wallace's letter is attached to the Complaint as Exhibit F. It is a true and accurate copy of the letter.

12. On May 6, 2025, the Commission issued a Notice of Violation to Curaleaf pursuant to N.J.A.C. 17:30-20.4. The notice stated that Curaleaf's LPA had expired. It also stated that "[m]aintenance of an LPA with a bona fide labor organization is an ongoing condition for any licensed cannabis business."

13. A copy of the notice is attached to the Complaint as Exhibit G. It is a true and accurate copy of the notice.

14. On August 25, 2025, the Commission sent Curaleaf another notice of enforcement. This notice advised Curaleaf that the Commission had decided to impose $610,000 in penalties on Curaleaf for operating a cannabis business without maintaining an active LPA.

15. A copy of the August 25 notice is attached to the complaint as Exhibit H. It is a true and accurate copy of the notice.

16. More recently, on September 28, in response to Curaleaf's application to renew its annual license for its Bordentown facility, the Commission provisionally granted the license

application, but it did so, only upon confirmation that Curaleaf secure an LPA for the facility on or before October 31, 2025.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed October 7, 2025.

Peter Clateman

4928-7401-0223.1 / 104177.1139

Stephen Ehrlich
*Deputy Solicitor General*
Bassam F. Gergi
Rachel E. Thompson
*Deputy Attorneys General*
MATTHEW J. PLATKIN
ATTORNEY GENERAL OF NEW JERSEY
R.J. Hughes Justice Complex
25 Market Street, P.O. Box 112
Trenton, New Jersey 08625
*Attorneys for Defendants*

| | |
|---|---|
| CURALEAF HOLDINGS, INC., a British Columbia corporation, and CURALEAF NJ, II, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NEW JERSEY CANNABIS REGULATORY COMMISSION, CHAIR DIANA HOUENOU, COMMISSIONERS KRISTA NASH and AMELIA MAPP, and ACTING EXECUTIVE DIRECTOR CHRISTOPHER RIGGS, in their official capacities,<br><br>Defendants. | No. 25-cv-16397 (MAS) (RLS)<br><br>*Electronically Filed*<br><br>**CERTIFICATION OF RACHEL E. THOMPSON, ESQ.** |

I, Rachel E. Thompson, of full age, hereby certify as follows:

1. I am licensed to practice law in the State of New Jersey. I am employed by the State of New Jersey, Department of Law and Public

Safety, Division of Law, as a Deputy Attorney General. I represent Defendants in this matter. As such, I am familiar with the facts I now relate.

2. Attached hereto as “Exhibit 1” is a true and accurate copy of the Transmittal of a Contested Case to the Office of Administrative Law.

3. Attached hereto as “Exhibit 2” is a true and accurate copy of the Notice of Docketing for OAL Docket No. CRC 17461-2025 S, dated October 8, 2025.

4. Attached hereto as “Exhibit 3” is a true and accurate copy of Curaleaf's June 2, 2025 letter in response to the May 6, 2025 Notice of Violation.

I certify that the foregoing statements by me are true. I understand that if any of the forgoing statements are willfully false, I may be subject to punishment.

Dated: November 17, 2025 By: /s/Rachel E. Thompson_________

Rachel E. Thompson
Deputy Attorney General
rachel.thompson@law.njoag.gov

# Exhibit 1

# STATE OF NEW JERSEY
# OFFICE OF ADMINISTRATIVE LAW

33 Washington Street
Newark. NJ 07102
(973) 648-7136

9 Quakerbridge Plaza / PO Box 049
Trenton, NJ 08625-0049
609-689-4030

**FROM:**

NJ Cannabis Regulatory Commission
**NAME OF AGENCY**

P.O. Box 216
Trenton, NJ 08625-0216
**ADDRESS**

David Tuason, *Transmitting Officer*
**TRANSMITTING OFFICER**

609-376-7338
**TELEPHONE NUMBER**

**CRC**

**AGENCY USE**

**COUNTY** Camden *

**JURISDICTION** South *

**********************************

Curaleaf NJ II LLC
**v.**
New Jersey Cannabis Regulatory Commission
**Name of Contested Case or Short Title**

N/A
**Agency Docket / Reference Number**

**THE FOLLOWING ADDITIONAL INFORMATION IS REQUIRED:**

1. Nature of the case. Please include references to statutes or rules and briefly summarize the facts and law involved. Attach pleadings to this form.
   Petitioner challenges an imposition of civil monetary penalty in the amount of $610,000.00.

2. Estimated time required for hearing.
   2 **Days(s) or** ______ **Hours**

3. Legal requirements (State or Federal) mandating a date for Agency Decision:
   ______ **Yes** X **No** If yes, please specify requirements and citation: ______

4. Is a court stenographer requested?
   ______ **Yes** X **No**

5. **Special features to be anticipated in this matter,** i.e., emergent relief, discovery motions, prehearing conference, conference hearing, remand, expedited hearings, location (county).
   Uncertain

6. Is a barrier-free location needed?
   ______ **Yes** ______ **No** X Uncertain

7. Have the attached documents been exchanged between the parties?
   X **Yes** ______ **No** If no, the documents shall be served on or offered to the parties on: ______

8. Names of other agencies claiming jurisdiction over transmitted dispute:
   **NONE**

Transmitting officer or other agency person to receive notices of hearing etc., pursuant to **N.J.A.C.** 1:1-8.2 (a) 13. This person need not be served by the parties with motions, correspondence, etc.

David Tuason, Chief Counsel, ***Transmitting Officer***
NJ Cannabis Regulatory Commission
P.O. Box 216
Trenton, NJ 08625-0216

**PHONE #:** (609) 376-7338 **FAX:** N/A
**E-MAIL ADDRESS:** David.Tuason@crc.nj.gov

## SERVICE LIST

### Parties Named in this Proceeding and their Representatives

For additional parties, attach names, addresses and telephone numbers of each party linked with that representative if any.

**#1. PETITIONER**

**Heather Sullivan**
**Curaleaf NJ II LLC**
**640 Creek Road**
**Bellmawr, New Jersey 08031**
**TELEPHONE #: (917) 717-5879**
**FAX : N/A**
**E-MAIL ADDRESS: licensing@curaleaf.com**

**PETITIONER REPRESENTATIVE**

**Christopher Porrino, Esq.**
**Lowenstein Sandler LLP**
**One Lowenstein Drive**
**Roseland, New Jersey 07068**
**TELEPHONE # (973) 597-6314**
**FAX : (973) 597-6315**
**E-MAIL ADDRESS: cporrino@lowenstein.com**

**#2. RESPONDENT**

**Dianna Houenou, Chair**
**New Jersey Cannabis Regulatory Commission**
**225 E. State Street P.O. Box 216**
**Trenton, NJ 08625-0216**
**TELEPHONE # 609-376-7338**
**FAX : N/A**
**E-MAIL ADDRESS: Dianna.Houenou@crc.nj.gov**

**RESPONDENT REPRESENTATIVE.**

**Deborah Shane-Held, DAG**
**Division of Law**
**25 Market Street, PO Box 112**
**Trenton, NJ 08625-0112**
**TELEPHONE # 609-376-3200**
**FAX : 609-777-4036**
**E-MAIL ADDRESS: Deborah.Shane-Held@law.njoag.gov**

**#3. OTHER**

**TELEPHONE #**
**FAX :**
**E-MAIL ADDRESS:**

**OTHER REPRESENTATIVE**

**TELEPHONE**
**FAX :**
**E-MAIL ADDRESS:**

**#4. OTHER**

**TELEPHONE #**
**FAX :**
**E-MAIL ADDRESS:**

**OTHER REPRESENTATIVE**

**TELEPHONE #**
**FAX :**
**E-MAIL ADDRESS:**

**(Please attach additional sheets for contacts as necessary and indicate representation)**

# State of New Jersey

**CANNABIS REGULATORY COMMISSION**
P.O. BOX 216
TRENTON, N.J. 08625-0216

PHILLIP D. MURPHY
*Governor*

TAHESHA L. WAY
*Lt. Governor*

DIANNA HOUENOU, *Chair*
KRISTA NASH, *Vice Chair*
AMELIA MAPP, *Commissioner*
CHRIS RIGGS, *Acting Executive Director*

August 25, 2025

Heather Sullivan
Curaleaf NJ II LLC
licensing@curaleaf.com

*Re:* **NOTICE OF ENFORCEMENT ACTION -** INITIAL AGENCY DECISION REGARDING IMPOSITION OF SANCTIONS AGAINST CURALEAF NJ II LLC

Dear Heather Sullivan:

The New Jersey Cannabis Regulatory Commission ("NJ-CRC" or "Commission") has imposed a civil monetary penalty of $610,000.00 against Curaleaf NJ II LLC for the reasons articulated below.

**NJ-CRC's Issuance of Notice of Violation**

Pursuant to N.J.A.C. 17:30-20.4(a), during an onsite assessment, a review of financial records, or other Commission review of the license holder and its operations, if the Commission identifies a violation of the Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act, P.L.2021, c.16, N.J.S.A. 24:6I-31 et seq., (the "Act") or the implementing Personal-Use Cannabis Rules (the "Personal-Use Regulations"), the Commission shall provide notice of the violation, including an official written report of the findings and the nature of the violation, to the cannabis business or testing laboratory within seven business days following the onsite assessment or other identification of the violation.

Pursuant to N.J.S.A. 24:6I-36(c), the maintenance of a labor peace agreement with a bona fide labor organization by a licensed cannabis establishment, distributor, or delivery service shall be an ongoing material condition of the establishment's, distributor's, or delivery service's license.

Pursuant to N.J.S.A. 24-6I-7(a)(2)(g), the maintenance of a labor peace agreement with a bona fide labor organization shall be an ongoing material condition of maintaining an alternative treatment center's permit.

Pursuant to N.J.A.C. 17:30-9.4(g), the maintenance of a labor peace agreement with a bona fide labor organization by a licensed cannabis business, including an expanded ATC, shall be an ongoing material condition of the cannabis business's license.

Curaleaf previously entered into a labor peace agreement with UFCW Local 360, a bona fide labor organization, effective April 6, 2022. As part of its periodic compliance review, the Commission found that Curaleaf's labor peace agreement had expired on April 6, 2025. Prior to the expiration of the LPA, Curaleaf had neither advised the Commission that it executed a new LPA, nor did it advise that the existing agreement had been renewed or otherwise extended.

On May 6, 2025, a Notice of Violation was issued to Curaleaf NJ II LLC ("Curaleaf") for violations related to its failure to maintain a labor peace agreement with a bona fide labor organization for any of its facilities in New Jersey (INV-83-2025).

Pursuant to N.J.A.C. 17:30-20.4(b), unless otherwise specified by the Commission, within 20 business days of receipt of the notice of violation, the cannabis business shall correct the violation(s) and notify the Commission, in writing, of any corrective actions taken to correct the violations, and the date of implementation of such corrective actions. Curaleaf responded to the Notice of Violation on June 2, 2025. Curaleaf's response admits to no longer having a labor peace agreement in place, does not correct the violation by providing a new LPA, and provides no details regarding how it plans to correct the violation.

**NJ-CRC's Review of Imposition of Sanctions**

Pursuant to N.J.A.C. 17:30-20.5(a), in response to a violation of any provision of the Act or the Personal-Use Regulations, the Commission is authorized to take enforcement action or impose sanctions upon a license holder. Pursuant to N.J.A.C. 17:30-20.6, -20.7, and -20.8, sanctions may include, but are not limited to: civil monetary penalties; suspension, revocation, non-renewal, or denial of a license; referral to State or local law enforcement; or any combination thereof.

Pursuant to N.J.A.C. 17:30-20.6(b), a monetary penalty imposed by the Commission on a license holder pursuant to this subchapter may not exceed $500,000 per major violation or $50,000 per any other license violation. Pursuant to N.J.A.C. 17:30-20.6(c), a violation by each entity or person per day shall constitute a separate incident for the purposes of calculating the number of violations.

Pursuant to N.J.A.C. 17:30-20.6(d), the Commission may impose greater penalties for successive violations up to the maximum amounts.

Pursuant to N.J.A.C. 17:30-20.6(f), the Commission may, in the Commission's sole discretion, consider additional factors in determining the penalty for each violation. Such factors may include, but are not limited to:

1. Any prior violations that the license holder has admitted to or was found to have engaged in;
2. Good faith measures by the license holder to self-report or prevent the violation;
3. The license holder's record of compliance with the laws and rules pertaining to personal use cannabis;
4. Corrective action(s) taken by the license holder related to the current violation or prior violations;
5. Willfulness and deliberateness of the violation;
6. Likelihood of reoccurrence of the violation; and

7. Violations involving damage or danger to the life, health, welfare, safety, or property of any person.

After completing a thorough review of Curaleaf's violations related to its failure to maintain a labor peace agreement with a bona fide labor organization, the Commission has determined to impose a civil monetary penalty of $610,000.00.

In determining the penalty, the Commission considered the facts and circumstances of the violation, including, but not limited to:

1. Maintenance of a labor peace agreement is an ongoing material condition of a business's license or permit;

2. Curaleaf's labor peace agreement with a bona fide labor organization, which was executed on April 6, 2022, expired on April 6, 2025;

3. Prior to the LPA's expiration, Curaleaf did not provide a new, executed LPA, nor did it advise the Commission that the existing agreement had been renewed or otherwise extended;

4. Despite multiple requests from NJ-CRC for written verification of mutual agreement by Curaleaf and a bona fide labor organization reflecting that the existing labor peace agreement had been extended or a new labor peace agreement had been entered into, Curaleaf did not provide such written verification;

5. Curaleaf responded to the CRC's Notice of Violation on June 2, 2025 admitting that it does not have a valid labor peace agreement in place with a bona fide labor organization; and

6. Curaleaf failed to maintain an LPA, as required by law, from April 7, 2025, through August 7, 2025, a period of 122 days.

Though the maintenance of a labor peace agreement is a material condition of licensure, the violation constitutes a "non-major," Category V violation under N.J.A.C. 17:30-20.7(a). The Commission has an established precedent of imposing a penalty of $5,000.00 per day against businesses that fail to maintain a labor peace agreement. The penalty of $5,000.00 per day for 122 days amounts to a total fine of $610,000.00. The Commission finds the imposed penalty to be fair, reasonable, and consistent with the regulations at N.J.A.C. 17:30.

**Next Steps**

Fines must be paid online by logging into the Commission's licensing portal at [https://nj-crc-public.nls.egov.com/login](https://nj-crc-public.nls.egov.com/login). If you feel you cannot pay the fine within 30 days of the date of this notice, you are encouraged to contact the Commission to establish a payment plan.

Please inform your assigned investigator when payment has been made.

If you wish to contest the imposition of this penalty, you may request an adjudicatory hearing pursuant to the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq., and 52:14F-1 et seq., to contest the Commission's imposition of a civil monetary penalty for any license violation within

14 days of receipt of this notice of enforcement action. If you wish to exercise your right to a hearing, such a request must be made in writing and sent to:

Dave Tuason, Chief Counsel
New Jersey Cannabis Regulatory Commission
PO Box 216
Trenton, NJ 08625-0216
David.Tuason@crc.nj.gov

Should you have any questions regarding this correspondence, please submit your inquiry to the NJ-CRC Licensing inbox at crc.licensing@crc.nj.gov.

Sincerely,

Dianna Houenou
Chairperson
New Jersey Cannabis Regulatory Commission

# MEMORANDUM

**TO:** CANNABIS REGULATORY COMMISSION BOARD

**FROM:** CHRISTOPHER J. RIGGS, ACTING EXECUTIVE DIRECTOR

**SUBJECT:** CURALEAF NJ II LLC PROPOSAL FOR ENFORCEMENT (INV 83 2025)

**DATE:** AUGUST 7, 2025

---

**BACKGROUND:** On May 6, 2025, a Notice of Violation was issued to Curaleaf NJ II, Inc. ("Curaleaf"), for violations related to maintenance of an labor peace agreement ("LPA") with a bona fide labor organization. The Office of Compliance and Investigations for the New Jersey Cannabis Regulatory Commission ("NJ-CRC") became aware of this violation through the regular monitoring activities of compliance officers on April 22, 2025. At that time, an investigation was conducted, and a recommendation was provided via e-mail to the Director of the Office of Compliance and Investigations. Upon a determination by the Director of the Office of Compliance and Investigations that violations had occurred, the matter was presented to Counsel's Office for consideration. In coordination with Counsel's Office and the Office of the Executive Director, the Notice of Violation was issued on May 6, 2025. On June 2, 2025, Curaleaf responded to the Notice of Violation.

**AUTHORITY:**

**N.J. Stat. Ann. 24:6I-36c.:** The maintenance of a labor peace agreement with a bona fide labor organization by a licensed cannabis establishment, distributor, or delivery service, other than an establishment that is a microbusiness, shall be an ongoing material condition of the establishment's distributor's, or delivery service's license.

**N.J. Stat. Ann. 24-6I-7a.(2)(g):** The maintenance of a labor peace agreement with a bona fide labor organization shall be an ongoing material condition of maintaining the alternative treatment center's permit.

**N.J. Admin. Code § 17:30-9.4(g):** the maintenance of a labor peace agreement with a bona fide labor organization by a licensed cannabis business, including an expanded ATC, shall be an ongoing material condition of the cannabis business's license.

**N.J. Admin. Code § 17:30-20.4**

(a) During an onsite assessment, a review of financial records, or other Commission review of the license holder and its operations, if the Commission identifies a violation of the Act or this chapter, the Commission shall provide notice of the violation, including an official written report of the findings and the nature of the violation, to the cannabis business or testing laboratory within seven business days following the onsite assessment or other identification of the violation.

1. Such notice may be provided by service of written notice or the receipt of a written notice from an investigating officer that a violation has occurred, which may be presented to the license holder's owner, principal, or manager at the licensed premises or administrative office, or through other reasonable form of notice, such as certified mail or personal service pursuant to N.J. Ct. R. 4:4–4.

(b) Unless otherwise specified by the Commission, within 20 business days of receipt of the notice of violation pursuant to (a) above, the cannabis business or testing laboratory shall:

1. Correct the violation(s); and

2. Notify the Commission, in writing, with a postmark date that is within 20 business days of the date of receipt of the notice of violation, of any corrective actions taken to correct the violations, and the date of implementation of such corrective actions.

(c) The violation identified pursuant to (a) above shall not be deemed corrected until the Commission verifies, in writing, within seven calendar days of receiving notice of corrective action pursuant to (b) above that the corrective action is satisfactory.

(d) If the violation identified pursuant to (a) above has not been corrected in accordance with (b) above, the Commission may, in its discretion, issue a notice of proposed suspension or revocation to the license holder and seek to revoke the cannabis business license in accordance with N.J.A.C. 17:30–20.8.

**N.J. Admin. Code § 17:30-20.6**

(a) This section sets forth civil monetary penalties for violations of the Act or this chapter and enforcement procedures for imposing and collecting civil monetary penalties by the Commission.

(b) A monetary penalty imposed by the Commission on a license holder pursuant to this subchapter may not exceed $500,000 per violation. Penalties may be imposed on a license holder as follows:

1. Not more than $500,000 per major license violation; and

2. Not more than $50,000 per any other license violation.

(c) A violation by each entity or person per day shall constitute a separate incident for purposes of calculating the number of violations.

(d) The Commission may impose greater penalties for successive violations up to the maximum amounts set forth at (b) above.

(e) The penalty for a subsequent violation shall only be imposed if the license holder has been notified of the prior violation or violations.

1. Such notice may be provided by service of written notice or the receipt of a written notice from an investigating officer that a violation has occurred, which may be presented to the license holder's owner, principal, or manager at the licensed premises or administrative office, or other reasonable form of notice such as certified mail or personal service pursuant to N.J. Ct. R. 4:4–4.

2. If violations are discovered during an undercover or unannounced inspection or onsite assessment, then no notice of any prior violation is necessary to impose the penalty for a subsequent violation.

(f) Notwithstanding anything in this section, the Commission may, in the Commission's sole discretion, consider additional factors in determining the penalty for each violation. Such factors may include, but are not limited to:

1. Any prior violations that the license holder has admitted to or was found to have engaged in;

2. Good faith measures by the license holder to self-report or prevent the violation;

3. The license holder's record of compliance with the laws and rules pertaining to personal use cannabis;

4. Corrective action(s) taken by the license holder related to the current violation or prior violations;

5. Willfulness and deliberateness of the violation;

6. Likelihood of reoccurrence of the violation; and

7. Violations involving damage or danger to the life, health, welfare, safety, or property of any person.

(g) Any penalties, costs, and/or fees pursuant to this subsection may be imposed and collected by the Commission in a summary proceeding pursuant to the Penalty Enforcement Law of 1999, P.L. 1999, c. 274 (N.J.S.A. 2A:58–10 et seq.).

(h) The Commission may additionally seek reimbursement for the costs of the State, including, but not limited to:

1. Costs of investigation, expert witness fees and costs, attorney fees and costs, and transcript costs for violations; and

2. Costs of cleaning up, mitigating, or remedying any environmental damage caused by a cannabis business or testing laboratory.

(i) The license holder may request an adjudicatory hearing pursuant to the Administrative Procedure Act, N.J.S.A. 52:14B–1 et seq., and 52:14F–1 et seq., to contest the Commission's imposition of a civil monetary penalty for any license violation within 14 days of receipt of the notice of civil monetary penalty.

(j) If the license holder requests an adjudicatory hearing pursuant to (i) above, the Commission shall arrange for a hearing to be conducted by the Commission and a final agency decision shall be issued after the hearing by the Commission.

1. If the Commission affirms the civil monetary penalty, it shall become final.

(k) The cannabis business may, pursuant to N.J.A.C. 17:30–20.10, apply for injunctive relief against the Commission's civil monetary penalty in the New Jersey Superior Court, Appellate Division.

**N.J. Admin. Code § 17:30-20.7**

(a) Violations shall be categorized as follows:

1. Category I, which is the exhibition of a pattern and practice of violating the requirements of the rules, posing a serious risk of harm to the health, safety, or welfare of consumers or personnel;

2. Category II, which is the failure to comply with administrative requirements, such that the licensee or permittee poses an immediate and serious risk of harm or actual harm to the health, safety, or welfare of consumers, personnel, or the general public, including, but not limited to, transfer of cannabis to a person under 21 years of age;

3. Category III, which is the submission of fraudulent, false, or misleading information, as to a material fact, to the Commission, or falsifying or concealing any record required to be maintained by the license holder;

4. Category IV, which is the failure of any owner, principal, management services contractor, employee, or volunteer of a cannabis business license holder or testing laboratory to register with the Commission and be issued a Cannabis Business Identification Card; or failure to complete training course, or failure to be in physical possession of their Cannabis Business Identification Card while acting in the course of their duties; and

5. Category V, which shall consist of other violations of the Commission's rules, or violations of valid ordinances established by municipalities that do not constitute a major violation.

(b) The Commission shall issue sanctions for violations of this chapter that account for the particular circumstances of the violation. The Commission shall consider, at a minimum, issuing the following sanctions for violations:

| Category | Violation 1 | Violation 2 | Violation 3 | Violation 4 |
|---|---|---|---|---|
| I | Revocation | | | |
| II | $500,000 | Suspension | Revocation | |
| III | $250,000 | $500,000 | Revocation | |
| IV | $10,000 | $25,000 | $50,000 | Suspension |
| V | $5,000 | $10,000 | $25,000 | $50,000 |

(c) A license holder shall pay an imposed civil monetary penalty by the time specified by the notice of enforcement action.

**IN-DEPTH REVIEW:** Inquiring parties can review the violations committed in the attached May 6, 2024, Notice of Violation. Curaleaf failed to adhere to the statute and the Adult Use regulations as it relates to maintenance of an LPA with a bona fide labor organization. Curaleaf's prior LPA between it and UFCW Local 360 was executed on April 6, 2022, and expired on April 6, 2025. On April 22, 2025, the NJ-CRC advised Curaleaf of the expiration, and requested proof, through written verification, of a mutual agreement by the parties to extend the LPA. Curaleaf has not provided such evidence as of the date of the Notice of Violation sent on May 6, 2024. Accordingly, from April 6, 2025 to May 6, 2024, Curaleaf has not been a party to any LPA with any bona fide labor organization.

As is required when a Notice of Violation is issued, Curaleaf did provide a response within 20 business days of receipt of the Notice of Violation, addressing the violations, and stating its reasoning for failing to comply with the statute and regulations.

**RECOMMENDATION:** It is the opinion of staff that Curaleaf has failed to adhere to the requirements imposed by the statute and regulations. This failure to adhere to the requirements, however, did not pose an immediate and serious risk of harm or actual harm to the health, safety, or welfare of consumers, personnel, or the general public.

The Office of Compliance and Investigations considers this a "violation of the Commission's rules… that do not constitute a major violation" and therefore it is prudent that the violations be treated as a Category V violation.

# APPENDIX

**N.J. Admin. Code § 17:30-20.4**

(a) During an onsite assessment, a review of financial records, or other Commission review of the license holder and its operations, if the Commission identifies a violation of the Act or this chapter, the Commission shall provide notice of the violation, including an official written report of the findings and the nature of the violation, to the cannabis business or testing laboratory within seven business days following the onsite assessment or other identification of the violation.

> 1. Such notice may be provided by service of written notice or the receipt of a written notice from an investigating officer that a violation has occurred, which may be presented to the license holder's owner, principal, or manager at the licensed premises or administrative office, or through other reasonable form of notice, such as certified mail or personal service pursuant to N.J. Ct. R. 4:4–4.

(b) Unless otherwise specified by the Commission, within 20 business days of receipt of the notice of violation pursuant to (a) above, the cannabis business or testing laboratory shall:

> 1. Correct the violation(s); and
>
> 2. Notify the Commission, in writing, with a postmark date that is within 20 business days of the date of receipt of the notice of violation, of any corrective actions taken to correct the violations, and the date of implementation of such corrective actions.

(c) The violation identified pursuant to (a) above shall not be deemed corrected until the Commission verifies, in writing, within seven calendar days of receiving notice of corrective action pursuant to (b) above that the corrective action is satisfactory.

(d) If the violation identified pursuant to (a) above has not been corrected in accordance with (b) above, the Commission may, in its discretion, issue a notice of proposed suspension or revocation to the license holder and seek to revoke the cannabis business license in accordance with N.J.A.C. 17:30–20.8.

**N.J. Admin. Code § 17:30-20.6**

(a) This section sets forth civil monetary penalties for violations of the Act or this chapter and enforcement procedures for imposing and collecting civil monetary penalties by the Commission.

(b) A monetary penalty imposed by the Commission on a license holder pursuant to this subchapter may not exceed $500,000 per violation. Penalties may be imposed on a license holder as follows:

1. Not more than $500,000 per major license violation; and

2. Not more than $50,000 per any other license violation.

(c) A violation by each entity or person per day shall constitute a separate incident for purposes of calculating the number of violations.

(d) The Commission may impose greater penalties for successive violations up to the maximum amounts set forth at (b) above.

(e) The penalty for a subsequent violation shall only be imposed if the license holder has been notified of the prior violation or violations.

1. Such notice may be provided by service of written notice or the receipt of a written notice from an investigating officer that a violation has occurred, which may be presented to the license holder's owner, principal, or manager at the licensed premises or administrative office, or other reasonable form of notice such as certified mail or personal service pursuant to N.J. Ct. R. 4:4–4.

2. If violations are discovered during an undercover or unannounced inspection or onsite assessment, then no notice of any prior violation is necessary to impose the penalty for a subsequent violation.

(f) Notwithstanding anything in this section, the Commission may, in the Commission's sole discretion, consider additional factors in determining the penalty for each violation. Such factors may include, but are not limited to:

1. Any prior violations that the license holder has admitted to or was found to have engaged in;

2. Good faith measures by the license holder to self-report or prevent the violation;

3. The license holder's record of compliance with the laws and rules pertaining to personal use cannabis;

4. Corrective action(s) taken by the license holder related to the current violation or prior violations;

5. Willfulness and deliberateness of the violation;

6. Likelihood of reoccurrence of the violation; and

7. Violations involving damage or danger to the life, health, welfare, safety, or property of any person.

(g) Any penalties, costs, and/or fees pursuant to this subsection may be imposed and collected by the Commission in a summary proceeding pursuant to the Penalty Enforcement Law of 1999, P.L. 1999, c. 274 (N.J.S.A. 2A:58–10 et seq.).

(h) The Commission may additionally seek reimbursement for the costs of the State, including, but not limited to:

1. Costs of investigation, expert witness fees and costs, attorney fees and costs, and transcript costs for violations; and

2. Costs of cleaning up, mitigating, or remedying any environmental damage caused by a cannabis business or testing laboratory.

(i) The license holder may request an adjudicatory hearing pursuant to the Administrative Procedure Act, N.J.S.A. 52:14B–1 et seq., and 52:14F–1 et seq., to contest the Commission's imposition of a civil monetary penalty for any license violation within 14 days of receipt of the notice of civil monetary penalty.

(j) If the license holder requests an adjudicatory hearing pursuant to (i) above, the Commission shall arrange for a hearing to be conducted by the Commission and a final agency decision shall be issued after the hearing by the Commission.

1. If the Commission affirms the civil monetary penalty, it shall become final.

(k) The cannabis business may, pursuant to N.J.A.C. 17:30–20.10, apply for injunctive relief against the Commission's civil monetary penalty in the New Jersey Superior Court, Appellate Division.

**N.J. Admin. Code § 17:30-20.7**

(a) Violations shall be categorized as follows:

1. Category I, which is the exhibition of a pattern and practice of violating the requirements of the rules, posing a serious risk of harm to the health, safety, or welfare of consumers or personnel;

2. Category II, which is the failure to comply with administrative requirements, such that the licensee or permittee poses an immediate and serious risk of harm or actual harm to the health, safety, or welfare of consumers, personnel, or the general public, including, but not limited to, transfer of cannabis to a person under 21 years of age;

3. Category III, which is the submission of fraudulent, false, or misleading information, as to a material fact, to the Commission, or falsifying or concealing any record required to be maintained by the license holder;

4. Category IV, which is the failure of any owner, principal, management services contractor, employee, or volunteer of a cannabis business license holder or testing laboratory to register with the Commission and be issued a Cannabis Business Identification Card; or failure to complete training course, or failure to be in physical possession of their Cannabis Business Identification Card while acting in the course of their duties; and

5. Category V, which shall consist of other violations of the Commission's rules, or violations of valid ordinances established by municipalities that do not constitute a major violation.

(b) The Commission shall issue sanctions for violations of this chapter that account for the particular circumstances of the violation. The Commission shall consider, at a minimum, issuing the following sanctions for violations:

| Category | Violation 1 | Violation 2 | Violation 3 | Violation 4 |
|---|---|---|---|---|
| I | Revocation | | | |
| II | $500,000 | Suspension | Revocation | |
| III | $250,000 | $500,000 | Revocation | |
| IV | $10,000 | $25,000 | $50,000 | Suspension |
| V | $5,000 | $10,000 | $25,000 | $50,000 |

(c) A license holder shall pay an imposed civil monetary penalty by the time specified by the notice of enforcement action.

State of New Jersey
CANNABIS REGULATORY COMMISSION
P.O. BOX 216
TRENTON, N.J. 08625-0216

PHILLIP D. MURPHY
*Governor*

TAHESHA L. WAY
*Lt. Governor*

DIANNA HOUENOU, *Chair*
KRISTA NASH, *Vice Chair*
AMELIA MAPP, *Commissioner*
CHRIS RIGGS, *Acting Executive Director*

## RESOLUTION 2025-08-07-15
## IMPOSITION OF SANCTIONS AGAINST CURALEAF NJ II LLC

**WHEREAS**, pursuant to N.J.S.A. 24:6I-35(a)(15), the New Jersey Cannabis Regulatory Commission ("Commission") shall adopt rules and regulations, which shall include civil penalties for the failure to comply with regulations adopted pursuant to this section; and

**WHEREAS**, pursuant to N.J.A.C. 17:30-20.4(a), during an onsite assessment, a review of financial records, or other Commission review of the license holder and its operations, if the Commission identifies a violation of the Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act, P.L.2021, c. 16, N.J.S.A. 24:6I-31 et seq., (the "Act") or the implementing Personal-Use Cannabis Rules (the "Personal-Use Regulations"), the Commission shall provide notice of the violation, including an official written report of the findings and the nature of the violation, to the cannabis business or testing laboratory within seven business days following the onsite assessment or other identification of the violation; and

**WHEREAS,** pursuant to N.J.A.C. 17:30-20.4(b), unless otherwise specified by the Commission, within 20 business days of receipt of the notice of violation, the cannabis business or testing laboratory shall correct the violation(s) and notify the Commission, in writing, of any corrective actions taken to correct the violations, and the date of implementation of such corrective actions; and

**WHEREAS,** N.J.A.C. 17:30-9.4(g), as well as N.J.S.A. 24:6I-7(g), -7.2(e), and -36(c), requires the maintenance of a labor peace agreement with a bona fide labor organization by a licensed cannabis business, including an expanded ATC, as an ongoing material condition of the cannabis business's license; and

**WHEREAS,** Curaleaf NJ II, Inc. ("Curaleaf") failed to adhere to the statutes and the Personal-Use regulations as it relates to maintenance of a labor peace agreement with a bona fide labor organization; and

**WHEREAS,** on May 6, 2025, a Notice of Violation was issued to Curaleaf (INV-83-2025); and

**WHEREAS,** Curaleaf's prior labor peace agreement between it and UFCW Local 360 was

executed on April 6, 2022, and expired on April 6, 2025. On April 22, 2025, the NJ-CRC advised Curaleaf of the expiration, and requested written verification of a mutual agreement by the parties to extend the labor peace agreement; and

**WHEREAS,** as of August 7, 2025, 122 days since the expiration of its labor peace agreement, Curaleaf has not provided evidence of extending its labor peace agreement with UFCW Local 360 or having executed a new labor peace agreement; and

**WHEREAS,** pursuant to N.J.A.C. 17:30-20.5(a), in response to a violation of any provision of the Act or regulations, the Commission is authorized to take enforcement action or impose sanctions upon a license holder. Sanctions may include, but are not limited to, civil monetary penalties; suspension, revocation, non-renewal, or denial of a license; referral to State or local law enforcement, pursuant to N.J.A.C. 17:30-20.6, -20.7, and -20.8; or any combination thereof; and

**WHEREAS,** pursuant to N.J.A.C. 17:30-20.6(b), a monetary penalty imposed by the Commission on a license holder pursuant to regulations may not exceed $500,000 per major violation or $50,000 per any other license violation; and

**WHEREAS,** pursuant to N.J.A.C. 17:30-20.6(c), a violation by each entity or person per day shall constitute a separate incident for purposes of calculating the number of violations; and

**WHEREAS,** pursuant to N.J.A.C. 17:30-20.6(d), the Commission may impose greater penalties for successive violations up to the maximum amounts; and

**WHEREAS,** pursuant to N.J.A.C. 17:30-20.6(f), the Commission may, in the Commission's sole discretion, consider additional factors in determining the penalty for each violation. Such factors may include, but are not limited to:

1. Any prior violations that the license holder has admitted to or was found to have engaged in;
2. Good faith measures by the license holder to self-report or prevent the violation;
3. The license holder's record of compliance with the laws and rules pertaining to personal use cannabis;
4. Corrective action(s) taken by the license holder related to the current violation or prior violations;
5. Willfulness and deliberateness of the violation;
6. Likelihood of reoccurrence of the violation; and
7. Violations involving damage or danger to the life, health, welfare, safety, or property of any person; and

**WHEREAS,** pursuant to N.J.A.C. 17:30-20.7(a), violations shall be categorized as follows:

1. Category I, which is the exhibition of a pattern and practice of violating the requirements of the rules, posing a serious risk of harm to the health, safety, or welfare of consumers or personnel;
2. Category II, which is the failure to comply with administrative requirements, such that the licensee or permittee poses an immediate and serious risk of harm or actual harm to the health, safety, or welfare of consumers, personnel, or the general public, including, but not limited to, transfer of cannabis to a person under 21 years of age;
3. Category III, which is the submission of fraudulent, false, or misleading information, as to a material fact, to the Commission, or falsifying or concealing any record required to be maintained by the license holder;
4. Category IV, which is the failure of any owner, principal, management services contractor, employee, or volunteer of a cannabis business license holder or testing laboratory to register with the Commission and be issued a Cannabis Business Identification Card; or failure to complete training course, or failure to be in physical possession of their Cannabis Business Identification Card while acting in the course of their duties; and
5. Category V, which shall consist of other violations of the Commission's rules, or violations of valid ordinances established by municipalities that do not constitute a major violation;

**NOW, THEREFORE, BE IT RESOLVED** by the New Jersey Cannabis Regulatory Commission that Curaleaf violated the applicable statutes and regulations by failing to maintain a labor peace agreement with a bona fide labor organization. The Commission further finds that the violation did not pose an immediate and serious risk of harm or actual harm to the health, safety, or welfare of consumers, personnel, or the general public.

The Commission has determined to impose a penalty of **$5,000 per day for 122 days (for a total of $610,000.00)** against Curaleaf in accordance with statute and regulations. A Notice of Enforcement shall be provided to the license holder in accordance with this Resolution and the Commission's regulations.

Pursuant to N.J.A.C. 17:30-20.6(i), the license holder may request an adjudicatory hearing pursuant to the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq., and 52:14F-1 et seq., to contest the Commission's imposition of a civil monetary penalty for any license violation within 14 days of receipt of the Notice of Enforcement Action.

Submitted by:



Dianna Houenou, Chair

**CERTIFICATION**

I hereby certify that the foregoing is a true copy of the Resolution adopted by the Cannabis Regulatory Commission at its meeting held on the 7th day of August 2025.

Dave A Tuason

Dave Tuason, Chief Counsel

| Vote on the Approval of This Resolution | Motion | Second | Yes | No | Abstain | Absent | Recused |
|---|---|---|---|---|---|---|---|
| Chairwoman Houenou | | X | X | | | | |
| Commissioner Mapp | | | X | | | | |
| Vice Chair Nash | X | | X | | | | |

Lowenstein Sandler

**Christopher Porrino**
Partner
Chair, Litigation Department

One Lowenstein Drive
Roseland, New Jersey 07068

T: (973) 597-6314
F: (973) 597-6315
E: cporrino@lowenstein.com

September 5, 2025

**VIA EMAIL AND CERTIFIED MAIL**
Dave Tuason, Chief Counsel
New Jersey Cannabis Regulatory Commission
P.O. Box 216
Trenton, New Jersey 08625-0216
David.Tuason@crc.nj.gov

**Re: Notice of Enforcement Action – Initial Agency Decision Regarding Imposition of Sanctions Against Curaleaf NJ II LLC**
***Request for Adjudicatory Hearing***

Dear Mr. Tuason:

This law firm represents Curaleaf NJ II LLC ("Curaleaf") in connection with the August 25, 2025 Notice of Enforcement Action – Initial Agency Decision Regarding Imposition of Sanctions Against Curaleaf ("Initial Agency Decision"). The Initial Agency Decision states that the New Jersey Cannabis Regulatory Commission ("CRC") has resolved to impose a civil monetary penalty of $610,000.00 against Curaleaf for the entity's purported failure to sign a labor peace agreement with a bona fide labor organization. Please be advised that Curaleaf requests an adjudicatory hearing to dispute the Initial Agency Decision.

As the CRC is aware, Curaleaf previously entered into a labor peace agreement with UFCW Local 360 effective April 6, 2022. The agreement's stated term was three years. Prior to the agreement's expiration, Curaleaf and the union were engaging in good faith negotiations over the terms of a collective bargaining agreement. Despite those efforts, the parties were not able to reach mutually agreeable terms by April 6, 2025.

Through its Initial Agency Decision with accompanying civil monetary penalty, the CRC is in effect penalizing Curaleaf $5,000 for every day that the union declines to come to terms with Curaleaf. The apparent motivation is that the CRC wishes to incentivize Curaleaf to agree to certain of the terms on which the unions insist, but which are not mutually agreeable to both parties. But regardless of the CRC's motives for issuing the Initial Agency Decision, neither the Initial Agency Decision nor the associated fine may stand. The New Jersey statutory and regulatory requirements for labor peace agreements as a condition of continued licensure, and any resultant monetary penalties for purported failure to finalize a collective bargaining agreement with a union, are all superseded by applicable federal law.

For nearly a century, labor relations have been the purview of federal law. The National Labor Relations Act ("NLRA") establishes a comprehensive, uniform system for regulating national labor relations. It governs labor disputes, collective bargaining, and the right to join or not join a

labor organization. It also assigns responsibility for enforcing the national system to a single agency, the National Labor Relations Board ("Board"). When activity is even arguably protected (or prohibited) by the NLRA, the Board has primary jurisdiction to address the issue. States have no power to decide the issue first, either in their courts or in their administrative proceedings.[1]

The NLRA's preemptive effect is broad—so broad, in fact, that it covers much conduct not explicitly regulated. When Congress enacted the NLRA, it deliberately left some subjects to the free operation of market forces. Chief among those subjects were so-called "economic weapons," such as picketing, lockouts, and strikes. Those tactics are as much a part of Congress's design as any conduct the NLRA explicitly regulates. They are therefore equally off-limits for state regulators.[2]

New Jersey's licensing regime invades the NLRA's territory in at least three ways. ***First***, by requiring a labor peace agreement, the licensing regime forces businesses like Curaleaf to reach agreements with labor organizations seeking to represent their employees. Such an agreement would be treated as a "permissive" subject under federal labor law. So under the NLRA, Curaleaf has a right not to negotiate over, much less agree to, any such provision. ***Second***, the labor-peace agreement logically and practically forces Curaleaf (and the labor organization) to forego their respective economic weapons, such as a lockout. It therefore regulates conduct the NLRA leaves deliberately unregulated. ***Third***, by dictating which labor organizations can sign qualifying labor-peace agreements, the regime restricts the right of employees to select their representatives in collective bargaining.[3] Any union who signs a labor peace agreement will have an insuperable advantage in organizing the employees; and by virtue of the regime's requirements and existing no-raiding agreements among major labor unions, nearly all other qualifying unions will be barred from even trying to represent the employees. The regime therefore denies employees the right to choose protected by federal law.

Collective bargaining, economic weapons, and employee representation are all the exclusive purview of federal law. They cannot be regulated by the State. New Jersey's licensing regime, and its labor-peace requirement in particular, are preempted.

Accordingly, Curaleaf disputes the validity of the Initial Agency Decision and requests both an adjudicatory hearing and all other review opportunities available to it under applicable law.

Respectfully submitted,

*<u>/s/ Christopher S. Porrino</u>*
Christopher S. Porrino

09/05/2025 315891222.1

---

[1] San Diego Bldg.& Trades Council v. Garmon, 359 U.S. 236, 245 (1959).
[2] Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp. Rels. Comm'n, 475 U.S. 608, 619 (1986).
[3] Hill v. State of Fla. ex rel. Watson, 325 U.S. 538, 541–43 (1945).

# Exhibit 2

***State of New Jersey***
OFFICE OF ADMINISTRATIVE LAW
P.O. Box 049
Trenton, NJ 08625-0049

OAL Docket. No.: CRC 17461-2025 S

Agency Ref. No.: n/a

Transmitting Agency: Cannabis Regulatory Commission

Filing Date: October 06, 2025
*******************************************
Curaleaf NJ II, LLC v.
NJ Cannabis Regulatory Commission

Notice of Filing
*******************************************
Nature of proceeding:

Petitioner challenges an imposition of civil monetary penalty in the amount of $610,000.00

This case was received by the Office of Administrative Law (OAL) on the above filing date and given the docket number above. You will receive another notice informing you of the date and location of the hearing. Please refer to the docket number in any correspondence and have the docket number available if you call the OAL at 609-689-4034.

The rules controlling the hearing, including discovery, motions, and other pre-hearing and post-hearing procedures, are found in N.J.A.C. 1:1-1 et. seq. These rules can be accessed through a link on the Office of Administrative Law's website: www.state.nj.us/oal. (see the "Rules" section under the Rules tab). Additional information about the hearing process is also on the website. (see the "Hearing" section under the Hearing tab).

Parties may represent themselves, may be represented by an attorney, or in some cases, may be represented by qualified nonlawyers. The standards for nonlawyer representation are in N.J.A.C. 1:1-5.4 et. seq. Nonlawyer representatives must submit a Notice of appearance/application on an OAL form at least 10 days before the hearing. Forms are available from the OAL clerk or on the OAL website (see "Notice of Appearance/Application under the Forms tab).

October 08, 2025
Date

Deputy Clerk, OAL

*State of New Jersey*
OFFICE OF ADMINISTRATIVE LAW
P.O. Box 049
Trenton, NJ 08625-0049

SERVICE LIST
OAL DOCKET NO. CRC 17461-2025 S

David Tuason, Chief Counsel
NJ Cannabis Regulatory Commission
PO Box 216
Trenton, NJ 08625-0216

Christopher Porrino, Esq.
Lowenstein Sandler, LLP
One Lowenstein Drive
Roseland, NJ 07068

Deborah Shane-Held, DAG
Div. of Law, L&PS
25 Market St.
PO Box 112
Trenton, NJ 08625-0112

# Exhibit 3

curaleaf

June 2, 2025

Paul Thomas Urbish
Director
Office of Compliance and Investigations
New Jersey Cannabis Regulatory Commission
P.O. Box 216
Trenton, NJ 08625

***Re: May 6, 2025 Notice of Violation***

Dear Mr. Urbish,

Curaleaf received the Notice of Violation issued by the New Jersey Cannabis Regulatory Commission (NJ-CRC) on May 6, 2025. In response to the Notice of Violation, Curaleaf submits that in an effort to comply with the relevant NJ statute, as referenced in the Notice of Violation, requiring the maintenance of a Labor Peace Agreement (LPA), Curaleaf executed a LPA with UFCW Local 360. The LPA included a three-year term that has now expired[1].

Prior to expiration, Curaleaf actively negotiated specific terms directly with UFCW Local 360 that Local 360 was unwilling to agree to. As a result, Curaleaf is now in negotiations with another union. The relevant NJ statute does not require specific terms. The only stated requirement is entering into and maintaining a LPA with a *bonafide* labor organization. As such, Curaleaf has the discretion to determine acceptable terms that exceed the basic requirements of the statute.

In addition, Curaleaf has been in negotiations with UFCW Local 360 for over two years and the parties are now at an end. Curaleaf NJ employees will participate in a contract ratification vote in the coming weeks. During collective bargaining, the parties reached tentative agreement on a no strike clause that will be included in the final collective bargaining agreement (CBA). Such a clause ensures there are no strikes or work stoppages for the duration of the CBA, which in this instance would be three years. As the parties have reached agreement to take a final CBA proposal to a ratification vote, it is likely the CBA will be ratified in effect guaranteeing labor peace.

Sincerely,

Cristina Nutzman
SVP, Associate General Counsel, Labor, Employment, EHS

---

[1] The legality of state mandates that licensees become a party to a LPA has been called into question in a number of courts; See *Ctrl Alt Destroy Inc. v. Elliot et. al.*, 3:24-cv-00753, (S.D. Cal. April 26, 2024); *Hybrid NYC LLC v. New York State Cannabis Control Board et.al.* Case No. 1:25-cv-03067 (S.D.N.Y April 14, 2025); *Casala LLC, d/b/a Bubble's Hash and Rec Rehab Consulting LLC, d/b/a Ascend Dispensary v. Tina Kotek, in her official capacity as Governor of the State of Oregon, et al.*, Case No. 3:25-cv-244-SI (D.Or. May 20, 2025). In *Casala*, the court ruled that the United for Cannabis Workers Act was preempted by the National Labor Relations Act. On May 29, 2025, the Oregon Liquor and Cannabis Commission declared that it will no longer require LPAs as part of cannabis license applications and license renewals.

**LITTLER MENDELSON, P.C.**
Keith J. Rosenblatt (016631997)
krosenblatt@littler.com
Alan I. Model (035511993)
amodel@littler.com
Anastasia Stylianou (198022017)
astylianou@littler.com
One Newark Center, 8th Floor
Newark, NJ 07102
973.848.4700
Attorneys for Plaintiffs
*Curaleaf Holdings, Inc.*
*and Curaleaf NJ, II, Inc.*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CURALEAF HOLDINGS, INC., a British Columbia corporation, and CURALEAF NJ, II, INC., a Delaware corporation,<br><br>Plaintiffs,<br><br>v.<br><br>NEW JERSEY CANNABIS REGULATORY COMMISSION, CHAIR DIANA HOUENOU, COMMISSIONERS KRISTA NASH and AMELIA MAPP, and ACTING EXECUTIVE DIRECTOR CHRISTOPHER RIGGS, in their official capacities,<br><br>Defendants. | Civil Action No. 3:25-cv-16397-MAS-RLS<br><br>**DECLARATION OF MICHAEL J. MAURO** |

I, Michael J. Mauro, declare as follows:

1. I am over the age of 18 and have personal knowledge of the facts stated in this declaration either through my own observations and experience or as made known to me in the course of my employment with Curaleaf, Inc.

2. I serve as the Vice President and Assistant General Counsel at Curaleaf. In that capacity, I am responsible for overseeing Curaleaf's labor and employment legal strategy, providing oversight and guidance on all related matters.

3. I make this declaration in support of Plaintiff's Reply Brief in Further Support of Their Motion for Preliminary Injunction and in Opposition to Defendant's Motion to Dismiss.

4. On September 28, in response to Curaleaf's application to renew its annual license for its Bordentown facility, the Commission provisionally granted the license application, but it did so only upon confirmation that Curaleaf secure an LPA for the facility on or before October 31, 2025. The renewed license now carries an expiration date of December 29, 2025.

5. Recently, Curaleaf's employees have ratified collective bargaining agreements across all New Jersey facilities. On October 30, 2025, Curaleaf's employees ratified the collective bargaining agreement for its retail locations and on October 17, 2025, its cultivation facilities.

6. Each agreement is binding for a three-year term and includes strict no-strike and no-lockout provisions. The agreement for retail locations was finalized on October 30, 2025, following the earlier ratification for cultivation facilities on October 17, 2025.

7. The no-strike provision explicitly prohibits the Union, its officers or agents, and all employees covered by the agreement from instigating, promoting, sponsoring, engaging in, or condoning any strike, sympathy strike, refusal to cross a picket line during work hours, secondary boycott, speedup, sit-down, concerted work stoppage, mass absenteeism, or any demonstrations that disrupt Curaleaf's operations.

8. The lockout provision affirms that Curaleaf will not impose a lockout on bargaining unit employees during the term of the agreement. It further defines a lockout as Curaleaf's use of an economic weapon by preventing the performance of bargaining unit work.

9. These provisions prevent labor disruptions to at least the same extent as any labor-peace agreement to which Curaleaf has been a party, including its labor-peace agreement with the United Food and Commercial Workers Union, Local 360, which was accepted by the Cannabis Regulatory Commission as a valid labor-peace agreement until it expired in April 2025.

10. True and accurate copies of the ratified collective bargaining agreements for Curaleaf's New Jersey facilities are attached to this declaration.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed December 8, 2025.

Michael J. Mauro
Vice President, Assistant General Counsel

# EXHIBIT A

Cultivation

Table of Contents

Table of Contents------------------------------------------------------------------------------------------1

Preamble

Article 1- Recognition--------------------------------------------------------------------------------

Article 2- Union Security and Checkoff---------------------------------------------------------------

Article 3- Leave of Absence---------------------------------------------------------------------------

Article 4- Management Rights-----------------------------------------------------------------------

Article 5- Holidays---------------------------------------------------------------------------------

Article 6- Vacation-------------------------------------------------------------------

Article 7- Sick Leave-------------------------------------------------------------------------------

Article 8- Jury Duty--------------------------------------------------------------------------------

Article 9- Funeral Leave----------------------------------------------------------------------------

Article 10- Grievance Procedure---------------------------------------------------------------------

Article 11- Union Representation/Shop Steward--------------------------------------------------

Article 12- Non-Discrimination------------------------------------------------------------------------

Article 13- Employee Discount and Tips----------------------------------------------------------

Article 14- No Strike / No Lockout--------------------------------------------------------------------

Article 15- Severability-----------------------------------------------------------------------------

Article 16- Hours of Work--------------------------------------------------------------------------

Article 17- Seniority--------------------------------------------------------------------------------

Article 18- Discipline and Discharge--------------------------------------------------------------

Article 19- Wages, Pay Period and Wage Statement---------------------------------------------

Article 20- Health and Welfare----------------------------------------------------------------------

Article 21- Retirement-----------------------------------------------------------------------------

Article 22- Uniforms-------------------------------------------------------------------------------

Article 23- Safety----------------------------------------------------------------------------------

Article 24- Successor Language-------------------------------------------------------------------

Article 25- Duration of Agreement-----------------------------------------------------------------

# Agreement

## Preamble

This Agreement, entered into by and between Curaleaf NJ II (the "Employer") and United Food and Commercial Workers Union, Local 360 (the "Union"), shall be effective upon execution by both parties.

## Article 1- Recognition

**Section 1:** The Employer hereby recognizes the Union as the sole collective bargaining representative for employees at the Employer's unionized cultivation facilities in the State of New Jersey as follows:

a. Included: All full-time and regular part-time Cultivation Associate, Delivery Driver, Extraction Technician, Fertigation Technician, HPLC Technician, Inventory Coordinator, IPM Technician, Kitchen Technician, Lead Cultivation Associate, Lead Extraction Technician, Lead Fertigation Technician, Lead HVAC Technician, Lead IPM Technician, Lead Kitchen Technician, Logistics Coordinator, Lead Production Technician, Lead Sanitation Technician, Maintenance Technician, Production Technician, Sanitation Technician, and Shipping & Receiving Coordinator.

b. Excluded: All other employees, including managers, guards, confidential employees and supervisors as defined by the Act.

**Section 2:** The Employer recognizes the Union as the sole and collective bargaining agent for all regular full and part-time cultivation, production and processing employees employed by the Employer at its Winslow, New Jersey production facility.

## Article 2 – Union Security and Checkoff

**Section 1**: It shall be a condition of employment that all employees covered by this Agreement who are members of the Union in good standing on the effective date of this Agreement shall remain in good standing and those who are not members on the effective date of this Agreement shall become members and remain members in good standing in the Union on the first of the month following thirty (30) days of employment. It shall also be a condition of employment that all employees covered by this Agreement hired on or after its effective date, whichever is later, shall, become members and remain members in good standing in the Union, not later than the first of the month following thirty (30) days of employment. At time of hire, all necessary Union

forms will be provided by the Union, which will then be completed and forwarded to the Union on a monthly basis.

Upon written notice by the Union to the Employer that an employee has not complied with the requirements of this Article, the Employer shall terminate the employment of said employee, inform the employee of the reasons for the termination of employment, and advise the Union thereof in writing and or email, unless to the extent doing so would be in violation of applicable law, to require that the employee pay to the Union membership dues and initiation fees, or the amount equivalent thereto, required by the Union membership.

The Union's written notice to the Employer shall verify that the Union (1) notified the employee of the employee's failure to pay dues; (2) provided an itemized list of payments due; (3) provided a warning to the employee of the consequences of nonpayment; (4) specified a deadline payment is due; and (4) provided a reasonable opportunity to make payment. The Employer has the right to investigate compliance with these elements before notifying the employee of the discharge.

**Section 2**: The Employer shall promptly, after the effective date, give the Union a list containing the names, the last four of Social Security Numbers, home addresses, and available personal telephone and email addresses of employees covered by this Agreement, as well as their job classifications and dates of hire, and shall thereafter furnish this information for all new employees in the bargaining unit within thirty (30) days following their hire date. Any disclosure of confidential information shall be done in accordance with applicable law of the State of New Jersey, if any.

**Section 3**: Deductions. Pursuant to a written authorization received from employees in accordance with applicable law and one-time notice to the Employer by the Union thirty (30) days in advance of the activation of this Section, the Employer shall regularly deduct from the wages of each such employee, Union dues, initiation fees and/or assessments, which the Employer shall pay over to the Union or its duly authorized representative. The Union will provide the Employer with a written document (email or otherwise) acknowledging its receipt of all such payments promptly upon receipt of the payments. Such deductions must be paid over to the Union on or before the twentieth (20) day of each month, covering the amounts so deducted in the prior month.

**Section 4:** The Union agrees to indemnify the Employer and its officials, representatives and agents from any and all claims, demands, suits or other forms of liability (monetary or otherwise) and costs resulting from the Employer's adherence with a checkoff authorization or otherwise with this Article.

## Article 3- Leave of Absence

**Section 1:** Leaves of absence will be granted in accordance with applicable federal, state, and municipal laws.

**Section 2:** At the sole discretion of the Employer, the Employer may grant an unpaid personal leave of absence of up to twenty-one (21) consecutive calendar days to employees, and have

completed their probationary period, for employees to tend to reasonable personal or family-related matters, once per twelve (12) month period. Approval or denial of requested unpaid personal leave and the duration of such leave will be based on reasonable business considerations, including staffing considerations of the operation as well as significant performance issues of the requesting employee. Requests for a leave of absence must be submitted as soon as practicable after the employee is aware of the need for leave and must be approved prior to taking the leave.

**Section 3:** Time spent on leaves of absence will not be used for computing PTO accrual and employees on leave of absence will not be paid for holidays on which they are on leave.

## Article 4 - Management Rights

**Section 1**: Except as expressly limited by this Agreement, all rights possessed by the Employer prior to the signing of this Agreement are retained by the Employer and remain exclusively within the rights of management. Such rights of management include, but are not limited to, the following: the exclusive right to plan, direct, and control the Employer's operations; to hire, promote, assign, transfer, or lay-off employees; to discipline, demote, suspend, or discharge non-probationary employees for just cause or probationary employees for any lawful reason; to determine any job selection or job posting processes; to increase or decrease the size of the workforce; to determine the skills, experience, training, and other qualifications required for the job; to create or modify existing job classifications and distribute job duties within job classifications; to determine the work hours, work weeks, work schedules, shifts, and the means and processes by which employees clock in and out of work, to determine standards for operation; to determine the number of employees assigned to any job classification or any work assignments; to select or change any third-party administrators, record keepers, or vendors that administer any employee benefit plans or provide payroll or related services; to determine the standards of quality and quantity of work; to determine and regulate the use of all material, equipment, and other property of the Employer; to determine the amount (if any) of promotional or marketing materials and items (also known as swag) to employees; to establish and implement sales incentive programs; to determine the products to be produced and sold and the processes for manufacturing and selling; to determine the events to be scheduled; to determine the materials, equipment, machinery, lockers, and supplies to be used; to determine appropriate search procedures (i.e. search of employee lockers, etc. but not vehicles, on Curaleaf property); to determine the type and scope of any uniforms and personal protective equipment (PPE); to determine when and where any uniforms or PPE are to be worn and proper care by employees of uniforms and PPE; to introduce new methods, materials, or techniques; to determine the layout of the Employer's worksites, and the size and character of its operations; to determine the need for and type of technological changes and to implement such; to determine the location of its facilities; to determine, change, or improve the physical condition of its facilities; to move, close, sell, lease, or liquidate part or all of its operations; to lay off or terminate its employees in connection with said moving, closing, selling, leasing, or liquidating; to determine, modify, change, add to, or delete the content and qualifications for job classification(s); and, to determine the qualifications for all jobs. The Employer may implement reasonable rules, regulations and procedures regarding equal employment opportunity and Non-Discrimination.

**Section 2:** The Employer has the right to subcontract limited bargaining unit work, such as limited duration project work or work requiring special skills or equipment for the efficient and effective operation of the business. The Employer will notify the Union of its decision to subcontract such work at least seven (7) days prior to the work being subcontracted, unless the Employer needs to subcontract the work immediately to meet business needs, in which case the Employer will notify the Union as soon as possible. The Employer also has the right to hire through temporary agencies, as needed, to staff positions. Temporary employees will not remain in a temporary capacity for longer than ninety (90) days, and if hired to become regular Curaleaf employees up to sixty (60) days worked in the temporary role will count toward the ninety (90) day Curaleaf probationary period. Temporary employees will be paid on the same wage scale under the contract as regular probationary employees but will not be entitled to benefits under the contract.

**Section 3:** Given the highly regulated nature of the cannabis industry, the Employer and the Union understand the importance of adhering to professional, legal, ethical, and compliant business practices and standards. It is expressly understood that the Employer has the right to establish, change, and enforce rules, regulations, policies, procedures, handbooks, and practices to assure the orderly, safe, productive, and/or efficient operation of the business; a respectful and civil working environment; including, but not limited to, rules and policies regarding safety protocols, attendance, use of drugs and alcohol, etc., so long as such rules, regulations, policies, procedures, and practices do not conflict with a specific provision(s) of this Agreement. Any change to rules, regulations, policies, procedures, handbooks, or practices must be provide to employees in writing. The Employer also agrees that any change in handbook policies shall first meet with the Union prior to implementation with the bargaining unit. Nothing in this Section shall be interpreted as requiring the Employer to post or distribute verbal or written instructions, directions, practices, procedures, or explanations that are part of the normal, routine managerial functions involving day-to-day operational matters. When the employer makes material change to work rules or handbook policies, it shall notify the Union prior to implementation.

**Section 4:** Nothing in this Agreement shall restrict the Employer's right to have supervisors and managers perform work normally performed by bargaining unit employees under any of the following circumstances: (A) experimental, testing, or trial work on new products, material, equipment, or work processes; (B) work performed for the purpose of training or instructing employees; (C) emergency situations in which the failure to perform the work might result in bodily injury, hazardous conditions, or loss or damage to material, equipment, product, etc.; (D) work to fill in for bargaining unit employees who are absent from work or otherwise unavailable and to meet basic staffing needs where bargaining unit staff is not readily available to meet these needs; and (E) work necessary to timely meet patient commitments or operational needs where there is not current staff available to meet these needs. This provision shall not be utilized to diminish the scope of bargaining unit work.

**Section 5:** In the event of an accident, fire, flood, power failure, weather or natural disaster, government or court action, civil strife, riot, evacuation of the premises by public authorities, health crisis or pandemic, state or federal state of emergency, war, act of terrorism, act of God, or any similar cause impacting the Employer which could not have been prevented by the Employer (hereinafter "force majeure event"). A force majeure event is further defined as an

act, event or occurrence which due exclusively to an extraordinary natural force free of human interference and which could not have been prevented by the exercise of reasonable care and foresight. For the Employer to exercise this provision: (1) the Employer must not be directly responsible for the force majeure event; (2) the force majeure event must involve situations which threatens to impair operations materially; (3) the force majeure event must be of limited time duration; (4) any violation or suspension of contractual terms must be unavoidable and limited only to the duration of the force majeure event.

The Employer reserves the right to respond to the force majeure event by unilaterally changing hours or relate conditions of employment, for the duration of the force majeure event. The Employer shall provide the Union with notice of the force majeure event as expeditiously as practical and any contemplated changes prior to implementation, and provide an opportunity to bargain the effects of such changes, unless doing so is not possible or practicable. If a force majeure event continues for more than sixty (60) days, then the Employer agrees to give the Union an opportunity to meet and negotiate whether any changes made in response to the force majeure event will continue. This provision is subject to the grievance arbitration provision of this Agreement.

**Section 6:** The Employer's failure to exercise any right hereby reserved to it shall not constitute a waiver by the Employer of any such right or preclude the Employer from exercising the same right to its fullest extent at a later date or in some other way not in conflict with the specific, express terms of this Agreement. The Union's failure to object to the improper exercise of any right under this Article shall not operate as a waiver or preclude the Union from asserting a violation at a later date.

## Article 5- Holidays

Section 1: The Employer recognizes the following paid holidays:

New Year's Day
MLK day
Presidents' Day
Memorial Day
Juneteenth
Independence Day
Labor Day
Thanksgiving Day
Christmas Day

Additionally, full-time and part-time cultivation employees also have one (1) floating holiday per year. Use of this floating holiday requires manager approval in advance and work should not be performed on the floating holiday. It will be paid at the regular rate of pay. Employees who do not use their floating holiday will not be paid for it at year end.

**Section 2:** All employees will be paid for holidays as long as they were present for work on the workdays immediately before and after that holiday, had a previously approved planned day or

days off, or had a scheduled absence. For holidays on which employees do not work, holiday pay will be paid to full-time employees based on the employee's straight time hourly rate multiplied by eight (8) hours and to part time employees by their straight time hourly rate multiplied by four (4) hours. If a paid holiday falls within an employee's vacation period, the holiday will not be counted as a vacation day. Holiday pay will not count as hours worked for overtime purposes.

**Section 3:** During the first year of this Agreement, employees (a) were employed on or before the ratification date of this agreement shall be paid 2 ½ times their regular rate of pay when they perform work on a paid holiday and (b) all other employees shall be paid 1 ½ times their regular rate of pay when they perform work on a paid holiday. During the second and third years of this Agreement, all employees will be paid 1 ½ times their regular rate of pay when they perform work on a paid holiday.

**Section 4:** When the Employer's facility is closed in observance of a holiday, regular status Employees who are normally scheduled to work will be paid for the length of their regularly scheduled shift. Full-time Employees will be paid no less than 8 hours of holiday pay, and part-time Employees will be paid no less than 4 hours of holiday pay.

## Article 6 – Vacation

Regular full-time employees are eligible to accrue vacation time on per pay period basis. The accrual for this policy starts on the day an employee is hired and there is a 90-day wait period until an employee may take vacation. Vacation is accrued on the following schedule:

| Completed Years of Employment: | Vacation Hours: |
|---|---|
| 0 to Less than 3 years | 80 Hours (3.08 hours per pay period) |
| 3 to less than 5 years | 96 Hours (3.69 hours per pay period) |
| 5 to less than 10 years | 120 Hours (4.62 hours per pay period) |
| 10 years and up | 160 Hours (6.15 hours per pay period) |

The maximum amount of vacation hours an employee accrues is determined by the employee's rate of accrual. Any increase to an employee's rate of accrual will take place on the pay period following the employee's anniversary date.

To request time off, a Time Off Request must be submitted to an employee's supervisor using the attendance management system. The supervisor will then check to ensure there are no conflicts for the dates/times requested and approve or reject the Time Off Request

Accrued and unused vacation time is required to be used when taking time off and employees are not permitted to take unpaid time off in lieu of accrued, unused vacation time.
Requests for using vacation time must be made as soon as possible, but not later than 14 days before the date of absence, except in unforeseen or emergency situations.

During the year, employees may use up to 40 hours of vacation time that they have not earned yet, causing the employee's vacation balance to go negative up to 40 hours.
Up to a maximum of 40 hours of vacation time earned but not used during the calendar year may be carried over to the following calendar year. All other earned but unused vacation time will be lost and may not be carried over from year to year, unless otherwise required by applicable state law.

Employees whose employment terminates will be paid for any vacation earned but not used through the date of termination. If a terminated employee's vacation balance is negative at the time of termination, then this time will be deducted from their final paycheck and paid back to Curaleaf, except to the extent prohibited by applicable law. Employees may not take vacation days once they have given notice of resignation.

## Article 7 - Sick Leave

**Eligibility, Amount, and Use of Paid Sick Leave**

All regular full-time and part-time employees are eligible for paid sick leave as described in this Article.

The Employer will grant each full-time employee a lump sum of 40 hours of paid sick leave each calendar year on January 1. Newly hired employees will receive a lump sum of paid sick leave during their first partial calendar year of employment depending on date of hire, according to the schedule below:

| Start Date | Paid Sick Leave Hours |
|---|---|
| January 1-September 30 | 40 hours |
| October 1- December 31 | 20 hours |

All part-time employees will earn sick leave at a rate of 1 hour per every 30 hours worked, up to a maximum of 40 hours per calendar year.

Employees may not use paid sick leave until an employee's 90th day of employment. Employees may carry over up to 40 hours of unused sick leave from one calendar year to the next. Unless otherwise required by state law, no employee may accrue greater than 40 hours of sick leave per year. The cap on the total sick leave balance an employee may have at any given time is up to 80 hours. Employees may use a maximum of 80 hours of paid sick leave per calendar year.

Employees may use paid sick leave if an employee or an immediate family member (i) is ill or injured, (ii) need to attend doctor's appointments for urgent, continued or preventative care, ~~or~~ (iii) if an employee or an immediate family member is a victim of family violence or sexual assault and require time off to address those circumstances, or other reason provided by the New Jersey Earned Sick Leave statute.

Employees will be paid for sick leave at their base salary or base hourly rate of pay. Employees may use paid sick leave in increments of 30 minutes or more, to cover up an 8-hour workday. Use of paid sick leave must be recorded in Wurk, Deputy, or the current HRIS (HR Information System).

If an employee misses work or are on a leave of absence related to any of the qualifying reasons listed above, and the employee has available sick leave to use, the Company reserves the right to automatically use this available sick leave.

Any unused sick leave under this Article will not be paid out at year end or upon separation, but if an employee is rehired, the employee's prior service will be credited in accordance with applicable law.

**Notice and Documentation**

For absences of three or more consecutive days under this Article, or under other circumstances permitted by applicable law, an employee may be required to provide the Employer with reasonable documentation from a licensed health care provider indicating the need for sick time taken. In addition, an employee may be required to provide written confirmation that the employee used sick time in accordance with this policy. The Employer will keep confidential any documentation or verification information provided regarding paid sick leave use, in accordance with federal, state and local law.

If an employee is absent for three or more consecutive days under this policy due to their own illness or injury, the Employer may require the employee to provide medical documentation confirming that they are well enough to return to work.

Employees are required to provide at least 3 days advance notice of the employee's intention to use sick leave unless the need for leave is unforeseeable. In all circumstances, employees are responsible for specifying that the time off is for paid sick leave reasons (as opposed to, for example, vacation), so that the absence may be designated as a paid sick leave absence.

So long as an employee provides adequate notice of their need for foreseeable sick leave, and as soon as it is practical for unforeseeable leave, the Employer will not count an employee's use of paid sick leave s an unexcused absence or "occurrence" under any Company attendance policy. Therefore, any such use of paid sick leave will not lead to or result in discipline, demotion, suspension, or termination. Employees may request, and use paid sick leave under this Article without fear of retaliation or discrimination, which the Employer prohibits. However, discipline may be taken against an employee who uses paid sick leave for a purpose not covered by, or in a manner not consistent with, applicable paid sick and safe time or mandatory paid time off law or this Article, or who violates this Article's requirements concerning requesting, using, recording, verifying, and/or documenting use of paid sick leave.

## Article 8 - Jury Duty

Curaleaf encourages all employees to fulfill their civic responsibilities and to respond to jury service summons or subpoenas, attend court for prospective jury service or serve as a juror. Under no circumstances will employees be terminated, threatened, harassed, coerced, or penalized because they request or take leave in accordance with this policy.

All employees, including temporary employees, will receive their regular compensation during the first five (5) days of jury service. Any additional time off under this policy will be without pay. Employees may use vacation time for jury duty after the fifth day, if otherwise available.

Employees scheduled to work at night will not be required to: (l) work beyond midnight the night before first day of jury service; (2) work while impaneled on a trial unless authorized by the judge; or (3) be required to work on the last day of service is released by the court after 4 pm.

Employees shall provide their supervisor with notice of any jury summons or subpoena within a reasonable amount of time after receipt and before their appearance is required. Verification from the court clerk of having served may also be required.

## Article 9 - Funeral Leave

The Employer will provide regular full time and part time employees with up to three days of paid bereavement leave per year to attend or prepare for the funeral services and/or bereave the death of an immediate family member. For purposes of this Article, "immediate family" is defined as the employee's spouse, domestic partner, parents, stepparents, domestic partner's parents, children, stepchildren, siblings, stepsister, stepbrother, grandparents, grandchildren, mother-in-law, and father-in-law or any other relative that resides in the employee's household. The Employer will provide regular full-time employees with up to one day of paid bereavement leave to attend or prepare for the funeral services or bereave the death of a family member who is not immediate, but to whom the employee is related by blood or marriage. Direct all requests for Bereavement Leave to an employee's supervisor or People and Culture partner. While on Bereavement Leave, an employee will be paid at straight time for the hours the employee was scheduled to work on the days missed.

## Article 10 - Grievance Procedure

**Section 1:** In the event of a dispute/grievance over the interpretation of this Agreement the procedure set forth below shall be followed.

**Section 2:** For purposes of this Agreement, a grievance is defined as a complaint that the application or interpretation of a specific provision or provisions of this Agreement violates or fails to comply with one or more provisions of this Agreement. A controversy as to any matter not specifically covered by a provision of this Agreement, or which arose prior to the signing of this Agreement, shall not be subject to the grievance procedure. A grievance may be brought by the Union or the Employer. The procedures set forth in this Article shall be the exclusive means for the disposition of all grievances under this Agreement.

Step One: Prior to the filing of any written grievance in Step Two below, the affected employee or the Union Representative (with or without the presence of a Union Steward at the employee's option) shall first discuss the matter with the immediate supervisor (or a member of management if the employee is not comfortable discussing the issue with the supervisor) to try to resolve the matter informally in a mutually satisfactory manner. Employees are encouraged to try to resolve issues with the Employer's leadership team before pursuing a formal grievance. It is expressly understood that the immediate supervisor and/or manager and the employee may resolve the grievance at this step, but such resolution shall not be considered a binding precedent on the parties to this Agreement. If the grievance has not been resolved informally and the employee wishes to pursue the matter further, a Union representative must elevate the grievance to Step Two by submitting a written grievance. An email that sets forth the information listed below shall suffice as a written grievance submission. Other than grievances that start at Step Two as set forth in this Article, no grievance will be processed at Step Two until the employee has complied with the Step One procedures.

Step Two: To be valid, all grievances must be presented in writing to the Employer within fourteen (14) days the date the employee first knew or should have known of the event(s) or condition(s) giving rise to the grievance, or within twenty-eight (28) days for any grievance involving pay. To be valid, all grievances at Step Two must be presented in writing and should include the following basic information: (1) the approximate dates and times of the alleged event(s) giving rise to the grievance; (2) a brief description of the circumstances that gave rise to the grievance sufficient to provide the parties with an understanding of the nature of the claim(s) involved that establish a contract violation; and (3) the relief or remedy sought. An email or a letter that sets forth the information listed below shall suffice as a written grievance submission.

The Employer shall issue a written answer to the grievance within the latter of fourteen (14) days following receipt of the written grievance or fourteen (14) days following the Union and the Employer meeting (by phone or in person) to discuss the grievance. Both parties shall make themselves available within a reasonable period of time to meet to discuss the grievance so as not to delay the Employer's answer.

Step Three: If the grievance is not satisfactorily resolved in Step Two, it may be submitted to final and binding arbitration upon the written request of the Union or Employer within fourteen (14) days after the Union receives the Employer's written answer.

**Section 3:** If either party fails to comply with any of the terms of this Article, or fails to file a timely grievance, or fails to timely move the grievance to the next step, the grievance involved shall be deemed waived and the matter resolved, the matter shall be ended with prejudice, and the grievance will not be subject to further reconsideration.

**Section 4:** Grievances involving the termination of an employee's employment may start at Step Two of the grievance procedure, provided that any such grievance must be presented in writing as set forth above within fourteen (14) days after the termination. Grievances brought by the Employer also will be initiated at Step Two with a meeting between the Union Representative and the Employer's Site Manager, or his/her designated representative.

**Section 5:** If arbitration is requested, the Union and Employer may first attempt to agree upon an impartial arbitrator. If they cannot agree on an arbitrator, the selection of an arbitrator shall be from a list of names provided by the American Arbitration Association.

**Section 6:** Each arbitration hearing shall deal with not more than one (1) grievance unless the parties mutually agree in writing. The Company and the Union may continue to attempt to resolve the grievance prior to arbitration.

**Section 7:** The Employer will not be responsible for any lost pay incurred by the grievant(s) or any other employee(s) who are called to testify as witnesses at any arbitration hearing. If an employee seeks to have time off for purposes of an arbitration, he/she should provide the Employer with reasonable advance notice of the requested time off to ensure staffing coverage can be arranged. The Employer may adjust or stagger the release of employees so as not to interfere with work. Employees released from work under this provision will be expected to return to work as soon as practicable after they have testified, or upon recess of the hearing.

**Section 8:** The fees and expenses of the arbitrator will be shared equally between the Union and the Employer. All expenses for the location for the arbitration hearing shall also be shared equally. If the parties both want a transcript of the hearing, they will split the cost of any court reporter and transcript costs. All other expenses, including those connected with the calling of witnesses, etc., shall be borne by the party incurring such expenses.

**Section 9:** For termination grievances under this Agreement, backpay awards shall be limited to the amount agreed to by the Employer and Union, or as ordered by the arbitrator, minus any unemployment compensation benefits and any other compensation the aggrieved employee may have received from any other source (including self-employment) during the period for which backpay is claimed.

**Section 10:** The parties may file post hearing briefs. The arbitrator's decision shall be in writing and shall be final and binding.

**Section 11:** The arbitrator shall be bound by the law applicable to the grievance properly presented. The arbitrator shall have no power to alter, modify, amend, change, add to, or subtract from any of the terms of this Agreement.

**Section 12:** For any grievance properly submitted to arbitration under the Grievance and Arbitration provisions of this Agreement and mutually agreed upon by the parties to have any related unfair labor practice charge(s) deferred to the Grievance and Arbitration provisions herein, the parties hereby authorize the arbitrator to decide the alleged unfair labor practice issues in the underlying arbitration case, including whether or not either party in the underlying arbitration case has committed a statutory violation of the National Labor Relations Act.

**Section 13:** All of the time limits specified in this Article are to be strictly applied, and may be extended only by mutual written agreement of all parties. Employer recognized holidays shall be excluded in computing any time limits set forth above.

**Section 14:** Unless doing so poses an immediate risk to the employee's personal health or safety, notwithstanding the pendency of any grievance, all employees are expected to comply with, and faithfully carry out, all orders, instructions, and policies, whether written or oral, even though they may be the basis for the grievance, and failure to do so constitutes insubordination.

## Article 11- Union Representative/Shop Steward

### Union Access

Section 1. The Union may designate in writing to the Employer the name(s) of up to two (2) Union representatives per cultivation facility who will be responsible for bargaining unit employees. The Union may change the identity of these persons through written notice to the Employer, but the Employer will only recognize the person(s) so designated.

**Section 2:** In the event a designated Union representative wants to visit the Employer's facility to ascertain whether this Agreement is being observed and carry out other obligations of the Union related to the bargaining unit, he/she shall first notify the Employer's designated People and Culture Partner for the facility. Notification shall be made via email by the Union Representative at least two (2) business days in advance (unless the need for the visit is urgent, then the visit can be requested twenty-four (24) hours in advance, except in the case of an emergency) and shall include the proposed date and approximate time of the visit, the general nature or reason for the visit and the names of any employees he/she may wish to pull off the work floor to meet with during the visit. The Employer shall not unreasonably deny the Union's request, but the parties agree that three visits during each month would be considered reasonable, absent documented special circumstances. The Union representative should appreciate current business considerations and not disrupt patient care or the performance of employee(s)' work, as set forth below.

The Union representative will enter the Employer's facility through the main entrance, notify the designated People and Culture Partner for the facility of his/her arrival, and wait in the front area for the , or another Employer representative designated by Except in the waiting area or lobby, the Union representative shall be accompanied by a Curaleaf representative in all areas of the facility unless otherwise approved in writing by the designated People and Culture Partner for the facility. The Employer may limit access to any part of the facility designated as a restricted area in accordance with the applicable laws or regulations. The Union Representative also shall follow applicable regulations, the Employer's rules and policies regarding conduct, safety and hygiene protocols, and don protective or sanitary clothing/equipment, depending upon the areas to be accessed.

**Section 3:** If the designated Union Representative wishes to personally meet with an employee (who has been previously identified as required in Section 2 above), the Employer may release the employee from duty in the Employer's sole discretion, such approval shall not be unreasonably withheld. The Employer will allow the Union representative to meet with the Employee in the employee break room for up to a half (1/2) hour. The Employer is not obligated to pay the employee for any time spent away from his/her job to participate in such discussions

and may require the employee to clock out prior to participating in such discussions. Only one (1) employee may be so released from work at a time, unless an exception is made by the designated People and Culture Partner, and no employee will be permitted to be absent from his/her work area for such purposes for more than fifteen (15) minutes unless approved by the designated People and Culture Partner for the facility. Management's approval shall not be unreasonably withheld.

**Union Bulletin Board**

**Section 4:** The Employer shall provide space for a bulletin board (which shall be provided by the Union and shall not exceed 3'W x 2'H in size), for the purpose of posting notices of official Union business including the administration of this Agreement and the official announcements of member benefits and events. The Employer will determine an appropriate location for the bulletin board. Posted materials shall not be inflammatory, misleading, contain deliberate misstatements, or disparage the Employer, nor shall the Union post any materials involving any political issues or candidates (except for internal union elections and communications from the NLRB). The Employer reserves the right to remove any materials from this bulletin board that violate this Article and the Employer's following policies: (a) Equal Employment Opportunity/Affirmative Action, (b) Americans with Disabilities Act, (c) Religious Accommodation; (d) Immigration Law Compliance; and (e) Anti-Harassment, Discrimination, and Retaliation and Complaint Procedures. The Employer will notify the Union if it removes any material.

**Union Negotiations**

**Section 5:** The agreed upon Union negotiating committee members shall be allowed time off without pay for the purpose of attending and participating in scheduled bargaining sessions with the Employer.

**Shop Stewards and Union Business Leave**

**Section 6:** The Union may designate a reasonable number of Shop Stewards (not to exceed 2 per location) for the purpose of monitoring compliance with this Agreement and other legitimate Union business related to the business of the Employer. The Union shall notify the Employer in writing of the name of the designated Shop Steward(s) within five (5) days of such designation.

**Section 7:** Stewards shall conduct all Union business, including the investigation and processing of grievances, only during their breaks, lunch periods, and before or after their shifts, unless otherwise approved by the Employer or the Steward is serving as a Weingarten representative for investigatory interviews. Stewards shall not be paid by the Employer for any time spent conducting Union business, with the exception of Union business conducted on a paid lunch break. Stewards shall not interrupt the Employer's operations or the work of any employees. Shop Stewards shall be permitted up to five (5) unpaid workdays per year for Union-conducted training or conferences, with a minimum of two (2) weeks' notice of such absences.

**Section 8:** A Steward may be released from performing job duties for the purpose of serving as a Weingarten representative when so requested by an employee.

**Section 9:** A Steward representing a grievant will be released from work without pay for the purposes of attending and/or participating in a grievance meeting with the Employer, collective bargaining negotiations, hearings involving the National Labor Relations Board, and/or an arbitration hearing each of which must [be] related to the Employer. If a Steward seeks to have time off from work for this purpose, the Steward should provide the Employer with reasonable advance notice, but not less than seven (7) days, of the requested time off to ensure staffing coverage can be arranged.

**Section 10:** Designation of an employee as a Steward does not affect that employee's responsibility and obligation to devote his/her working time to performing productive work for the Employer's business operations.

**Section 11:** Under no circumstances will a Steward have any authority to direct the workforce on behalf of the Employer.

## Article 12 - Non-Discrimination

**Section 1:** The Employer and the Union agree not to discriminate against any employee in violation of on the basis of their age, gender, gender identity or expression, marital status, sexual orientation, race, color, religion, national origin, veteran status, military status, disability, genetic information, or any other characteristic protected by federal, state or local law. In accordance with Employer policies prohibiting discrimination in the workplace, employees are encouraged to promptly bring concerns about workplace discrimination on the basis of any protected category to the attention of their supervisor or any member of the Employer's management team to enable the Employer to investigate any such allegations and, where appropriate, take prompt and effective remedial action.

**Section 2:** The grievance procedure may be used for alleged violations of Section 1 of this Article, provided that such grievance shall not be subject to arbitration.

## Article 13 – Employee Discount and Tips

**Section 1: Employee Discount**. Employees will receive a 40% discount on Curaleaf's vertically integrated products sold at Curaleaf dispensaries.

## Article 14 - No Strike / No Lockout

**Section 1:** No Strike
During the term of this Agreement, neither the Union nor any of its officers or agents, nor any employees covered by this Agreement will instigate, promote, sponsor, engage in, or condone any strike, sympathy strike, refusal to cross a picket line on work time, secondary boycott, speedup, sit-down, concerted stoppage of work, mass absenteeism, or demonstrations that

interfere with the Employer's operations. Any or all employees who violate this Section may be discharged or otherwise disciplined by the Employer subject to Section 4, below.

**Section 2:** Compliance

In the event of any violation of this Section, the Union agrees to inform all employees of their obligations under this Article and to encourage and direct them to return to work.

**Section 3:** Lock Out
The Employer agrees that there shall be no lock-out of bargaining unit employees during the term of this Agreement. A lockout is defined as preventing the performance of bargaining unit work, as an exercise by the Employer of an economic weapon. In the event of any violation of this Section, the Employer agrees to inform all employees of their obligations under this Article and to encourage and direct them to end the lockout.

**Section 4:** Grievances of Article
The only matter which may be made the subject of a grievance by an employee, who has been disciplined for an alleged violation of this Article, is whether or not the employee actually engaged in such conduct. The Employer's failure to confer a penalty in any particular instance will not constitute a waiver of such right as to any other instance, nor will it constitute a precedent. An arbitrator shall have no authority to modify the level of discipline imposed by the Employer.

**Section 5:** Other Protections

Nothing contained herein shall preclude the Union or Employer from obtaining judicial protection, restraint and damages in the event the Union, Employer (including its authorized agents) or any employee covered by this Agreement violates, or threatens to violate, this Article.

## Article 15 - Severability

**Section 1:** Nothing in this Agreement shall be construed to require either party to act contrary to any applicable federal, state, or local law, regulation, ordinance, governmental authority, or declaration.

**Section 2:** The Parties are executing this Agreement with the belief that it is in conformity with all applicable federal, state, and local laws and governmental rules and regulations. However, in the event that any provision in this Agreement should be held illegal, invalid, or unenforceable for any reason by a court or agency which has proper jurisdiction over the matter, said illegality or invalidity shall not affect any of the remaining provision(s) of this Agreement, and the provision held illegal or invalid shall be fully severable and this Agreement shall be construed and enforced as if said illegal or invalid provision had never been included in this Agreement.

**Section 3:** If either party desires to negotiate a new provision regarding the unlawful, eliminated portion of the Agreement, then that party may serve written notice upon the other, of its desire to negotiate a new relevant provision based on the invalidated portion of the Agreement. The parties shall meet within thirty (30) days of the written notice to negotiate possible changes to the Agreement. Any new provision to the Agreement brought about by these negotiations shall be in writing and signed by the parties hereto. In the meantime, the Employer can immediately take the necessary steps to ensure it is not violating any applicable laws.

## Article 16- Hours of Work

**Section 1:** The regularly scheduled workday for employees varies based on job assignments and staffing needs, and may regularly include weekend and overtime work. The regular work week for full-time employees shall consist of at least thirty-six (36) hours for employees scheduled to work eight (8) or ten (10) hour shifts. The Employer may schedule Employees for weekend shifts of a minimum of four (4) hours. Full-time employees will be regularly scheduled up to five (5) workdays (Monday – Friday) in a workweek, except departments that are scheduled to work on weekends. Absent unforeseen operational need, the Employer will provide two (2) weeks' notice of changes to an Employee's scheduled hours.

**Section 2:** Part-time employees are those who regularly work less than thirty (30) hours per week.

**Section 3:** Employees may be assigned to work overtime based on the needs of the business. Before requiring mandatory overtime, the Employer will seek qualified volunteers to work the overtime, by order of seniority. If there are insufficient volunteers, mandatory overtime will be assigned based on a monthly rotating seniority list beginning with the least senior qualified employee. Employees shall not work overtime without the prior approval of his/her supervisor.

**Section 4:** Employees working at least eight (8) consecutive hours per day are entitled to a thirty (30)-minute unpaid meal break and two (2) fifteen (15)-minute paid breaks. The Employer will schedule these breaks based on operational needs. Breaks cannot be combined. Employees must take their scheduled meal break and are prohibited from working during this time without prior management authorization. Employees may not forego their meal break to leave work early. Employees must record their own work hours.

**Section 5:** All time worked in excess of forty (40) hours in one (1) workweek shall be paid at the rate of time and one-half (1 ½) the straight time hourly rate.

## Article 17 - Seniority

**Section 1:** Definition of Seniority.

a. Bargaining unit seniority is the length of time from the last date of hire an employee has been employed by the Employer in the bargaining unit. Job classification seniority is the length of time the Employee has been employed in their job classification.

b. Regular full-time employees shall have seniority over part-time Employees.

**Section 2:** Probationary Period. Employees shall be deemed probationary during the first ninety (90) calendar days of their employment in a bargaining unit position, during which time they may be discharged for any reason. The Employer may request that the Union approve the extension of the probationary period by an additional thirty (30) calendar days, which approval shall not be unreasonably denied. The discharge and/or layoff of a probationary employee shall not be subject to the Grievance and Arbitration procedure. If the employee is retained at the conclusion of the probationary period, the employee's seniority date shall be retroactive to the last date of hire within the bargaining unit, but seniority shall not apply to any employee until he or she has completed the probationary period. The discharge and/or layoff of a probationary employee shall not be subject to the Grievance and Arbitration procedure.

**Section 3:** Layoff. The Employer, in its discretion, shall determine whether a layoff of an employee or employees within a position is necessary. In the case of any reduction in force, when determining who will be laid off in an affected classification, probationary employees within a classification shall be laid off first and then the least senior employee in the classification shall be laid off first, except in instances where a more senior employee is not qualified to perform the job.

**Section 4:** Recall. Non-probationary employees who are laid off shall be placed on a recall list for a maximum period of nine (9) months following the date of layoff (probationary employees have no right of recall in the event of layoff). If there is a recall, employees who are still on the recall list shall be recalled, in the inverse order of their layoff, provided they are presently qualified to perform the work in the job to which they are recalled without further training. An employee may only be recalled to the same job in the bargaining unit for which they are qualified.

Employees who are eligible for recall shall be given notice of recall sent to the employee by email with a copy distributed via email to a designated representative of the Union. The Employer shall be deemed to have fulfilled its obligations by mailing the recall notice by email last provided by the employee, it being the obligation and responsibility of each employee to provide the Employer's People and Culture Department with the current email address. An employee who fails to respond to a recall notice within ten (10) calendar days shall be removed from the recall list. Upon recall within nine (9) months from the date of layoff, the employees' original seniority date shall be reinstated.

**Section 5:** Filling Vacancies. When the Employer determines there is a vacancy in the bargaining unit that it will fill, the Employer will decide the employee best suited for the job. The Employer will first post the position within the bargaining unit. The Employer will consider skill, ability, attendance, cross-training, discipline record and other job-related performance and ability factors.

If all job-related performance and ability factors are equal, the most senior employee will be selected to fill the vacancy. The Employer's judgment in this regard may not be challenged or set aside unless it is shown to be unreasonable. In the event that there is no qualified internal applicant, the Employer may hire any qualified applicant.

**Section 6:** Seniority shall terminate for the following reasons:

a. Discharge for just cause;
b. resignation:
c. retires or is retired;
d. Failure to immediately return to work after notice from the Employer of recall from layoff, or to report for work or otherwise does not timely respond to a notice or recall as provided in Article 17, Section 4;
e. Layoffs or an authorized leave of absence for a period in excess of nine (9) months or a period equal to the length of the employee's seniority as of the date of the layoff, whichever is less, except as may be required by applicable law;
f. Unauthorized absence from work without reporting to management for three (3) calendar days, unless the absence was as a result of a medical emergency; and
g. Failure to report to work as directed by the Employer following an authorized leave of absence.

**Section 7:** The Employer will provide the Union with a copy of the seniority list upon request, but no more frequently than once per month.

**Section 8:** Transfers. No Employee shall be involuntarily transferred to another location.

**Section 9:** The Employer shall maintain an overall Employee ratio of no less than seventy-five (75) percent full-time Employees in each facility. If transitioning Employees to part-time status, the Employer will first ask for volunteers. If there are insufficient volunteers, the Employer will reduce full-time to part-time based on reverse seniority, among qualified Employees.

## Article 18 – Discipline and Discharge

**Section 1:** The Employer may discipline, demote, suspend, or discharge non-probationary employees only for just cause.

**Section 2:** In all investigatory interviews that may lead to discipline, the employee shall have the right to request Union representation at the interview. The Union representative and the employee will be given paid time off if the meeting is conducted on scheduled working time.

**Section 3:** The following serious infractions may result in immediate termination of

employment:

- Theft or intentional damage to the property of others;
- Insubordination;
- Abusive conduct towards others;
- Egregious inappropriate conduct;
- Physical fighting, violence, or threats of violence;
- Dishonesty;
- Intentional disclosure of confidential customer information or proprietary information;
- Violation of the Employer's drug and alcohol policy;
- Commission of a crime; and
- Possession of a weapon on Company property.

**Section 4**: All discipline shall sunset after twelve (12) months of issuance, unless additional discipline occurs during the twelve (12) month period following issuance.

## Article 19- Wages, Pay Period and Wage Statement

**Section 1:** Rates and Annual Increases:

| **Date** | **Rate Increase** |
|---|---|
| Ratification | 3% |
| 1 Year From Ratification | 3% |
| 2 Years From Ratification | 3% |

| **Job Title** | **Hiring Rate of Pay** |
|---|---|
| Cultivation Lead | $21.25 |
| Cultivation Tech I (aka Cultivation Associates in CBA) | $17.00 |

| | |
|---|---|
| Cultivation Tech II | $18.25 |
| Cultivation Tech III | $19.50 |
| Driver (aka Delivery Driver in CBA) | $18.00 |
| Extraction Lead | $25.75 |
| Extraction Tech | $20.50 |
| Fertigation Tech | $19.50 |
| Lead Fertigation Tech | $23.00 |
| HPLC Tech | $25.50 |
| Inventory Lead (aka Lead Inventory Coordinator) | $24.00 |
| Inventory Tech (aka Inventory Coordinator) | $19.25 |
| IPM Leads | $23.00 |
| IPM Tech | $19.50 |
| Kitchen Tech | $18.00 |
| Lead Kitchen Tech | $22.50 |
| Logistics Tech (aka Logistics Coordinator) | $19.25 |
| Logistics Lead (aka Lead Logistics Coordinator) | $24.00 |
| Maintenance Tech | $21.00 |
| Maintenance Lead | $26.25 |
| Post Harvest Lead | n/a |

| | |
|---|---|
| Post Harvest Tech | n/a |
| Production Lead (including Lead Processing Lab Technicians) | $21.25 |
| Production Tech (including Processing Lab Technicians) | $17.00 |
| Production Tech II | $18.25 |
| Production Tech III | $19.50 |
| Packaging Lead | n/a |
| Packaging Tech | n/a |
| Sanitation Tech | $18.00 |
| Lead Sanitation Tech | $19.25 |
| Shipping and Receiving Coordinator | $19.25 |
| Quality Control Tech | $20.50 |
| Lead HVAC Technician | $32.00 |

**Section 2:** The minimum rates set forth above are the minimum rates for each classification. Upon ratification, employees who are currently below the minimum rate shall receive the greater of (a) the increased minimum rate or (b) the across-the-board increase (percentage), but not both. Bargaining Unit members must have been employed sixty (60) days prior to the month and date of ratification to be eligible for this increase.

**Section 3:** Working out of classification: When an employee works in a classification with a higher pay rate, that employee will receive the difference in the rates per hour for all hours worked in that classification (an employee must work in the classification for at least one hour to receive the differential and will only be paid for each full hours worked). When an employee is temporarily working in a classification that has a lower rate of pay that employee will not lose any pay.

**Section 4:** The Employer's work week currently begins on 12:01 a.m. on Sunday and ends on 12:00 (midnight) on Saturday and paychecks are issued every other Friday, unless modified due to the observance of a holiday. The pay period and paycheck issuing day of the week may

change based on the needs of the business, but only with advance notice to the employees, Union and consistent with applicable law. To the extent required by applicable law, wages shall be accompanied by an itemized wage statement.

**Section 5:** Employees are encouraged to use direct deposit for their paychecks.

**Section 6:** Ratification Bonus. Employees shall receive the following ratification bonus:

- Employees who have continuously worked for the Employer for one year or more as of the date of ratification shall receive a one-time lump sum payment of $550.00, minus appliable taxes and withholdings.

- Employees who have less than one year of continuous employment with the Employer as of the date of ratification shall receive a one-time lump sum payment of $250.00, minus applicable taxes and withholdings.

## Article 20 - Health and Welfare

**Section 1:** Full-time bargaining unit members shall receive health and welfare insurance benefits to include medical (including prescriptions), vision, dental, short- and long-term disability and life insurance on the same terms and conditions as offered to unrepresented (non-union) New Jersey employees, except as modified by this Agreement.

a. The Employer in its discretion may amend insurance vendors, carriers, benefit managers and/or the third-party plan administrator, as applicable, with respect to any of these plans or benefits) provided such amendments apply on a state-wide basis to unrepresented (non-union) eligible employees of the Employer in New Jersey.

b. The Employer in its discretion also may amend insurance benefits provided such amendments apply on a state-wide basis to unrepresented (non-union) eligible employees of the Employer in New Jersey. If the Employer decides to amend any of the insurance benefits, terms or conditions, including employee premium share, deductibles, and/or co-pays, it shall notify the Union forty-five (45) days prior to any prospective change. The parties agree to meet and discuss the effect of such proposed changes on the bargaining unit members. Such effects bargaining shall not delay implementation of such changes for the bargaining unit beyond the time of implementation for the rest of the Employer's employees unless the parties mutually agree to such delay.

**Section 2:** The Employer shall provide an open enrollment period for its medical insurance plans at least annually. Employees can change their plan selections only during the open enrollment period, unless otherwise specified by the plan. If an Employee terminates employment and is subsequently re-employed, he/she has the option of choosing a plan other than the plan which he/she was covered by previously.

## Article 21 – Retirement

All employees may participate in the Company's 401k Plan as set forth in the applicable plan documents. The Company will offer a discretionary match up to 1% (25% of the first 4% contributed) contributed by all full and part time employees with one or more years of service. All contributions are immediately vested. The Company retains the right to unilaterally amend the Plan at any time, including investment offerings, Plan administrators or fiduciaries, and other terms, so long as it acts in a nondiscriminatory manner that is consistent with Plan documents and applicable law.

## Article 22- Uniforms

If Employees are required to wear uniforms (including scrubs and static-resistant clothing), the Employer shall furnish such uniforms at no cost, and will furnish static-resistant shirts in long sleeve and scrubs in short sleeve.

The Employer shall replace damaged scrubs or static-resistant clothing as needed.

## Article 23- Safety

Section 1: Where needed, the Employer will provide employees with appropriate safety equipment, PPE, and devices, including appropriate first aid materials. Employees are expected to take care of all equipment and supplies provided to them.

Section 2: The Employer shall provide facility-only footwear to Employees.

Section 3: The Employer will convey safety rules or processes to employees and provide safety training to employees where appropriate. Employees are expected to adhere to safety rules and processes and use safety equipment as directed.

Section 4: The Employer will maintain a Safety Committee that includes bargaining unit employees and, upon request, union shop steward, which will meet quarterly to address safety concerns. The Employer will regularly convey information about the work of the Committee to employees.

## Article 24 – Successor Language

In the event the Employer agrees to sell or transfer the site(s) covered in this Agreement, the Employer will advise the Union no less than twelve (12) days prior to the closing date of the transaction. The Employer further agrees to notify any potential buyer of the existence of this Agreement. The Union agrees that it will maintain this information in strict confidence, including entering into a mutually agreeable confidentiality agreement upon request by the Employer only if the sale or transfer is not public information.

## Article 25 - Duration of Agreement

Except as otherwise indicated herein, this Agreement shall be effective upon execution by both parties and shall remain in full force and effect in all areas to and including three (3) years from the date of execution, and this Agreement shall be considered as renewed from year to year thereafter unless either party hereto gives written notice to the other of its desire to have the same modified or terminated. Such notice shall be given at least sixty (60) days prior to such expiration date during which period negotiations for a new agreement shall be conducted with all conditions agreed to by the parties to become effective on the first (1st) day of the week nearest the expiration date of this Agreement.

| FOR THE COMPANY: | FOR THE UNION: |
| --- | --- |
| CURALEAF | UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL 360 |

# Curaleaf.UFCW Local 360 - Final Proposal for Operations (6.6.25)

Final Audit Report 2025-06-10

| | |
|---|---|
| Created: | 2025-06-10 |
| By: | Ryan Gonsalves (ryan.gonsalves@curaleaf.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAnz2wds09-nwUDwH8rqh8tl0gfil7--2q |

## "Curaleaf.UFCW Local 360 - Final Proposal for Operations (6.6.25)" History

Document created by Ryan Gonsalves (ryan.gonsalves@curaleaf.com)
2025-06-10 - 5:57:32 PM GMT- IP address: 212.102.44.84

Document emailed to Cristina Nutzman (cristina.nutzman@curaleaf.com) for signature
2025-06-10 - 5:58:37 PM GMT

Email viewed by Cristina Nutzman (cristina.nutzman@curaleaf.com)
2025-06-10 - 6:01:29 PM GMT- IP address: 104.47.59.254

Document e-signed by Cristina Nutzman (cristina.nutzman@curaleaf.com)
Signature Date: 2025-06-10 - 6:01:46 PM GMT - Time Source: server- IP address: 73.44.110.155

Agreement completed.
2025-06-10 - 6:01:46 PM GMT

Adobe Acrobat Sign

Table of Contents

**Table of Contents------------------------------------------------------------------------------------------------------ 1**

**Preamble**

**Article 1- Recognition---------------------------------------------------------------------------------------------**

**Article 2- Union Security and Checkoff--------------------------------------------------------------------**

**Article 3- Leave of Absence---------------------------------------------------------------------------------**

**Article 4- Management Rights-----------------------------------------------------------------------------**

**Article 5- Holidays-------------------------------------------------------------------------------------------**

**Article 6- Vacation------------------------------------------------------------------------**

**Article 7- Sick Leave-----------------------------------------------------------------------------------------**

**Article 8- Jury Duty-------------------------------------------------------------------------------------------**

**Article 9- Funeral Leave--------------------------------------------------------------------------------------**

**Article 10- Grievance Procedure-------------------------------------------------------------------------------**

**Article 11- Union Representation/Shop Steward----------------------------------------------------------**

**Article 12- Non-Discrimination-------------------------------------------------------------------------------**

**Article 13- Employee Discount and Tips----------------------------------------------------------------------**

**Article 14- No Strike / No Lockout--------------------------------------------------------------------------**

**Article 15- Severability----------------------------------------------------------------------------------------**

**Article 16- Hours of Work-------------------------------------------------------------------------------------**

**Article 17- Seniority---------------------------------------------------------------------------------------------**

**Article 18- Discipline and Discharge-------------------------------------------------------------------------**

**Article 19- Wages, Pay Period and Wage Statement----------------------------------------------------------**

**Article 20- Health and Welfare--------------------------------------------------------------------------------**

**Article 21- Retirement-----------------------------------------------------------------------------------------**

**Article 22- Uniforms-------------------------------------------------------------------------------------------**

**Article 23- Safety-----------------------------------------------------------------------------------------------**

**Article 24- Successor Language--------------------------------------------------------------------------------**

**Article 25- Duration of Agreement-----------------------------------------------------------------------**

# Agreement

## Preamble

This Agreement, entered into by and between Curaleaf NJ II (the "Employer") and United Food and Commercial Workers Union, Local 360 (the "Union"), shall be effective upon execution by both parties.

## Article 1- Recognition

**Section 1**: The Employer hereby recognizes the Union as the sole collective bargaining representative for employees at the Employer's unionized retail dispensaries in the State of New Jersey as follows:

a. **Included**: All full-time and regular part-time sanitation techs, store associates, lead store associates, inventory coordinators, and lead inventory coordinators.

b. **Excluded:** All other employees, including store managers, assistant store managers, managers, guards, confidential employees and supervisors as defined by the Act.

c. Part-time Employee means a regular employee who works, on average, less than 30 hours per week.

**Section 2**: The Employer recognizes the Union as the sole and collective bargaining agent for all regular full and part-time retail employees employed by the Employer at its Bellmawr, Edgewater, and Bordentown, New Jersey retail facilities.

## Article 2 – Union Security and Checkoff

**Section 1**: It shall be a condition of employment that all employees covered by this Agreement who are members of the Union in good standing on the effective date of this Agreement shall remain in good standing and those who are not members on the effective date of this Agreement shall become members and remain members in good standing in the Union on the first of the month following thirty (30) days of employment. It shall also be a condition of employment that all employees covered by this Agreement hired on or after its effective date, whichever is later, shall, become members and remain members in good standing in the Union, not later than the first of the month following thirty (30) days of employment. At time of hire, all necessary Union forms will be provided by the Union, which will then be completed and forwarded to the Union on a monthly basis.

Upon written notice by the Union to the Employer that an employee has not complied with the requirements of this Article, the Employer shall terminate the employment of said employee, inform the employee of the reasons for the termination of employment, and advise the Union thereof in writing and or email, unless to the extent doing so would be in violation of applicable law, to require that the employee pay to the Union membership dues and initiation fees, or the amount equivalent thereto, required by the Union membership.

The Union's written notice to the Employer shall verify that the Union (1) notified the employee of the employee's failure to pay dues; (2) provided an itemized list of payments due; (3) provided a warning to the employee of the consequences of nonpayment; (4) specified a deadline payment is due; and (4) provided a reasonable opportunity to make payment. The Employer has the right to investigate compliance with these elements before notifying the employee of the discharge.

**Section 2**: The Employer shall promptly, after the effective date, give the Union a list containing the names, the last four of Social Security Numbers, home addresses, and available personal telephone and email addresses of employees covered by this Agreement, as well as their job classifications and dates of hire, and shall thereafter furnish this information for all new employees in the bargaining unit within thirty (30) days following their hire date. Any disclosure of confidential information shall be done in accordance with applicable law of the State of New Jersey, if any.

**Section 3**: Deductions. Pursuant to a written authorization received from employees in accordance with applicable law and one-time notice to the Employer by the Union thirty (30) days in advance of the activation of this Section, the Employer shall regularly deduct from the wages of each such employee, Union dues, initiation fees and/or assessments, which the Employer shall pay over to the Union or its duly authorized representative. The Union will provide the Employer with a written document (email or otherwise) acknowledging its receipt of all such payments promptly upon receipt of the payments. Such deductions must be paid over to the Union on or before the twentieth (20) day of each month, covering the amounts so deducted in the prior month.

**Section 4:** The Union agrees to indemnify the Employer and its officials, representatives and agents from any and all claims, demands, suits or other forms of liability (monetary or otherwise) and costs resulting from the Employer's adherence with a checkoff authorization or otherwise with this Article.

## Article 3- Leave of Absence

**Section 1:** Leaves of absence will be granted in accordance with applicable federal, state, and municipal laws.

**Section 2:** At the sole discretion of the Employer, the Employer may grant an unpaid personal leave of absence of up to twenty-one (21) consecutive calendar days to employees, and have completed their probationary period, for employees to tend to reasonable personal or family-related matters, once per twelve (12) month period. Approval or denial of requested unpaid personal leave and the duration of such leave will be based on reasonable business

considerations, including staffing considerations of the operation as well as significant performance issues of the requesting employee. Requests for a leave of absence must be submitted as soon as practicable after the employee is aware of the need for leave and must be approved prior to taking the leave.

**Section 3:** Time spent on leaves of absence will not be used for computing PTO accrual and employees on leave of absence will not be paid for holidays on which they are on leave.

## Article 4 - Management Rights

**Section 1:** Except as expressly limited by this Agreement, all rights possessed by the Employer prior to the signing of this Agreement are retained by the Employer and remain exclusively within the rights of management. Such rights of management include, but are not limited to, the following: the exclusive right to plan, direct, and control the Employer's operations; to hire, promote, assign, transfer, or lay-off employees; to discipline, demote, suspend, or discharge non-probationary employees for just cause or probationary employees for any lawful reason; to determine any job selection or job posting processes; to increase or decrease the size of the workforce; to determine the skills, experience, training, and other qualifications required for the job; to create or modify existing job classifications and distribute job duties within job classifications; to determine the work hours, work weeks, work schedules, shifts, and the means and processes by which employees clock in and out of work, to determine standards for operation; to determine the number of employees assigned to any job classification or any work assignments; to select or change any third-party administrators, record keepers, or vendors that administer any employee benefit plans or provide payroll or related services; to determine the standards of quality and quantity of work; to determine and regulate the use of all material, equipment, and other property of the Employer; to determine the amount (if any) of promotional or marketing materials and items (also known as swag) to employees; to establish and implement sales incentive programs; to determine the products to be produced and sold and the processes for manufacturing and selling; to determine the events to be scheduled; to determine the materials, equipment, machinery, lockers, and supplies to be used; to determine appropriate search procedures (i.e. search of employee lockers, etc. but not vehicles, on Curaleaf property); to determine the type and scope of any uniforms and personal protective equipment (PPE); to determine when and where any uniforms or PPE are to be worn and proper care by employees of uniforms and PPE; to introduce new methods, materials, or techniques; to determine the layout of the Employer's worksites, and the size and character of its operations; to determine the need for and type of technological changes and to implement such; to determine the location of its facilities; to determine, change, or improve the physical condition of its facilities; to move, close, sell, lease, or liquidate part or all of its operations; to lay off or terminate its employees in connection with said moving, closing, selling, leasing, or liquidating; to determine, modify, change, add to, or delete the content and qualifications for job classification(s); and, to determine the qualifications for all jobs. The Employer may implement reasonable rules, regulations and procedures regarding equal employment opportunity and Non-Discrimination.

**Section 2:** The Employer has the right to subcontract limited bargaining unit work, such as limited duration project work or work requiring special skills or equipment for the efficient and effective operation of the business. The Employer will notify the Union of its decision to

subcontract such work at least seven (7) days prior to the work being subcontracted, unless the Employer needs to subcontract the work immediately to meet business needs, in which case the Employer will notify the Union as soon as possible. The Employer also has the right to hire through temporary agencies, as needed, to staff positions. Temporary employees will not remain in a temporary capacity for longer than ninety (90) days, and if hired to become regular Curaleaf employees up to sixty (60) days worked in the temporary role will count toward the ninety (90) day Curaleaf probationary period. Temporary employees will be paid on the same wage scale under the contract as regular probationary employees but will not be entitled to benefits under the contract.

**Section 3:** Given the highly regulated nature of the cannabis industry, the Employer and the Union understand the importance of adhering to professional, legal, ethical, and compliant business practices and standards. It is expressly understood that the Employer has the right to establish, change, and enforce rules, regulations, policies, procedures, handbooks, and practices to assure the orderly, safe, productive, and/or efficient operation of the business; a respectful and civil working environment; including, but not limited to, rules and policies regarding safety protocols, attendance, use of drugs and alcohol, etc., so long as such rules, regulations, policies, procedures, and practices do not conflict with a specific provision(s) of this Agreement. Any change to rules, regulations, policies, procedures, handbooks, or practices must be provide to employees in writing. The Employer also agrees that any change in handbook policies shall first meet with the Union prior to implementation with the bargaining unit. Nothing in this Section shall be interpreted as requiring the Employer to post or distribute verbal or written instructions, directions, practices, procedures, or explanations that are part of the normal, routine managerial functions involving day-to-day operational matters. When the employer makes material change to work rules or handbook policies, it shall notify the Union prior to implementation.

**Section 4:** Nothing in this Agreement shall restrict the Employer's right to have supervisors and managers perform work normally performed by bargaining unit employees under any of the following circumstances: (A) experimental, testing, or trial work on new products, material, equipment, or work processes; (B) work performed for the purpose of training or instructing employees; (C) emergency situations in which the failure to perform the work might result in bodily injury, hazardous conditions, or loss or damage to material, equipment, product, etc.; (D) work to fill in for bargaining unit employees who are absent from work or otherwise unavailable and to meet basic staffing needs where bargaining unit staff is not readily available to meet these needs; and (E) work necessary to timely meet patient commitments or operational needs where there is not current staff available to meet these needs. This provision shall not be utilized to diminish the scope of bargaining unit work.

**Section 5:** In the event of an accident, fire, flood, power failure, weather or natural disaster, government or court action, civil strife, riot, evacuation of the premises by public authorities, health crisis or pandemic, state or federal state of emergency, war, act of terrorism, act of God, or any similar cause impacting the Employer which could not have been prevented by the Employer (hereinafter "force majeure event"). A force majeure event is further defined as an act, event or occurrence which due exclusively to an extraordinary natural force free of human interference and which could not have been prevented by the exercise of reasonable care and foresight. For the Employer to exercise this provision: (1) the Employer must not be directly responsible for the force majeure event; (2) the force majeure event must involve situations

which threatens to impair operations materially; (3) the force majeure event must be of limited time duration; (4) any violation or suspension of contractual terms must be unavoidable and limited only to the duration of the force majeure event.

The Employer reserves the right to respond to the force majeure event by unilaterally changing hours or relate conditions of employment, for the duration of the force majeure event. The Employer shall provide the Union with notice of the force majeure event as expeditiously as practical and any contemplated changes prior to implementation, and provide an opportunity to bargain the effects of such changes, unless doing so is not possible or practicable. If a force majeure event continues for more than sixty (60) days, then the Employer agrees to give the Union an opportunity to meet and negotiate whether any changes made in response to the force majeure event will continue. This provision is subject to the grievance arbitration provision of this Agreement.

**Section 6:** The Employer's failure to exercise any right hereby reserved to it shall not constitute a waiver by the Employer of any such right or preclude the Employer from exercising the same right to its fullest extent at a later date or in some other way not in conflict with the specific, express terms of this Agreement. The Union's failure to object to the improper exercise of any right under this Article shall not operate as a waiver or preclude the Union from asserting a violation at a later date.

## Article 5 - Holidays

**Section 1:** The Employer recognizes the following paid holidays:

New Year's Day – modified hours
Memorial Day – modified hours
Juneteenth – modified hours
Independence Day – modified hours
Labor Day – modified hours
Thanksgiving Day – closed
Christmas Day – closed

Due to the nature of the cannabis business, work still may be required of employees on scheduled holidays.

**Section 2:** For holidays on which employees do not work, holiday pay will be paid to full-time employees based on the employee's straight time hourly rate multiplied by eight (8) hours and to part time employees by their straight time hourly rate multiplied by four (4) hours. To be eligible for holiday pay, the employee must have worked his/her full scheduled shift immediately before the holiday and immediately following the holiday, unless excused by the Employer. If a paid holiday falls within an employee's vacation period, the holiday will not be counted as a vacation day. Holiday pay will not count as hours worked for overtime purposes. Full-time Team Members who do not work on a paid holiday will be paid 8 hours of holiday pay, and part-time Team Members will be paid 4 hours of holiday pay, both at their regular rate of pay.

**Section 3:** During the first year of this Agreement, employees (a) were employed on or before the ratification date of this agreement shall be paid 2 ½ times their regular rate of pay when they perform work on a paid holiday and (b) all other employees shall be paid 1 ½ times their regular rate of pay when they perform work on a paid holiday. During the second and third years of this Agreement, all employees will be paid 1 ½ times their regular rate of pay when they perform work on a paid holiday.

**Section 4:** When the employer's facility is closed in observance of a holiday, regular status Team Members who are normally scheduled to work will be paid for the length of their regularly scheduled shift. Full-time Team Members will be paid no less than 8 hours of holiday pay, and part-time Team Members will be paid no less than 4 hours of holiday pay.

## Article 6 – Vacation

Regular full-time employees are eligible to accrue vacation time on per pay period basis. The accrual for this policy starts on the day an employee is hired and there is a 90-day wait period until an employee may take vacation. Vacation is accrued on the following schedule:

| Completed Years of Employment: | Vacation Hours: |
|---|---|
| 0 to Less than 3 years | 80 Hours (3.08 hours per pay period) |
| 3 to less than 5 years | 96 Hours (3.69 hours per pay period) |
| 5 to less than 10 years | 120 Hours (4.62 hours per pay period) |
| 10 years and up | 160 Hours (6.15 hours per pay period) |

The maximum amount of vacation hours an employee accrues is determined by the employee's rate of accrual. Any increase to an employee's rate of accrual will take place on the pay period following the employee's anniversary date.

To request time off, a Time Off Request must be submitted to an employee's supervisor using the attendance management system. The supervisor will then check to ensure there are no conflicts for the dates/times requested and approve or reject the Time Off Request

Accrued and unused vacation time is required to be used when taking time off and employees are not permitted to take unpaid time off in lieu of accrued, unused vacation time.
Requests for using vacation time must be made as soon as possible, but not later than 14 days before the date of absence, except in unforeseen or emergency situations.

During the year, employees may use up to 40 hours of vacation time that they have not earned yet, causing the employee's vacation balance to go negative up to 40 hours.
Up to a maximum of 40 hours of vacation time earned but not used during the calendar year may be carried over to the following calendar year. All other earned but unused vacation time will be lost and may not be carried over from year to year, unless otherwise required by applicable state law.

Employees whose employment terminates will be paid for any vacation earned but not used through the date of termination. If a terminated employee's vacation balance is negative at the time of termination, then this time will be deducted from their final paycheck and paid back to Curaleaf, except to the extent prohibited by applicable law. Employees may not take vacation days once they have given notice of resignation.

## Article 7 - Sick Leave

**Eligibility, Amount, and Use of Paid Sick Leave**

All regular full-time and part-time employees are eligible for paid sick leave as described in this Article.

The Employer will grant each full-time employee a lump sum of 40 hours of paid sick leave each calendar year on January 1. Newly hired employees will receive a lump sum of paid sick leave during their first partial calendar year of employment depending on date of hire, according to the schedule below:

| Start Date | Paid Sick Leave Hours |
|---|---|
| January 1-September 30 | 40 hours |
| October 1- December 31 | 20 hours |

All part-time employees will earn sick leave at a rate of 1 hour per every 30 hours worked, up to a maximum of 40 hours per calendar year.

Employees may not use paid sick leave until an employee's 90th day of employment. Employees may carry over up to 40 hours of unused sick leave from one calendar year to the next. Unless otherwise required by state law, no employee may accrue greater than 40 hours of sick leave per year. The cap on the total sick leave balance an employee may have at any given time is up to 80 hours. Employees may use a maximum of 80 hours of paid sick leave per calendar year.

Employees may use paid sick leave if an employee or an immediate family member (i) is ill or injured, (ii) need to attend doctor's appointments for urgent, continued or preventative care, ~~or~~ (iii) if an employee or an immediate family member is a victim of family violence or sexual assault and require time off to address those circumstances, or other reason provided by the New Jersey Earned Sick Leave statute.

Employees will be paid for sick leave at their base salary or base hourly rate of pay. Employees may use paid sick leave in increments of 30 minutes or more, to cover up an 8-hour workday. Use of paid sick leave must be recorded in Wurk, Deputy, or the current HRIS (HR Information System).

If an employee misses work or are on a leave of absence related to any of the qualifying reasons listed above, and the employee has available sick leave to use, the Company reserves the right to automatically use this available sick leave.

Any unused sick leave under this Article will not be paid out at year end or upon separation, but if an employee is rehired, the employee's prior service will be credited in accordance with applicable law.

**Notice and Documentation**

For absences of three or more consecutive days under this Article, or under other circumstances permitted by applicable law, an employee may be required to provide the Employer with reasonable documentation from a licensed health care provider indicating the need for sick time taken. In addition, an employee may be required to provide written confirmation that the employee used sick time in accordance with this policy. The Employer will keep confidential any documentation or verification information provided regarding paid sick leave use, in accordance with federal, state and local law.

If an employee is absent for three or more consecutive days under this policy due to their own illness or injury, the Employer may require the employee to provide medical documentation confirming that they are well enough to return to work.

Employees are required to provide at least 3 days advance notice of the employee's intention to use sick leave unless the need for leave is unforeseeable. In all circumstances, employees are responsible for specifying that the time off is for paid sick leave reasons (as opposed to, for example, vacation), so that the absence may be designated as a paid sick leave absence.

So long as an employee provides adequate notice of their need for foreseeable sick leave, and as soon as it is practical for unforeseeable leave, the Employer will not count an employee's use of paid sick leave s an unexcused absence or "occurrence" under any Company attendance policy. Therefore, any such use of paid sick leave will not lead to or result in discipline, demotion, suspension, or termination. Employees may request, and use paid sick leave under this Article without fear of retaliation or discrimination, which the Employer prohibits. However, discipline may be taken against an employee who uses paid sick leave for a purpose not covered by, or in a manner not consistent with, applicable paid sick and safe time or mandatory paid time off law or this Article, or who violates this Article's requirements concerning requesting, using, recording, verifying, and/or documenting use of paid sick leave.

## Article 8 - Jury Duty

Curaleaf encourages all employees to fulfill their civic responsibilities and to respond to jury service summons or subpoenas, attend court for prospective jury service or serve as a juror. Under no circumstances will employees be terminated, threatened, harassed, coerced, or penalized because they request or take leave in accordance with this policy.

All employees, including temporary employees, will receive their regular compensation during the first five (5) days of jury service. Any additional time off under this policy will be without pay. Employees may use vacation time for jury duty after the fifth day, if otherwise available.

Employees scheduled to work at night will not be required to: (l) work beyond midnight the night before first day of jury service; (2) work while impaneled on a trial unless authorized by the judge; or (3) be required to work on the last day of service is released by the court after 4 pm.

Employees shall provide their supervisor with notice of any jury summons or subpoena within a reasonable amount of time after receipt and before their appearance is required. Verification from the court clerk of having served may also be required.

## Article 9 - Funeral Leave

The Employer will provide regular full time and part time employees with up to three days of paid bereavement leave per year to attend or prepare for the funeral services and/or bereave the death of an immediate family member. For purposes of this Article, "immediate family" is defined as the employee's spouse, domestic partner, parents, stepparents, domestic partner's parents, children, stepchildren, siblings, stepsister, stepbrother, grandparents, grandchildren, mother-in-law, and father-in-law or any other relative that resides in the employee's household. The Employer will provide regular full-time employees with up to one day of paid bereavement leave to attend or prepare for the funeral services or bereave the death of a family member who is not immediate, but to whom the employee is related by blood or marriage. Direct all requests for Bereavement Leave to an employee's supervisor or People and Culture partner. While on Bereavement Leave, an employee will be paid at straight time for the hours the employee was scheduled to work on the days missed.

## Article 10 - Grievance Procedure

**Section 1:** In the event of a dispute/grievance over the interpretation of this Agreement the procedure set forth below shall be followed.

**Section 2:** For purposes of this Agreement, a grievance is defined as a complaint that the application or interpretation of a specific provision or provisions of this Agreement violates or fails to comply with one or more provisions of this Agreement. A controversy as to any matter not specifically covered by a provision of this Agreement, or which arose prior to the signing of this Agreement, shall not be subject to the grievance procedure. A grievance may be brought by the Union or the Employer. The procedures set forth in this Article shall be the exclusive means for the disposition of all grievances under this Agreement.

Step One: Prior to the filing of any written grievance in Step Two below, the affected employee or the Union Representative (with or without the presence of a Union Steward at the employee's option) shall first discuss the matter with the immediate supervisor (or a member of management if the employee is not comfortable discussing the issue with the supervisor) to try

to resolve the matter informally in a mutually satisfactory manner. Employees are encouraged to try to resolve issues with the Employer's leadership team before pursuing a formal grievance. It is expressly understood that the immediate supervisor and/or manager and the employee may resolve the grievance at this step, but such resolution shall not be considered a binding precedent on the parties to this Agreement. If the grievance has not been resolved informally and the employee wishes to pursue the matter further, a Union representative must elevate the grievance to Step Two by submitting a written grievance. An email that sets forth the information listed below shall suffice as a written grievance submission. Other than grievances that start at Step Two as set forth in this Article, no grievance will be processed at Step Two until the employee has complied with the Step One procedures.

Step Two: To be valid, all grievances must be presented in writing to the Employer within fourteen (14) days the date the employee first knew or should have known of the event(s) or condition(s) giving rise to the grievance, or within twenty-eight (28) days for any grievance involving pay. To be valid, all grievances at Step Two must be presented in writing and should include the following basic information: (1) the approximate dates and times of the alleged event(s) giving rise to the grievance; (2) a brief description of the circumstances that gave rise to the grievance sufficient to provide the parties with an understanding of the nature of the claim(s) involved that establish a contract violation; and (3) the relief or remedy sought. An email or a letter that sets forth the information listed below shall suffice as a written grievance submission.

The Employer shall issue a written answer to the grievance within the latter of fourteen (14) days following receipt of the written grievance or fourteen (14) days following the Union and the Employer meeting (by phone or in person) to discuss the grievance. Both parties shall make themselves available within a reasonable period of time to meet to discuss the grievance so as not to delay the Employer's answer.

Step Three: If the grievance is not satisfactorily resolved in Step Two, it may be submitted to final and binding arbitration upon the written request of the Union or Employer within fourteen (14) days after the Union receives the Employer's written answer.

**Section 3:** If either party fails to comply with any of the terms of this Article, or fails to file a timely grievance, or fails to timely move the grievance to the next step, the grievance involved shall be deemed waived and the matter resolved, the matter shall be ended with prejudice, and the grievance will not be subject to further reconsideration.

**Section 4:** Grievances involving the termination of an employee's employment may start at Step Two of the grievance procedure, provided that any such grievance must be presented in writing as set forth above within fourteen (14) days after the termination. Grievances brought by the Employer also will be initiated at Step Two with a meeting between the Union Representative and the Employer's Site Manager, or his/her designated representative.

**Section 5:** If arbitration is requested, the Union and Employer may first attempt to agree upon an impartial arbitrator. If they cannot agree on an arbitrator, the selection of an arbitrator shall be from a list of names provided by the American Arbitration Association.

**Section 6:** Each arbitration hearing shall deal with not more than one (1) grievance unless the parties mutually agree in writing. The Company and the Union may continue to attempt to resolve the grievance prior to arbitration.

**Section 7:** The Employer will not be responsible for any lost pay incurred by the grievant(s) or any other employee(s) who are called to testify as witnesses at any arbitration hearing. If an employee seeks to have time off for purposes of an arbitration, he/she should provide the Employer with reasonable advance notice of the requested time off to ensure staffing coverage can be arranged. The Employer may adjust or stagger the release of employees so as not to interfere with work. Employees released from work under this provision will be expected to return to work as soon as practicable after they have testified, or upon recess of the hearing.

**Section 8:** The fees and expenses of the arbitrator will be shared equally between the Union and the Employer. All expenses for the location for the arbitration hearing shall also be shared equally. If the parties both want a transcript of the hearing, they will split the cost of any court reporter and transcript costs. All other expenses, including those connected with the calling of witnesses, etc., shall be borne by the party incurring such expenses.

**Section 9:** For termination grievances under this Agreement, backpay awards shall be limited to the amount agreed to by the Employer and Union, or as ordered by the arbitrator, minus any unemployment compensation benefits and any other compensation the aggrieved employee may have received from any other source (including self-employment) during the period for which backpay is claimed.

**Section 10:** The parties may file post hearing briefs. The arbitrator's decision shall be in writing and shall be final and binding.

**Section 11:** The arbitrator shall be bound by the law applicable to the grievance properly presented. The arbitrator shall have no power to alter, modify, amend, change, add to, or subtract from any of the terms of this Agreement.

**Section 12:** For any grievance properly submitted to arbitration under the Grievance and Arbitration provisions of this Agreement and mutually agreed upon by the parties to have any related unfair labor practice charge(s) deferred to the Grievance and Arbitration provisions herein, the parties hereby authorize the arbitrator to decide the alleged unfair labor practice issues in the underlying arbitration case, including whether or not either party in the underlying arbitration case has committed a statutory violation of the National Labor Relations Act.

**Section 13:** All of the time limits specified in this Article are to be strictly applied, and may be extended only by mutual written agreement of all parties. Employer recognized holidays shall be excluded in computing any time limits set forth above.

**Section 14:** Unless doing so poses an immediate risk to the employee's personal health or safety, notwithstanding the pendency of any grievance, all employees are expected to comply with, and faithfully carry out, all orders, instructions, and policies, whether written or oral, even though they may be the basis for the grievance, and failure to do so constitutes insubordination.

## Article 11- Union Representative/Shop Steward

### Union Access

**Section 1:** The Union may designate in writing to the Employer the name(s) of up to two (2) Union representatives per dispensary who will be responsible for bargaining unit employees. The Union may change the identity of these persons through written notice to the Employer, but the Employer will only recognize the person(s) so designated.

**Section 2:** In the event a designated Union representative wants to visit the Employer's facility to ascertain whether this Agreement is being observed and carry out other obligations of the Union related to the bargaining unit, he/she shall first notify the Employer's designated People and Culture Partner for the facility. Notification shall be made via email by the Union Representative at least two (2) business days in advance (unless the need for the visit is urgent, then the visit can be requested twenty-four (24) hours in advance, except in the case of an emergency) and shall include the proposed date and approximate time of the visit, the general nature or reason for the visit and the names of any employees he/she may wish to pull off the work floor to meet with during the visit. The Employer shall not unreasonably deny the Union's request, but the parties agree that three visits during each month would be considered reasonable, absent documented special circumstances. The Union representative should appreciate current business considerations and not disrupt patient care or the performance of employee(s)' work, as set forth below.

The Union representative will enter the Employer's facility through the main entrance, notify the designated People and Culture Partner for the facility of his/her arrival, and wait in the front area for the , or another Employer representative designated by Except in the waiting area or lobby, the Union representative shall be accompanied by a Curaleaf representative in all areas of the facility unless otherwise approved in writing by the designated People and Culture Partner for the facility. The Employer may limit access to any part of the facility designated as a restricted area in accordance with the applicable laws or regulations. The Union Representative also shall follow applicable regulations, the Employer's rules and policies regarding conduct, safety and hygiene protocols, and don protective or sanitary clothing/equipment, depending upon the areas to be accessed.

**Section 3:** If the designated Union Representative wishes to personally meet with an employee (who has been previously identified as required in Section 2 above), the Employer may release the employee from duty in the Employer's sole discretion, such approval shall not be unreasonably withheld. The Employer will allow the Union representative to meet with the Employee in the employee break room for up to a half (1/2) hour. The Employer is not obligated to pay the employee for any time spent away from his/her job to participate in such discussions and may require the employee to clock out prior to participating in such discussions. Only one (1) employee may be so released from work at a time, unless an exception is made by the designated People and Culture Partner, and no employee will be permitted to be absent from his/her work area for such purposes for more than fifteen (15) minutes unless approved by the designated People and Culture Partner for the facility. Management's approval shall not be unreasonably withheld.

**Union Bulletin Board**

**Section 4:** The Employer shall provide space for a bulletin board (which shall be provided by the Union and shall not exceed 3'W x 2'H in size), for the purpose of posting notices of official Union business including the administration of this Agreement and the official announcements of member benefits and events. The Employer will determine an appropriate location for the bulletin board. Posted materials shall not be inflammatory, misleading, contain deliberate misstatements, or disparage the Employer, nor shall the Union post any materials involving any political issues or candidates (except for internal union elections and communications from the NLRB). The Employer reserves the right to remove any materials from this bulletin board that violate this Article and the Employer's following policies: (a) Equal Employment Opportunity/Affirmative Action, (b) Americans with Disabilities Act, (c) Religious Accommodation; (d) Immigration Law Compliance; and (e) Anti-Harassment, Discrimination, and Retaliation and Complaint Procedures. The Employer will notify the Union if it removes any material.

**Union Negotiations**

**Section 5:** The agreed upon Union negotiating committee members shall be allowed time off without pay for the purpose of attending and participating in scheduled bargaining sessions with the Employer.

**Shop Stewards and Union Business Leave**

**Section 6:** The Union may designate a reasonable number of Shop Stewards (not to exceed 2 per location) for the purpose of monitoring compliance with this Agreement and other legitimate Union business related to the business of the Employer. The Union shall notify the Employer in writing of the name of the designated Shop Steward(s) within five (5) days of such designation.

**Section 7:** Stewards shall conduct all Union business, including the investigation and processing of grievances, only during their breaks, lunch periods, and before or after their shifts, unless otherwise approved by the Employer or the Steward is serving as a Weingarten representative for investigatory interviews. Stewards shall not be paid by the Employer for any time spent conducting Union business, with the exception of Union business conducted on a paid lunch break. Stewards shall not interrupt the Employer's operations or the work of any employees. Shop Stewards shall be permitted up to five (5) unpaid workdays per year for Union-conducted training or conferences, with a minimum of two (2) weeks' notice of such absences.

**Section 8:** A Steward may be released from performing job duties for the purpose of serving as a Weingarten representative when so requested by an employee.

**Section 9:** A Steward representing a grievant will be released from work without pay for the purposes of attending and/or participating in a grievance meeting with the Employer, collective bargaining negotiations, hearings involving the National Labor Relations Board, and/or an arbitration hearing each of which must [be] related to the Employer. If a Steward seeks to have time off from work for this purpose, the Steward should provide the Employer with reasonable

advance notice, but not less than seven (7) days, of the requested time off to ensure staffing coverage can be arranged.

**Section 10:** Designation of an employee as a Steward does not affect that employee's responsibility and obligation to devote his/her working time to performing productive work for the Employer's business operations.

**Section 11:** Under no circumstances will a Steward have any authority to direct the workforce on behalf of the Employer.

## Article 12 - Non-Discrimination

**Section 1:** The Employer and the Union agree not to discriminate against any employee in violation of on the basis of their age, gender, gender identity or expression, marital status, sexual orientation, race, color, religion, national origin, veteran status, military status, disability, genetic information, or any other characteristic protected by federal, state or local law. In accordance with Employer policies prohibiting discrimination in the workplace, employees are encouraged to promptly bring concerns about workplace discrimination on the basis of any protected category to the attention of their supervisor or any member of the Employer's management team to enable the Employer to investigate any such allegations and, where appropriate, take prompt and effective remedial action.

**Section 2:** The grievance procedure may be used for alleged violations of Section 1 of this Article, provided that such grievance shall not be subject to arbitration.

## Article 13 – Employee Discount and Tips

**Section 1: Employee Discount**. Employees will receive a 40% discount on Curaleaf's vertically integrated products sold at Curaleaf dispensaries.

## Article 14 - No Strike / No Lockout

**Section 1:** No Strike
During the term of this Agreement, neither the Union nor any of its officers or agents, nor any employees covered by this Agreement will instigate, promote, sponsor, engage in, or condone any strike, sympathy strike, refusal to cross a picket line on work time, secondary boycott, speedup, sit-down, concerted stoppage of work, mass absenteeism, or demonstrations that interfere with the Employer's operations. Any or all employees who violate this Section may be discharged or otherwise disciplined by the Employer subject to Section 4, below.

**Section 2:** Compliance

In the event of any violation of this Section, the Union agrees to inform all employees of their obligations under this Article and to encourage and direct them to return to work.

**Section 3:** Lock Out
The Employer agrees that there shall be no lock-out of bargaining unit employees during the term of this Agreement. A lockout is defined as preventing the performance of bargaining unit work, as an exercise by the Employer of an economic weapon. In the event of any violation of this Section, the Employer agrees to inform all employees of their obligations under this Article and to encourage and direct them to end the lockout.

**Section 4:** Grievances of Article
The only matter which may be made the subject of a grievance by an employee, who has been disciplined for an alleged violation of this Article, is whether or not the employee actually engaged in such conduct. The Employer's failure to confer a penalty in any particular instance will not constitute a waiver of such right as to any other instance, nor will it constitute a precedent. An arbitrator shall have no authority to modify the level of discipline imposed by the Employer.

**Section 5:** Other Protections

Nothing contained herein shall preclude the Union or Employer from obtaining judicial protection, restraint and damages in the event the Union, Employer (including its authorized agents) or any employee covered by this Agreement violates, or threatens to violate, this Article.

## Article 15 - Severability

**Section 1:** Nothing in this Agreement shall be construed to require either party to act contrary to any applicable federal, state, or local law, regulation, ordinance, governmental authority, or declaration.

**Section 2:** The Parties are executing this Agreement with the belief that it is in conformity with all applicable federal, state, and local laws and governmental rules and regulations. However, in the event that any provision in this Agreement should be held illegal, invalid, or unenforceable for any reason by a court or agency which has proper jurisdiction over the matter, said illegality or invalidity shall not affect any of the remaining provision(s) of this Agreement, and the provision held illegal or invalid shall be fully severable and this Agreement shall be construed and enforced as if said illegal or invalid provision had never been included in this Agreement.

**Section 3:** If either party desires to negotiate a new provision regarding the unlawful, eliminated portion of the Agreement, then that party may serve written notice upon the other, of its desire to negotiate a new relevant provision based on the invalidated portion of the Agreement. The parties shall meet within thirty (30) days of the written notice to negotiate possible changes to the Agreement. Any new provision to the Agreement brought about by these negotiations shall be in writing and signed by the parties hereto. In the meantime, the Employer can immediately take the necessary steps to ensure it is not violating any applicable laws.

## Article 16 - Hours of Work

**Section 1:** The regularly scheduled workday for employees varies by locations, job assignments, and staffing needs, and may regularly include weekend and overtime work. The regular work week for full time employees shall typically consist of at least thirty-two (32) hours of work. While employees will regularly be scheduled to work the weekly minimum number of hours as set forth above, there may be unforeseen circumstances, such as acts of God, emergencies, or safety or regulatory reasons that limit the number of work hours available.

**Section 2:** Part-time employees are those who regularly work less than thirty (30) hours per week. Part-time employees shall be scheduled no less than four (4) hours on any day that they are scheduled to work, except by mutual consent.

**Section 3:** Employees are required to be present, on time for work during their scheduled and assigned work times and must timely clock in and out at the beginning and end of their shift and at the beginning and end of their meal period.

**Section 4:** All employees are required to take their meal break and no employee is authorized, without prior management approval, to perform work during his/her meal period. Employees may forego their meal break to leave work prior to the scheduled end of their shift with consent from management. Only the individual employee is authorized to record his/her own time.

**Section 5:** Full-time employees will regularly be assigned to work shifts of no less than six (6) hour. Employees may be assigned to work overtime based on the needs of the business. Before requiring overtime, the Employer will seek qualified volunteers to work the overtime by seniority, starting with the most senior employee. If there are insufficient volunteers, overtime will be required based on the least senior qualified employee. Under no circumstances shall an employee work overtime without the prior approval of his/her immediate supervisor. In the absence of qualified volunteers to work the overtime, the Employer may have supervisors perform the work.

**Section 6:** All time worked in excess of forty (40) hours in one (1) work week shall be paid at the rate of time and one-half (1 ½) the employee's regular rate of pay. Hours worked do not include paid or unpaid time off of work.

**Section 7:** Employees who are scheduled to work six (6) or more hours in a day shall receive an unpaid thirty (30) minute meal period and one fifteen (15) minute paid break. Employees who work eight (8) or more hours in day shall receive a second fifteen (15) minute paid break.

**Section 8:** Sundays are part of retail scheduling. Team Members required to perform their usual work on a Sunday will be provided twenty-four (24) consecutive hours without work during the following six days. The Employer agrees to develop a process by which Sunday work will be distributed in an equitable basis.

## Article 17 - Seniority

**Section 1:** Definition of Seniority.

a. Bargaining unit seniority is the length of time from the last date of hire an employee has been employed by the Employer in the bargaining unit. Job classification seniority is the length of time the Employee has been employed in their job classification.

b. Regular full-time employees shall have seniority over part-time Employees.

**Section 2:** Probationary Period. Employees shall be deemed probationary during the first ninety (90) calendar days of their employment in a bargaining unit position, during which time they may be discharged for any reason. The Employer may request that the Union approve the extension of the probationary period by an additional thirty (30) calendar days, which approval shall not be unreasonably denied. The discharge and/or layoff of a probationary employee shall not be subject to the Grievance and Arbitration procedure. If the employee is retained at the conclusion of the probationary period, the employee's seniority date shall be retroactive to the last date of hire within the bargaining unit, but seniority shall not apply to any employee until he or she has completed the probationary period. The discharge and/or layoff of a probationary employee shall not be subject to the Grievance and Arbitration procedure.

**Section 3:** Layoff. The Employer, in its discretion, shall determine whether a layoff of an employee or employees within a position is necessary. In the case of any reduction in force, when determining who will be laid off in an affected classification, probationary employees within a classification shall be laid off first and then the least senior employee in the classification shall be laid off first, except in instances where a more senior employee is not qualified to perform the job.

**Section 4:** Recall. Non-probationary employees who are laid off shall be placed on a recall list for a maximum period of nine (9) months following the date of layoff (probationary employees have no right of recall in the event of layoff). If there is a recall, employees who are still on the recall list shall be recalled, in the inverse order of their layoff, provided they are presently qualified to perform the work in the job to which they are recalled without further training. An employee may only be recalled to the same job in the bargaining unit for which they are qualified.

Employees who are eligible for recall shall be given notice of recall sent to the employee by email with a copy distributed via email to a designated representative of the Union. The Employer shall be deemed to have fulfilled its obligations by mailing the recall notice by email last provided by the employee, it being the obligation and responsibility of each employee to provide the Employer's People and Culture Department with the current email address. An employee who fails to respond to a recall notice within ten (10) calendar days shall be removed from the recall list.

Upon recall within nine (9) months from the date of layoff, the employees' original seniority date shall be reinstated.

**Section 5:** Filling Vacancies. When the Employer determines there is a vacancy in the bargaining unit that it will fill, the Employer will decide the employee best suited for the job. The Employer will first post the position within the bargaining unit. The Employer will consider skill, ability, attendance, cross-training, discipline record and other job-related performance and ability factors. If all job-related performance and ability factors are equal, the most senior employee will be selected to fill the vacancy. The Employer's judgment in this regard may not be challenged or set aside unless it is shown to be unreasonable. In the event that there is no qualified internal applicant, the Employer may hire any qualified applicant.

**Section 6:** Seniority shall terminate for the following reasons:

a. Discharge for just cause;
b. resignation:
c. retires or is retired;
d. Failure to immediately return to work after notice from the Employer of recall from layoff, or to report for work or otherwise does not timely respond to a notice or recall as provided in Article 17, Section 4;
e. Layoffs or an authorized leave of absence for a period in excess of nine (9) months or a period equal to the length of the employee's seniority as of the date of the layoff, whichever is less, except as may be required by applicable law;
f. Unauthorized absence from work without reporting to management for three (3) calendar days, unless the absence was as a result of a medical emergency; and
g. Failure to report to work as directed by the Employer following an authorized leave of absence.

**Section 7:** The Employer will provide the Union with a copy of the seniority list upon request, but no more frequently than once per month.

**Section 8:** Transfers. No employee shall be involuntarily transferred to another location.

## Article 18 – Discipline and Discharge

**Section 1:** The Employer may discipline, demote, suspend, or discharge non-probationary employees only for just cause.

**Section 2:** In all investigatory interviews that may lead to discipline, the employee shall have the right to request Union representation at the interview. The Union representative and the employee will be given paid time off if the meeting is conducted on scheduled working time.

**Section 3:** The following serious infractions may result in immediate termination of employment:

- Theft or intentional damage to the property of others;
- Insubordination;
- Abusive conduct towards others;
- Egregious inappropriate conduct;
- Physical fighting, violence, or threats of violence;
- Dishonesty;
- Intentional disclosure of confidential customer information or proprietary information;
- Violation of the Employer's drug and alcohol policy;
- Commission of a crime; and
- Possession of a weapon on Company property.

**Section 4**: All discipline shall sunset after twelve (12) months of issuance, unless additional discipline occurs during the twelve (12) month period following issuance.

## Article 19 - Wages, Pay Period and Wage Statement

**Section 1:** Rates and Annual Increases:

| **Date** | **Rate Increase** |
|---|---|
| Upon Ratification | 3% |
| 1 Year From Ratification | 3% |
| 2 Years From Ratification | 3% |

| **Job Title** | **Hiring Rate of Pay** |
|---|---|
| Lead Store Associates | $19.50 |
| Store Associates/Delivery Drivers | $17.00 |
| Inventory Coordinator | $17.00 |
| Lead Inventory Coordinator | $19.50 |

| | |
|---|---|
| Sanitation Techs | $17.00 |

**Section** 2: The minimum rates set forth above are the minimum rates for each classification. Upon ratification, employees who are currently below the minimum rate shall receive the greater of (a) the increased minimum rate or (b) the across-the-board increase (percentage), but not both. Bargaining Unit members must have been employed sixty (60) days prior to the month and date of ratification to be eligible for this increase.

**Section 3:** Working out of classification: When an employee works in a classification with a higher pay rate, that employee will receive the difference in the rates per hour for all hours worked in that classification (an employee must work in the classification for at least one hour to receive the differential and will only be paid for each full hours worked). When an employee is temporarily working in a classification that has a lower rate of pay that employee will not lose any pay.

**Section 4:** Overnight Shift Differential: Employees who work the overnight shift (from 5:00p to 1:00a) shall receive a $1.50/hour shift differential for the hours worked during the overnight shift. Working past 5:00p on a regularly scheduled day shift does not qualify an employee for the overnight shift differential.

**Section 5:** Ratification Bonus. Employees shall receive the following ratification bonus:

- Employees who have continuously worked for the Employer for one year or more as of the date of ratification shall receive a one-time lump sum payment of $550.00, minus appliable taxes and withholdings.

- Employees who have less than one year of continuous employment with the Employer as of the date of ratification shall receive a one-time lump sum payment of $250.00, minus applicable taxes and withholdings.

## Article 20 - Health and Welfare

**Section 1:** Full-time bargaining unit members shall receive health and welfare insurance benefits to include medical (including prescriptions), vision, dental, short- and long-term disability and life insurance on the same terms and conditions as offered to unrepresented (non-union) New Jersey employees, except as modified by this Agreement.

a. The Employer in its discretion may amend insurance vendors, carriers, benefit managers and/or the third-party plan administrator, as applicable, with respect to any of these plans or benefits) provided such amendments apply on a state-wide basis to unrepresented (non-union) eligible employees of the Employer in New Jersey.

b. The Employer in its discretion also may amend insurance benefits provided such amendments apply on a state-wide basis to unrepresented (non-union) eligible employees

of the Employer in New Jersey. If the Employer decides to amend any of the insurance benefits, terms or conditions, including employee premium share, deductibles, and/or co-pays, it shall notify the Union forty-five (45) days prior to any prospective change. The parties agree to meet and discuss the effect of such proposed changes on the bargaining unit members. Such effects bargaining shall not delay implementation of such changes for the bargaining unit beyond the time of implementation for the rest of the Employer's employees unless the parties mutually agree to such delay.

**Section 2**: The Employer shall provide an open enrollment period for its medical insurance plans at least annually. Employees can change their plan selections only during the open enrollment period, unless otherwise specified by the plan. If an Employee terminates employment and is subsequently re-employed, he/she has the option of choosing a plan other than the plan which he/she was covered by previously.

## Article 21 – Retirement

All employees may participate in the Company's 401k Plan as set forth in the applicable plan documents. The Company will offer a discretionary match up to 1% (25% of the first 4% contributed) contributed by all full and part time employees with one or more years of service. All contributions are immediately vested. The Company retains the right to unilaterally amend the Plan at any time, including investment offerings, Plan administrators or fiduciaries, and other terms, so long as it acts in a nondiscriminatory manner that is consistent with Plan documents and applicable law.

## Article 22 - Uniforms

If employees are required to wear uniforms, the Employer shall furnish such uniforms at no cost and will furnish uniforms in long sleeve and short sleeve.

## Article 23 - Safety

**Section 1:** The Employer commits to maintaining a safe and healthy working environment for employees. The Employer and the employees agree to make reasonable efforts to ensure a safe working environment and reduce the possibility of workplace accidents and employees are expected to be safety conscious, work in a safe manner, warn co-workers if they observe knowingly unsafe conditions, and immediately report unsafe conditions or workplace accidents or injuries to their supervisor. Once reported, the Employer will timely investigate the concern and take appropriate action.

**Section 2:** Where needed, the Employer will provide employees with appropriate safety equipment and devices, including appropriate first aid materials. Employees are expected to take care of all safety-related equipment and supplies provided to them. The Employer will train employees how to properly operate equipment, and will periodically retrain employees, as necessary.

**Section 3:** Consistent with Article, Management Rights, the Employer will have the right to establish safety rules, protocols, or processes. The Employer will notify employees of such rules, protocols, and processes and, where appropriate, provide safety training to employees. Employees are expected to adhere to safety rules, protocols, and processes and use safety equipment as directed. Failure to adhere safety rules, protocols, and process may result in discipline.

**Section 4:** All weapons are not permitted in the workplace.

## Article 24 – Successor Language

In the event the Employer agrees to sell or transfer the site(s) covered in this Agreement, the Employer will advise the Union no less than twelve (12) days prior to the closing date of the transaction. The Employer further agrees to notify any potential buyer of the existence of this Agreement. The Union agrees that it will maintain this information in strict confidence, including entering into a mutually agreeable confidentiality agreement upon request by the Employer only if the sale or transfer is not public information.

## Article 25 - Duration of Agreement

Except as otherwise indicated herein, this Agreement shall be effective upon execution by both parties and shall remain in full force and effect in all areas to and including three (3) years from the date of execution, and this Agreement shall be considered as renewed from year to year thereafter unless either party hereto gives written notice to the other of its desire to have the same modified or terminated. Such notice shall be given at least sixty (60) days prior to such expiration date during which period negotiations for a new agreement shall be conducted with all conditions agreed to by the parties to become effective on the first (1st) day of the week nearest the expiration date of this Agreement.

| FOR THE COMPANY: | FOR THE UNION: |
| --- | --- |
| [signature] | [signature] |
| CURALEAF | UNITED FOOD AND COMMERCIAL WORKERS UNION, LOCAL 360 |

# Curaleaf.UFCW Local 360 - Final Proposal for Retail (6.6.25)

Final Audit Report 2025-06-10

| | |
|---|---|
| Created: | 2025-06-10 |
| By: | Ryan Gonsalves (ryan.gonsalves@curaleaf.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAxb0Yn7TI8xFxni6-RPFdYc5NdFkOQpFD |

## "Curaleaf.UFCW Local 360 - Final Proposal for Retail (6.6.25)" History

Document created by Ryan Gonsalves (ryan.gonsalves@curaleaf.com)
2025-06-10 - 5:59:03 PM GMT- IP address: 212.102.44.84

Document emailed to Cristina Nutzman (cristina.nutzman@curaleaf.com) for signature
2025-06-10 - 5:59:41 PM GMT

Email viewed by Cristina Nutzman (cristina.nutzman@curaleaf.com)
2025-06-10 - 6:01:55 PM GMT- IP address: 104.47.66.126

Document e-signed by Cristina Nutzman (cristina.nutzman@curaleaf.com)
Signature Date: 2025-06-10 - 6:02:12 PM GMT - Time Source: server- IP address: 73.44.110.155

Agreement completed.
2025-06-10 - 6:02:12 PM GMT

Adobe Acrobat Sign

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---

CURALEAF HOLDINGS, INC., ET AL. 25-CV-16397-MAS
ORAL ARGUMENT

Plaintiffs

vs.

NEW JERSEY CANNABIS REGULATORY COMMISSION, ET AL.

Defendants

---

CLARKSON S. FISHER BUILDING & U.S. COURTHOUSE
402 East State Street, Trenton, NJ 08608
April 2, 2026
Commencing at 10:01 a.m.

B E F O R E: THE HONORABLE MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

LITTLER MENDELSON, PC
BY: ALEX MACDONALD, ESQUIRE
KEITH J. ROSENBLATT, ESQUIRE
815 Connecticut Avenue NW, Suite 400
Washington, DC 20006
For Plaintiffs

Proceedings recorded by mechanical stenography
Transcript produced by computer-aided transcription

Shannan O'Neill, Official Court Reporter
shannan_oneill@njd.uscourts.gov
(609)815-2750

APPEARANCES CONTINUED:

NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
BY: BASSAM GERGI, ESQUIRE
STEPHEN EHRLICH, ESQUIRE
RACHEL KORNBERG, ESQUIRE
25 Market Street
Trenton, NJ 08625
For Defendants

(PROCEEDINGS held in open court before the Honorable Michael A. Shipp, United States District Judge, at 10:01 a.m.)

THE DEPUTY CLERK: All rise.

THE COURT: Please be seated. Good morning. So we are here and we're on the record in the matter of Curaleaf Holdings, Inc. v. the New Jersey Cannabis Regulatory Commission, Docket No. 25-16397.

May I have appearances of counsel, please?

MR. MacDONALD: Yes, Your Honor. Alex MacDonald of Littler Mendelson for Curaleaf.

THE COURT: Good morning.

MR. ROSENBLATT: Keith Rosenblatt from Littler Mendelson for Curaleaf. Good morning, Your Honor.

THE COURT: Good morning.

MR. GERGI: Good morning, Your Honor. Bassam Gergi from the New Jersey Attorney General's Office for the defendants, Cannabis Regulatory Commission and its officers.

THE COURT: Good morning.

MR. EHRLICH: Good morning, Your Honor. Stephen Ehrlich also from the New Jersey Attorney General's Office on behalf of the defendants.

THE COURT: Good morning.

MS. KORNBERG: Good morning, Your Honor. Rachel Kornberg, Deputy Attorney General on behalf of the defendants, Your Honor.

THE COURT: Good morning to all of you and welcome.

So the Court scheduled this oral argument to hear more from the parties on the plaintiffs' motion for an order to show cause and preliminary injunction, which was filed October 24, 2025, and the defendants' motion to dismiss and opposition to the plaintiffs' motion for an order to show cause, which was filed on November 17.

The Court has done a quick review of your papers and I'm familiar with the arguments that you've made, but I've called you here today so that we can get a little bit more clarity and hear from you a little bit more about some of your main arguments.

The Court understands that the plaintiffs seek to enjoin the defendants from imposing any penalties, licensing consequences, or other adverse actions for Curaleaf's alleged failure to enter into a labor peace agreement or otherwise restricting Curaleaf's engaging in conduct under the NLRA.

In support of their motion, the plaintiffs argue that the labor peace agreement requirements are preempted under the NLRA under both *Garmon* and *Machinists* preemption because the requirements restrict plaintiffs' access to economic weapons and regulate union organizing and collective bargaining and its subjects exclusively are generally regulated by the NLRA as well as limits the employees' choice of bargaining rep.

The defendants, in support of their motion to dismiss

and opposition to plaintiffs' motion for an order to show cause, argue that, one, the complaint should be dismissed because plaintiffs' claims are barred by the doctrine of unclean hands; two, the Court should abstain from deciding this case given the pending state proceedings; three, the NLRA does not preempt the labor peace requirement, and even if the NLRA does apply, both *Garmon* and *Machinists* preemption fail; and then four, the plaintiff has no irreparable injury and the equities heavily favor New Jersey's sovereignty.

So for purposes of oral argument, the Court would like to focus on, one, I'd like to hear from you on the whole unclean hands doctrine, the NLRA preemption under both *Garmon* and *Machinists*, and this whole immediate and irreparable injury.

I think that's all I want to say at this juncture. I'm going to go ahead and let's start and invite the plaintiffs to come forward first and let me hear from you. This is your motion for preliminary injunction, so let's start there. And then we'll hear from defense in opposition.

MR. MacDONALD: Thank you, Your Honor. May it please the Court. Your Honor, defendants have effectively admitted that the labor peace agreement requirement in this case is preempted by the NLRA, and I'll just quickly direct you to two sentences in the defendants' --

THE COURT: Before you get started, I have just this

fundamental issue that's kind of been stuck in the back of my head.

Why is it that the federal court should even recognize a business that basically conducts a business that is not federally legal?

I mean, it's an issue that kind of is a threshold issue for me. You're here in federal court. You're seeking or asking the Court to render aid for a business that the federal courts don't recognize. So let's start there, and then we'll jump into the other arguments.

MR. MacDONALD: Of course, Your Honor. And this is a fundamental error that we believe the defendants have made in their analysis of this case, and that's a conflation of the product market, which is cannabis, and the labor market, which is fully regulated by the NLRA and the NLRB.

All the responsible authorities, the NLRB itself has recognized for more than a decade that the NLRA applies in cannabis workplaces and that it has full authority to regulate them.

THE COURT: In the medical cannabis context, right?

MR. MacDONALD: Both contexts, both contexts, Your Honor. And federal courts reviewing the NLRB's orders, including in cases involving Curaleaf, have affirmed the NLRB's authority to regulate and to apply the NLRA in these workplaces.

So to understand why this is, you can go back to the 1930s originally when the NLRA was enacted. Employers were arguing that the NLRA couldn't apply to workplaces where only local production was done, there was no interstate commerce involved. Now, of course, we have a different idea of what interstate commerce meant for constitutional purposes back then, but the argument was fundamentally the same.

The Supreme Court rejected this very early on in the *Jones & Laughlin* case. What the Court said was, yes, Congress did intend to regulate marketplace or, excuse me, workplaces in which only local production was done. Congress's judgment in the 1930s was that labor disruption, even in local workplaces, could spill over into the broader economy.

THE COURT: What about here? I guess one of the arguments is that when we think about interstate commerce, here there is no real interstate market for cannabis.

We don't have an interstate cannabis market, correct?

MR. MacDONALD: Correct. But we do have an interstate labor market, and that's the important point. Congress has always distinguished between how it regulates product markets and how it regulates labor markets.

Just think if you're in the pharmaceutical business and you have to go through an FDA-approved process to sell your product. Well, if you step over that process and violate the FDA, that doesn't mean that your employees all of a sudden

aren't entitled to minimum wages.

Congress has approached labor markets and product markets very differently. In this case, we're only talking about the labor market. We're talking about the law that applies to employees who show up to work every day in these workplaces and the employers who employ them. That's the relevant body of law we're talking about. We're not talking about the body of law that regulates the products from that business.

This is the fundamental error that so many of defendants' arguments make in defense is they're conflating this product market, which is regulated or banned under the CSA and the NLRA, which reaches all kinds of workplaces.

And courts have rejected this repeatedly. We cite cases in our brief in which employers argue that, for example, the Fair Labor Standards Act didn't apply to cannabis workplace because of this exact issue, and Courts have rejected that. They said no, no, no, just because the product market is regulated in a particular way, that doesn't mean that the labor laws don't apply in the same way in that workplace.

Now, Congress has made distinctions in the labor market for certain industries. There are industries who are covered by other laws. For example, the Railway Labor Act regulates airlines and interstate trains differently than it regulates other workplaces. But Congress hasn't made any

exception or moved cannabis workplaces over into some other regime, so we're back to the default position, which is that the NLRA applies on its terms. That's the relevant body of law we're talking about.

That's what the NLRB has decided. That's what the federal courts have decided. In fact, there is no case finding that the NLRA does not apply to cannabis workplaces, whereas, in fact, we have plenty of authority we've cited in our brief that says that it does.

So to decide this case to say that the NLRA doesn't reach the cannabis industry, this Court would have to make new law. We don't think that would be appropriate in this case, and this has already been decided. It's been addressed by multiple authorities. It's very clear the NLRA does reach these workplaces.

THE COURT: Okay.

MR. MacDONALD: If I could just return very quickly to the preemption issue, I do think it's important to focus on how defendants themselves have defined labor peace agreements, and this is how they describe it. They say a labor peace agreement is a contract between an employer and a labor organization where the employer agrees not to interfere with union organizing. This requirement serves important interests by preventing disruptive labor conflicts, easing the union organizing process, and ensuring operational stability for

employers, employee, and the public.

Now, there's a lot packed into those two sentences, but I want to just make two points about them, one per sentence. Start with that first sentence. Defendants say that the labor peace agreement requirement prevents employer interference with union organizing.

The problem is that the NLRA already prohibits interference with union organizing. Section 8(a)(1) of the Act, the very first unfair labor practice in the Act says that an employer may not interfere with employees exercising their protective rights, and the protective rights include forming and joining labor unions.

Now, everyone agrees under the *Garmon* doctrine, if conduct is even arguably regulated by the NLRA, the state can't then regulate it itself. You can't have redundant state protections. So by defendants' own description, the LPA requirement is regulating conduct that is already regulated by the NLRA. For that reason alone, it's preempted.

But go to the second sentence. The second sentence says that the purpose of these agreements is to prevent disruptive labor conflicts. Well, disruptive labor conflicts are work stoppages. Work stoppages are another way to describe a resort to what's called economic weapons in the labor relations world, and these are things like strikes and picketing and boycotts and lockouts.

That's all covered by the *Machinists* doctrine. The *Machinists* doctrine says that Congress intentionally left the parties to work out their disputes in certain labor disruptions through resorts to economic tests of strength. Congress put certain limits on resort to economic weapons and otherwise left the parties to the free exercise of market forces.

By defendants' own description, the LPA requirement tries to prevent their resort to economic weapons further than Congress would have allowed. So for that reason alone, it's also preempted.

Now, there's a lot of other ways in which an LPA requirement conflicts with the standards in the NLRA, and that shouldn't be a surprise because, again, by defendants' own description, the LPA requirement is intended to reregulate the union organizing process to make it, in defendants' words, easier. But the union organizing employee representation process is already comprehensively regulated by the NLRA. So of course it conflicts with it in a number of ways, and we've laid out four different ways in our brief.

I'm happy to go into those, but I do want to spend some additional time on the non-merits arguments the defense have raised and which Your Honor mentioned before. There's the unclean hands doctrine and there's the abstention doctrine. I'd like to address those in turn.

I'll start with the unclean hands doctrine. The

argument seems to be this. Because Curaleaf participated in a market that was created and is regulated by defendants, Curaleaf has engaged in a type of illegality that would prevent it from coming to this Court and asking for relief in an equitable fashion.

That argument is wrong, and it's wrong for at least three reasons. The first reason is that's just not how the unclean hands doctrine works. The unclean hands doctrine, according to the Third Circuit, there's the *Scherer Design Group* case cited in the briefs, also going back to the *Keystone Driller* case from the US Supreme Court, the unclean hands doctrine prevents a plaintiff from benefiting from its own wrong in a case to gain a new right.

That's not what Curaleaf is doing here. Curaleaf is asserting its rights under federal labor law, rights that are available to any employer, and that right is to be free of preempted state interventions into the labor relations regime. It is not seeking to benefit from some wrong that it committed. It is not seeking to gain some new right based on prior misconduct. It is simply asserting its rights under federal law.

You know, defense makes this argument that, well, if the Court were to grant relief in this case to Curaleaf, it would be facilitating illegal conduct. That just makes no sense because the illegal conduct they point to is the regime

that they have created, and that regime is going to exist and continue regardless of the relief the Court were to offer in this case.

The only thing Curaleaf is asking the Court to do in this case is to say that a separate illegality, this LPA requirement that the state has imposed on cannabis businesses, is unlawful under federal labor law. That doesn't facilitate any unlawful conduct. That stops one instance of unlawful conduct.

I mentioned that the argument was wrong for three reasons. The second reason is that this is not the kind of -- the conduct alleged by defendants, the wrongdoing, is not the kind of wrongdoing that courts apply the unclean hands doctrine to. The unclean hands doctrine applies to misrepresentations or fraud or deceit, what's called unconscionable conduct in the case law.

Curaleaf didn't do anything like that. Curaleaf participated openly and in good faith in a regime that, again, was created and is administered by the defendants. Curaleaf didn't deceive anyone. Curaleaf acted openly. Curaleaf is here with its cards on the table. The only problem in this case that Curaleaf is seeking to avoid is losing its license because of a preempted unlawful labor peace agreement requirement.

And finally, I'll just move quickly on to the third

reason. The third reason that the unclean hands doctrine doesn't work here is that courts require defendants, when they're raising an unclean hands doctrine defense, to show some kind of harm to the defendants. They have to show the misconduct by the plaintiff hurt the defendants in some way.

The CRC hasn't shown any harm by this alleged unlawful conduct. Again, the only thing they point to is Curaleaf's participation in their own scheme. They benefited from this alleged wrongdoing.

This sort of gets to the fundamental irony of the defendants' argument. The defendants say, well, Curaleaf is trying to benefit from its unlawful conduct and to seek benefit from it, but what's actually happening is the defendants are pointing to an alleged illegality that they created and they implemented to shield a separate illegality from review, which is the LPA requirement. That's a perversion of equity. That's not equitable. That's not how equitable doctrines work. So for all of these reasons, we think the unclean hands doctrine just doesn't fit here.

I apologize. There's one other point I want to make about this before I move on to abstention. The main authority that the defendants are relying on for this unclean hands doctrine is the *Ctrl Alt Destroy* case.

THE COURT: What about that case?

MR. MacDONALD: That case misapplied the unclean

hands doctrine to such an extent that the beneficiary of that misapplication, the State of California, has disavowed it on appeal. The State of California said that's not how the unclean hands doctrine works. It's not this automatic bar that defendants are making it out to be. There's really just no authority for using the unclean hands doctrine, no good authority for using the unclean hands doctrine in this context.

I'll move on to the abstention.

THE COURT: I don't really want to hear much about abstention. I think I'd rather you use your time to tell me about the relief that you're seeking and whether or not it is purely economic in nature.

I mean, we're talking about a preliminary injunction here, right? I'm concerned about a couple things: A, the immediate harm, the immediacy. I mean, this matter's been pending now for about six months. I don't know that there's any real differential between the harm that was, I guess, in front of you six months ago versus the harm that's in front of you today and then whether or not it's really a remedy that's cured by strictly money damages here.

MR. MacDONALD: These are good questions, Your Honor. The harm is the same as it was when we filed, the potential harm, and the reason is this: If this Court were to lift the stay that's in place today, Curaleaf would immediately face jeopardy to its licenses in its Bellmawr facility and in

others. It would immediately be unable to operate in the market. It has no labor peace agreement today, and defendants would withdraw Curaleaf's authority to operate in the market.

And that's not just economic damages because what it would mean is effectively the equivalent of a capital sentence for a business. Curaleaf would have to shut its doors. It would have to -- its employees would no longer be able to come to work. It would lose its business goodwill. It would lose its supplier relationships. It could lose employee relationships. This is the kind of thing you can't unwind after it's been done.

So it's not just a matter of the 600,000-dollar fine that's hanging over Curaleaf's head. It's a matter of Curaleaf just being able to do business. Once the business is shut down, it's almost impossible to quantify on the back end what kind of damages that could be or to fix that with a money payment somewhere down the road.

So we are still facing irreparable harm at this stage, and we do think it's appropriate to get an injunction, particularly given the strength of the merits of this case and the equities that the defendants point to. There is no state interest on the other side in enforcing a preempted unlawful regime.

So we're facing, on a balance of equities, on one side there is a zero, and on our side there is the potential of

all of this not just economic loss, but the loss of relationships and goodwill and the ability to operate in the state. So we think it's an easy call to say where the equities lie in this case.

The other thing I'll point to is that the only interest the state identifies in maintaining labor peace agreements is labor stability, the prevention of strife or strikes. Curaleaf has a collective bargaining agreement that has a no-strike provision in it and has arbitration in it. There is no risk of labor strife in Curaleaf's workforce. There is no risk. So, again, you're pointing to a zero on the other side versus all of the harm that Curaleaf could face in its own situation.

THE COURT: Okay. So, Counsel, let me hear from the Commission, then I'll hear from you again shortly on reply.

MR. MacDONALD: Of course. Thank you, Your Honor.

THE COURT: Thank you.

Good morning.

MR. GERGI: Good morning, Your Honor. Give me just a second.

THE COURT: Take a minute to get organized there.

MR. GERGI: I appreciate it.

THE COURT: I want you to start with the same question that I posed to your adversary here, and counsel very eloquently says that this is really a regulation that speaks to

the labor market and not the product market. And so when we think about the application of this, the arguments that you raise on the other side are really inapposite, so let's start there.

MR. GERGI: I would call this argument our merits argument that the NLRA doesn't apply at all. Their distinction they're trying to draw, this distinction between the labor market and the product market, doesn't work. Because under that theory, under that logic, every business would be covered by the NLRA no matter how localized, no matter how intrastate it is, because the labor market is always separate from the product market. There's always a labor market in whatever good or service.

But this idea that the labor market, when it comes to a good that Congress and the Controlled Substances Act has said is federally illegal and has said that on the interstate level there should be no commerce in cannabis, that it is contraband, not commerce, in New Jersey, our statutes itself, it's not just federal law, the Act they're challenging, CREAMMA, says that interstate trafficking of marijuana, hashish, cannabis, or any cannabis item is illegal and should not take place. So there can be no interstate market.

And the NLRA, by its own jurisdictional terms, when you read the statute, it says it covers -- it prevents any person from engaging in the unfair labor practice affecting

commerce. What does commerce mean under the NLRA? We know in 29 USC 152(6), the statute says affecting commerce means commerce among the several states. There can be no commerce in cannabis among the several states because Congress has said interstate commerce in cannabis is illegal, New Jersey law says interstate commerce in cannabis is illegal, which is why, when you go to *Absolute Healthcare*, which is the opinion we cite from the DC Circuit where Judge Walker wrote a compelling concurrence discussing this very issue, he said it is absurd to believe that the NLRA reaches and would somehow protect the engagement of labor relations in a product market that Congress itself has said should not exist.

It would be like someone engaged in the production and sale of fentanyl or cocaine or heroin coming before Your Honor and saying there's somehow been an unfair labor practice or the NLRA should apply. Your Honor would say that that's an absurdity. Of course, you cannot say you're protected to engage in interstate labor relations in an industry Congress itself has said should not exist at all.

And you know --

THE COURT: But New Jersey has said it should exist, right? We kind of have to distinguish this a little bit. I know we're kind of walking a fine line here because we're jumping in and out of sovereigns, so to speak, but New Jersey has recognized this whole cannabis industry. And now you jump

to the other side and say, oh, wait a minute, they're illegal, so they shouldn't be able to get any assistance. Well, New Jersey says that it's a legal operation.

MR. GERGI: I think this issue kind of crosses over between the unclean hands argument and the NLRA doesn't apply, but New Jersey has, on the state level, said if you're going to operate a cannabis business or engage in cannabis, you have to meet certain conditions, license conditions and other requirements. So as a matter of state law, you can engage, in theory, in the cannabis industry without violating state law.

But this is what was actually said in *Absolute Healthcare*, which was the DC Circuit opinion, which is state law cannot displace federal law. Your Honor's obviously a federal judge. Federal law is supreme. Neither can an NLRB memo, the only other real piece of evidence they have, agency memo, displace federal law so long as the federal government, Congress, has declared in unequivocal terms in the Controlled Substances Act that cannabis is federally illegal and to engage in it is to violate federal criminal law. You cannot then turn around and say that somehow there's this national interstate market and that the interstate labor relations need to be protected by the NLRA when Congress has said there should be no interstate market.

I understand there's a bit of tension, I'll grant you that, between the fact that on the state level we've created

this regime, but this was actually in one of the preemption argument cases decided by the New Jersey appellate division, *Botteon v. Highland Park*. It says CREAMMA, our state licensing statute, the statute at issue here, does not tell anyone go out and operate a cannabis business. It does not tell anyone go out and sell or buy cannabis.

It is saying in order to avoid liability under state law, when you do those things, these are the conditions that must be met. So if you go out and you operate a cannabis business, if you go out and you purchase cannabis, if you go out and you engage in the distribution, you might avoid state liability if you comply with our state laws, but federal law continues to apply in full force.

And I'll give you an example. Your Honor probably has, and I think it applies in this district, I've read that it applies in other districts, there are individuals on federal supervised release who, if they are found to have smoked cannabis or possessed it, can have their federal supervised release revoked and have their liberty taken.

So the federal illegality of cannabis is not some abstract concept that has no basis. It has very real meaning for the lives of many people, and it continues to be federal law. And until federal law is changed, and it might one day change, I think part of the issue here with some of the cases is courts are kind of getting ahead of the political process.

They are looking down the road and they're saying we seem to be trending towards a world in which at some point on the federal level cannabis might one day be legal, and so the fact that states have now created these regimes, we're just going to ignore the illegality and apply, you know, the NLRA or other statutes as they are.

But that isn't the world we live in. And as a federal judge, and this is, you know, we cite it in our brief and it's clear case law from the Supreme Court, as a federal judge, you cannot ignore the clearly declared law of Congress, and Congress has said in this area it remains illegal. It might one day change, but it has not changed today.

THE COURT: I know I'm jumping in and out, a little bit of preemption, a little bit of unclean hands, but some of this kind of is conflated in my head.

When I'm thinking back now to the close connection, isn't there a requirement that the misconduct here, this federal illegality, be immediate and necessary to the claim?

When we start thinking about, you know, is it just the whole nature that they're engaged in this business, I'm still stuck here on this whole product versus the labor market.

Aren't we talking about specific conduct that the NLRA, under Section 7 and Section 8, exclusively and expressly says this is NLRA stuff and should be preempted?

MR. GERGI: If I can talk on unclean hands --

THE COURT: I'm bouncing and I know that.

MR. GERGI: -- and why it applies here. There are two elements under our precedent for application of unclean hands. You must be engaged in unclean conduct.

Here, it's undisputed. The unclean conduct is operating a business that every day violates federal criminal law, engages in the sale and operation and manufacture of cannabis. So that is unclean conduct, and that hasn't been disputed.

And then the other, the relief you seek, the equitable relief, and the equitable relief in this case is getting rid of a New Jersey licensing requirement is granting the relief related to that unclean conduct.

And I want to make an important point because they get up, the opposing counsel, and they say, you know, it's their regime. We're, you know, operating openly. Unclean hands is actually not about the parties, Your Honor. It's about you. It's about the Court. It's about the integrity of the Court and should the Court be issuing relief that facilitates conduct that is illegal.

Here, the question is, would the Court removing an element of New Jersey's licensing scheme facilitate the operation of this illegal business? And on its face, it does. And I can cite you many cases. They talk about *Ctrl Alt Destroy* in California, identical circumstances. The judge

found it did. They say on appeal California has said it wants a remand because it wants to further flesh out the factual record. It's a bit disingenuous to say it was disavowed. It wasn't.

But in the Ninth Circuit opinion that came out two months ago in *Peridot Tree v. State of Washington and City of Sacramento*, the Ninth Circuit cited that *Ctrl Alt Destroy* opinion approving, including for the unclean hands concept, when it found that the Dormant Commerce Clause doesn't apply to the cannabis industry.

So, if anything, I think the fact that that district court opinion has now been cited in a published unanimous decision by the Ninth Circuit gives it added force, and I understand that, you know, we don't know what will happen currently in its pending appeal.

But in addition to *Ctrl Alt Destroy*, in a reported decision out of the District of Maryland, *Jensen v. Maryland Cannabis Administration*, same exact circumstances. Someone sought a PI to eliminate an aspect of the cannabis regime that had been created under Maryland law. In a reported decision that was later affirmed by the Fourth Circuit, the district court denied the PI and says, you know, the Court cannot use its equitable power to encourage participation in activities that Congress has expressly prohibited.

In *Original Investments v. State of Oklahoma*,

reported decision from the Western District of Oklahoma, it dismissed equitable claims, again, challenging a state licensing regime saying that because the requested relief would facilitate criminal acts, the Court will not -- what all of these Courts are saying is you can view what their activity kind of is like driving down this road, and going down the road in this direction is illegal. Operating a business selling cannabis is illegal.

And New Jersey's licensing scheme is kind of a roadblock in that road. It says in order to continue to engage in this conduct, you have to meet certain terms and conditions. One of those terms and conditions is you have to obtain a labor peace agreement. They're saying no, we don't want to do it, it's too burdensome, it's problematic. And they're saying, Judge, you should apply this other federal statute to eliminate the roadblock, get rid of the barrier.

If Your Honor gets rid of the barrier, you are effectively granting them the license to engage in the criminal conduct. That is facilitation of unclean conduct. And we know this --

THE COURT: But, Counsel, if what you're saying is true, then basically anything and everything that they do is improper, right? I mean, basically, because they're operating a cannabis business, then there is no relief that they can get in this courthouse, period.

It just seems like we're talking about some different things here. We're here about a licensing scheme and about something that's separate and apart. If I understand your argument, your argument is that, look, Curaleaf sells cannabis. Cannabis is federally illegal. Therefore, Curaleaf has unclean hands, and, therefore, it can't seek any equitable relief from a state LPA requirement.

The problem that I have with that is selling cannabis is not really the misconduct that's being complained about in this lawsuit. It's really the licensing scheme. So I'm trying to stay focused on what's before the Court and not expand it and just kind of sweep it all in under just, well, they're engaged in a subject matter that is federally illegal.

MR. GERGI: We're not saying that. We're not saying anyone who tangentially touches cannabis. We're saying if you remove that licensing requirement, you make it easier for them to engage in that illegal conduct. The Court will be facilitating that conduct. I've cited, obviously, district courts that have reached the same conclusion.

I would say that Curaleaf itself today is defending an appeal in the Sixth Circuit where it is saying exactly what I just said. I'm going to quote from their brief: Courts cannot -- these are their words -- issue orders that facilitate illegal activity, mainly, violations of the Controlled Substances Act.

What I hear from Your Honor is, you know, a concern about the breadth that this doctrine could reach or how would unclean hands be applied in other issues. I have really two responses. First is unclean hands only applies to equitable relief. So legal relief, compensatory damages, punitive damages, other form of legal relief would remain available to Curaleaf and others notwithstanding how the unclean hands doctrine applies in this area.

The other thing I would note, and I would have cited it further, you know, previously, but we just saw it last night, is after briefing concluded in this case and recently I think in the past two months, the Third Circuit issued a decision in *Apical Biotek v. Maitri Holdings* where it was a contract case between two businesses that seemed to be based in Pennsylvania engaged in the medical marijuana business, and one of the parties won on summary judgment. It went up on appeal.

The Third Circuit vacated the district court's decision and remanded and said because none of the parties addressed the issue and the district court didn't even address the issue about how the illegality of cannabis applies, it needs to be taken a look at because we refuse to grant contract-based relief in this cannabis industry, and that was a decision which was written by Judge Shwartz. Judge Ambro was on the panel. Judge Matey was on the panel as well, and Judge Matey wrote a concurrence, he felt so strongly, emphasizing

that cannabis remains federally illegal and that federal illegality needs to have a close look by the district court before it grants relief in this context.

And I understand that it might mean that cannabis businesses have to operate differently than other businesses, but that will come as no surprise to Curaleaf because, again, citing their own Sixth Circuit brief, they said, you know, cannabis businesses cannot obtain federal trademarks to protect their brands. They can't file for bankruptcy. They can't secure small business loans. They may face potential civil and criminal RICO for engaging in their business. That's their representations about the constraints of operating in this space.

And when you operate in this space, when you make that voluntary decision, you take on certain risks. You can't then turn around and come to court and say, Judge, you should use your equitable powers to facilitate violations of federal law. That's what the unclean hands doctrine exists to stop, and that's why other Courts, *Ctrl Alt Destroy*, *Jensen*, and *Original Investments* have all --

THE COURT: I just worry about, you know, matters that are collateral. We're thinking about conduct that is really collateral to what the claim is here and what's really background illegality unrelated to the claim. I'm kind of getting two -- a request to take two different approaches here,

you know, one that's kind of all-encompassing and another that kind of separates this out and says, Judge, look expressly at what's in front of the Court and not the background or collateral issues and one that says, well, wait a minute, this whole thing is the threshold or the roadblock to which everything else is swept in.

MR. GERGI: Judge, I don't think it's collateral. I think Your Honor has to look at the nature of the business. I think this idea that operating a federally illegal business has no effect whatsoever on the analysis is just plainly wrong, and the Third Circuit, that's what it said, you have to take a look at the context. That's why it vacated and remanded the district court's opinion. It said no one took a look at what the contract was actually about, and that needs to be done.

I think it goes really to our core substantive points on why the NLRA doesn't apply but also why, even if you were to get past unclean hands, get past abstention, and I know Your Honor didn't want to talk about it, but we think, you know --

THE COURT: You want to talk about.

MR. GERGI: I would love to talk about it, but, Your Honor, I'm not going to force the Court to talk about what it doesn't want to.

But then, you know, even if you get past somehow the NLRA not applying, like, all of these factors weigh clearly in favor of the conclusion that this is an area of peripheral

concern to the NLRA, a scenario really of deep local feeling and local interest. This is an industry totally federally illegal, banned by Congress.

The state has stepped in and created a regime to regulate it and to ensure that the security of its citizens are maintained in it; that there's no labor exploitation, which has historically plagued the industry; that there isn't any violence, which has historically plagued the industry.

We've created certain -- when you go back and you look at the constitutional amendment that the voters passed in November of 2020, they didn't say we're legalizing cannabis full stop. The very next word after the lawfulness of cannabis was "and subject to regulation by the New Jersey Cannabis Regulatory Commission," my client.

And I think why New Jersey stepped in is there came a time, a reality, that people were engaging in this operation, they had been for many years, and that the state needed to take certain action to try to eradicate some of the harms that continued to flow from it. There were obviously significant racial injustices in this area when people were prosecuted under state law. I think there was three times to one African Americans were prosecuted despite the same usage rate as whites. There was obviously violence and property damage and other things.

THE COURT: I'm going to skip around a bit. Talk to

me about *Machinists* preemption.

MR. GERGI: So *Machinists* preemption exists to -- and these are implied doctrines, so nowhere in the NLRA does it say anything about it. But it effectively says there are certain areas that Congress intended to let leave unregulated and free to the play of economic forces.

THE COURT: Why wouldn't that be appropriate here?

MR. GERGI: Well, Your Honor, how could we say that Congress intended to leave this area free and not even regulated when Congress has spoken directly and said there should be no interstate commerce in cannabis?

Clearly, it's an area that is banned, barred, not an area that's unregulated. We made that argument in our motion to dismiss, and they didn't actually even address that argument in their opposition. They addressed other arguments, but they never at all addressed that point, the same point that the district court in *Ctrl Alt Destroy* found persuasive.

He ultimately dismissed on unclean hands grounds, but he put a footnote and he said even if I wasn't going to dismiss on unclean hands, on *Machinists* preemption, it's clear that in this area that is banned, I could not find that Congress somehow intended to leave it free and unregulated and open to the free play of economic forces.

And I think it makes total sense. How could you say that an area banned is left unregulated? There's a

contradiction, but there's a contradiction really flowing through their entire argument where they've taken advantage of the state scheme to do something on the state level and yet are somehow now trying to strip away an element of that state scheme relying on a federal statute, the NLRA, while ignoring another federal statute, you know, the Controlled Substances Act.

They're picking and choosing between federal laws in order to undermine the only thing that allows them to operate on the state level in a legal manner. I think, you know, that there's a contradiction.

And when you look at our requirement, what I found interesting partly about the argument counsel made today is counsel wasn't citing any statute or regulation when he was claiming what the LPA requires. He was citing I think a letter that they received at some point in 2024 from the New Jersey Cannabis Regulatory Commission.

But our statute doesn't say, and it's very unlike other statutes that have in other contexts that they say in their brief, we don't say you need to give up your right to strike, you need to give up your right to engage in economic, you know, actions. We just say you need to sit at the table with a bona fide labor organization. You have to enter into a labor peace agreement. And what is in that agreement is left up to the parties. It's left up to the employer and the union

to figure out what is, you know, appropriate for them under the circumstances.

And I'd like to quote actually from a letter after we started our enforcement action that we received from Curaleaf. It's at ECF No. 39-2, page 29. It's a June 2, 2025 letter that Curaleaf sent us. This is their own words. It says: The LPA requirement does not require specific terms. The only stated requirement is entering into and maintaining an LPA with a bona fide labor organization. As such -- again, their words -- Curaleaf has the discretion to determine acceptable terms that exceed the basic requirements of the statute.

So now they're in front of Your Honor saying, Your Honor, you should presume, even though it doesn't say it in the statute, that it requires all these things that should make it preempted. And yet in their own representation to us that's part of the record before Your Honor, they said it doesn't require anything, that we can ultimately sit down with a bona fide labor organization and figure out what suits us and what suits our circumstances.

And that makes sense. What we're dealing with here, and they conflate the two, is pre-recognition, pre-collective bargaining. We're saying that you need to enter into this agreement to kind of, you know, create a framework for, you know, educating employees about their rights. What's in there is left up to the parties to figure out.

The NLRB specifically, in a 2010 decision, *Dana Corp.*, which is cited in our brief, found that these kinds of agreements are permissible, do not infringe on the NLRA, do not violate it. They found that it doesn't violate an employee's right to select their collective bargaining representative and anything else because it's not actually an agreement with the employees. The employees still contain all their rights to pick and choose whoever they want to represent them and to engage in the collective bargaining process.

And I can tell you, it's a motion to dismiss but we put it in our brief, the Cannabis Regulatory Commission has seen instances where employees have rejected the organization that entered into the LPA with the employer and chose another representative to represent them in the collective bargaining process. We've also seen instances where employees have chosen not to be represented at all and not chosen any rep.

And so to say that somehow this infringes on an employee's right to select their representative is just not true. This has nothing to do with that. This is about pre-recognition, pre-collective bargaining.

THE COURT: I guess, finally, and I'm going to give you an opportunity to speak again as well, I'd like to hear from you about whether or not money damages resolves this, if there are proper meeting of the prongs for injunctive relief here. You know the prongs that we look at for injunctive

relief. Let's walk through those.

MR. GERGI: Certainly, Your Honor. Let's look at irreparable harm. This LPA requirement is not a new requirement. It's been on the books since 2022. Curaleaf complied with it for three years clearly without issue. They're still operating. Their business is still fine. In 2025, they decided they don't want to comply with it anymore. Now they're claiming that there's this urgency. Your Honor needs to enjoin it or strike it down.

But they didn't bring suit in April 2025 when their LPA expired. They didn't bring suit in, I think, June 2025 when they got a notice of violation. They didn't even bring suit in August of 2025 when the penalties were imposed and there was a notice of enforcement. They waited until October, after they've initiated, I know you don't want to talk about abstention --

THE COURT: You keep bringing it up, Counsel.

MR. GERGI: I think it's a strong argument.

And then they bring suit in October 2025. But what's interesting, and I can't wrap my head around it, but after we moved to dismiss, in their opposition, they attached a certification, a declaration from an executive and an assistant vice president at Curaleaf. And in that certification, they said the LPA requirement is now meaningless because we've entered into collective bargaining agreements covering all of

our New Jersey employees for three years, and those collective bargaining agreements have all the same terms that would be in an LPA.

I have this declaration that's part of the record, it's attached to their reply, from Mr. Mauro. I'm probably mispronouncing his name.

So I ask Your Honor, if the very month we move to dismiss they've now entered into collective bargaining agreements with all the terms that would be in an LPA, how could they possibly be injured if they now proceed to comply with New Jersey law in an LPA? It would effectively, according to their own representations, mirror the terms they already agreed to, so what could be the possible harm?

And I found -- obviously I represent the state, but this idea that there's no interest in our democratically enacted laws in New Jersey, when the legislature enacts a licensing requirement after the voters have amended the Constitution to say we want cannabis to be lawful on the state level and regulated, and then the legislature responds to that, enacts those regulations, to say there's no state interest in our democratically enacted laws I think is significant.

This is a very carefully calibrated regime in a very sensitive area, an area that remains federally illegal. The state has created that regime thoughtfully. In 2021, it passed three laws. It's enacted regulations. There is a significant,

there always is, and we cite *Delaware Sportsmen's*, which was, you know, a very thoughtful opinion from Judge Bibas where he goes through just how significant the state interest is in state laws and how the burden, really the significant burden, I think he believed, the Third Circuit believed it because it's a reported decision, that Courts had perhaps too quickly acted to enjoin state laws, said there is a significant interest in ensuring that state laws are not unduly struck down.

And I think particularly here where they've conceded that they now have collective bargaining agreements for three years, there really is no problem with them continuing to comply. And I'm going to say, if they're worried about the imposition of penalties, they have a forum currently where those are being adjudicated and can be adjudicated. They can appeal from that to the New Jersey appellate division. They can appeal from that to the New Jersey Supreme Court. If they want to, they can appeal from that to the US Supreme Court. Obviously, they'd have to have certification granted.

THE COURT: Certiorari.

MR. GERGI: Certiorari.

THE COURT: When you say New Jersey Supreme Court --

MR. GERGI: You corrected me. New Jersey certification, US Supreme Court certiorari.

But ultimately the point is still the same. They have multiple avenues of review. There's no harm. There's a

significant state interest in our duly enacted laws, particularly in an area that remains federally illegal. And then those non-enforcement memos that DOJ has issued saying that, you know, we're not going to be as forceful in enforcing our federal cannabis laws as we might otherwise be in other areas like fentanyl, heroin, or cocaine.

The only reason the federal government has said it's going to take a step back, and this is in most clearly the 2013 memo, I think it's called the Cole memo, is because they are trusting that the states will have robust and strong regulatory and enforcement mechanisms and schemes and that they will ensure that it is complied with. Only then has the federal government said it might take a step back from enforcement.

So to turn around and say that the state has no interest in ensuring its state regulatory and enforcement schemes are enforced I think can't square with the whole area of law that we're dealing with.

THE COURT: Okay.

MR. GERGI: Could I make one more point?

THE COURT: As long as it's not about abstention.

MR. GERGI: I'm not going to bring up abstention again, Your Honor. I learned my lesson.

This is the point. Counsel said, you know, in order for unclean hands to apply, there must be a harm to the defendants in some way. I have two points just in response to

that.

First, this was not mentioned in their briefing because, if it was mentioned in their briefing, what I would have said is if you go look at the Third Circuit precedent, in the Third Circuit it said there's no requirement that there be an injury to a defendant for unclean hands to apply. That's clear case law.

If Your Honor wants, I can brief it. I can submit something afterwards. I don't think it's necessary, but I just -- it annoyed me a little bit because it was a new argument brought up today, and it's also contrary to our circuit's precedent.

THE COURT: Thank you so much, Counsel.

MR. GERGI: Thank you, Your Honor.

THE COURT: I'm going to give you an opportunity to come back after I hear from your adversary once more because you, in addition to opposing their motion for a preliminary injunction, also have your own motion to dismiss. So I think it's only right that you get the last word on this, okay?

MR. GERGI: Appreciate it, Your Honor. Thank you.

THE COURT: Counsel, let me hear from you. Apparently, you disagree with much of what your adversary has said here.

MR. MacDONALD: That's correct, Your Honor. I'll start with --

THE COURT: And I don't want to open this can of worms anew. Let's only deal with the response to what was said.

MR. MacDONALD: Of course. Nothing about abstention, Your Honor.

Just to start, the quotation that I read Your Honor earlier wasn't from a letter from the CRC. It was from counsel's brief. That's how they described the LPA requirement.

The LPA, as counsel says, does not separately define labor peace agreement, but that doesn't mean that labor peace agreement has no meaning. What it means is we give the statute its plain meaning.

Now, we cite some authorities in our brief, how this has been defined in other states, what the plain meaning of the words "labor peace agreement" are. But, frankly, those all point back to exactly how counsel has described labor peace agreement in its own brief. We agreed with that definition. So there's no ambiguity about what a labor peace agreement means. After all, I mean, if the labor peace agreement requirement didn't mean anything, how would the CRC even know that Curaleaf doesn't have a labor peace agreement?

So all of the logic and authorities point back to a labor peace agreement is exactly what counsel said it was in its brief. It's an agreement that prevents an employer from

interfering with labor organizing and that prevents labor disruption, which is another way of saying economic weapons. We think that's very clear.

The next point I wanted to address was counsel points to a number of different cases, including the *Peridot Tree* case and a few district court cases dealing with this unclean hands doctrine and the cannabis industry, but the point of those cases is they all dealt with cannabis product market.

When you look at the cases that deal with the application of federal labor and employment laws to the cannabis industry, specifically cannabis workplaces, those courts, aside from *Ctrl Alt Destroy*, uniformly said that the laws do apply.

We cite some of these cases in our brief, our reply brief on pages 9 to 10. This is ECF 42. These cases deal with the Fair Labor Standards Act, which courts have found does apply to cannabis workplaces. It deals with Title 7, which does apply to the cannabis workplaces.

And the National Labor Relations Act, there's no reason that the National Labor Relations Act would be categorically different from these other federal labor and employment laws, which obviously apply to people who go to work in cannabis workplaces. Just because the product is regulated under a different regime doesn't mean that these laws stop applying to the labor markets.

Just think about what that would mean. Take something like the Americans with Disabilities Act. Let's say that somebody wanted to go into a cannabis dispensary, but there was no ramp. You have to put a ramp in. It's required by federal law. Under defendants' position, the business would be able to say sorry, we don't have to do that, we're exempt because we're operating under a quote/quote illegal regime set up by the State of New Jersey. That's not right. That's been rejected in courts. That's not how the distinction between labor and product regulations work.

I did feel compelled to go back to *Ctrl Alt Destroy* a little bit. I heard counsel describe our position as disingenuous about California abandoning this. What California said on appeal is that the *Ctrl Alt Destroy* --

THE COURT: He also said your argument about the state not having an interest was disingenuous as well, so I'm hoping that you'll get back to that as well.

MR. MacDONALD: I will get to that one as well, Your Honor. The *Ctrl Alt Destroy*, what happened on appeal is California said that analysis was wrong. What they want a remand on was there was an allegation that the business in that case had contracted with an illegitimate labor organization. So that was the inequitable conduct they were pointing to.

They have abandoned this idea that a business is banned from federal court under the doctrine simply because it

operates in this industry. They have abandoned that argument. What they are saying is that additional factual development is necessary to address this other issue about whether the business in that case tried to circumvent the licensing regime by contracting with an illegitimate labor organization.

There's no allegations like that in this case. It just simply doesn't apply. I think it is fair to describe California's position in that case as having abandoned the rationale because that wasn't the rationale that the district court relied on in that case.

I'll go back to the harm issue. Defendants say that our position is disingenuous on the harm side, but it's very clear, this is well-established case law, there is no interest for a state to enforce an unconstitutional law that's a zero.

So you're looking at -- if we're balancing the scales, their scale is all the way up here. There's nothing pushing it down. So all of the harms that we're talking about are the only legitimate harms in this case. It all depends on the merits. If Your Honor agrees with us that this law is preempted by the NLRA, the state has no interest in enforcing it.

This intersects with the point about the collective bargaining agreements. They say that we have no risk, no potential harm because we have these CBAs, but the state is not saying that it won't enforce a separate LPA requirement against

us because we have the CBAs in place. They absolutely will take our licenses away.

Again, this intersects with this idea that there's no separate meaning to an LPA. The LPA has to mean something different than a CBA. It's in the statute. They are separated out. And we cannot -- Curaleaf cannot unilaterally enter into an LPA. That's not an option. The two sides have to agree to this.

And what happened here is, yes, Curaleaf had an LPA for years. It was unable to enter an LPA with the union because the union insisted on terms that were separate and apart what were ultimately agreed to in the LPA.

If defendants were willing to say yes, of course we're not going to take away your license, we agree that your collective bargaining agreement totally satisfies the statute, then in that case we'd have a different case. There would be no harm pending over the business that was immediate.

But that's not the case we're facing. If, in fact, this Court lifts the stay, defendants are going to take away Curaleaf's licenses. That's a death sentence for the business. That's the harm we're facing.

So it's not disingenuous to say that we're facing irreparable harm. We absolutely are. These collective bargaining agreements are not going to stop the CRC from taking aware the license. We still face that exact same risk.

THE COURT: What he said was disingenuous, though, is he said the state doesn't have an interest, though. His argument was that the people of the State of New Jersey passed a law or passed at the time I guess a referendum, and it was specific language in it and they wanted this area regulated.

So does the state have an interest in enforcing and regulating a law that the people have spoken to?

MR. MacDONALD: The state has no interest in enforcing such a law if that law is inconsistent with federal law and the Constitution. There's the *Jolly* case. There's Supreme Court case law on this we cited in our brief. States have no interest in enforcing unconstitutional laws. Full stop.

Yes, we understand that the state wanted to regulate it in this way, but the state has no legitimate interest in enforcing a law that is contrary to federal law. So this all goes back to the merits. If, in fact, this law is inconsistent with the NLRA, then there is no interest in enforcing it.

THE COURT: Thank you so much, Counsel.

Mr. Gergi, you get the last word here today.

MR. GERGI: Thank you, Your Honor.

THE DEPUTY CLERK: Before we begin, do you mind slowing down a little bit for the court reporter?

MR. GERGI: Of course. I apologize. I get a little excited.

Your Honor, I'll just address the points that they made, and obviously, if Your Honor has any additional questions, I'm happy to answer them.

On their point that the NLRA obviously applies and they cite the pages in their brief, I've gone through their brief. Other than the 2013 NLRB memo, which *Absolute Healthcare* says can't displace conflicting federal law, none of the decisions they cite actually addresses the issue before Your Honor, whether the NLRA applies to a labor relations and a market that's nationally illegal.

And when we look back at the purpose of the NLRA, the purpose of the NLRA and the reason it's crafted the way it is is to ensure labor peace and to stop labor strife in areas of labor relations that affect interstate commerce. Again, that's in the statute, affecting commerce. Commerce is defined as commerce between the several states, as Judge Walker said in his concurrence in the DC Circuit in 2024. We cannot credibly say that there is a national interest in preserving labor relations on an interstate level in a market that is totally illegal.

And the opinion from Oregon that they put a lot of weight on, it's really the only district court case to really have addressed this issue, was *Casala v. Kotek*, which was decided in 2025. And then finding that the NLRA applies in *Casala*, the district court looked at Dormant Commerce Clause

cases, there were divided opinions from the First and Second Circuit, and said, well, courts say that the Dormant Commerce Clause applies so, therefore, I'm going to conclude that, you know, the NLRA should apply.

But in that opinion, the district judge noted that the Ninth Circuit had not weighed in. The Ninth Circuit has now weighed in. In January of this year, the Ninth Circuit looked at those divided panel opinions, and in a unanimous panel opinion, it says the Dormant Commerce Clause doesn't apply because it's absurd to think that the Dormant Commerce Clause would protect a national market in an industry that is banned by federal law.

And it went through and I think very persuasively noted how the really momentum in the district courts is that the Dormant Commerce Clause and some laws don't apply and that the dissents in those First and Second Circuit opinions, which were older, were more persuasive.

In particular, I think Chief Judge Livingston's dissent, Second Circuit, where she said when Congress criminalizes a market, we have to presume that states can enact laws that aid that objective either by banning, restricting, or burdening operations -- and I'm going to put my own gloss -- including labor operations in that industry.

Again, cannabis has been sold, it has been bought, there have been cannabis operations in this country, I think

the first cannabis law was the Marijuana Tax Act in 1937, which was passed shortly after the NLRA was enacted in 1935. Before we legalized and we regulated on a state level in New Jersey the cannabis operations, I can't find a single example of anyone selling or buying or operating a cannabis business in New Jersey ever claimed that they were protected by the NLRB, that they could file a ULP charge if someone alleged a labor charge in the industry, and that makes sense.

THE COURT: What about your adversary's argument about the ramp, the ADA and FLSA and other federal statutes that apply in this area? Would you agree that if a cannabis business did not put up a ramp, that an employee with special needs who needed the ramp, would they have a cause of action in federal court?

MR. GERGI: They would definitely have a cause of action probably under state law because we have very robust state discrimination and labor regimes, and those are not implicated in any way, at least not implicated directly in the same way by the federal illegality of cannabis.

Whether or not -- I think there are two issues. Can you get relief? And that goes to the unclean hands doctrine. And one of the questions you'd have to ask: Are they seeking legal relief, are they seeking equitable relief, and even then, is the relief they're seeking related to the unclean conduct, the illegal operation of a business?

And I think there might be instances where a Court could look down and say no, this isn't related in any way, it's not facilitating an illegal operation of a business in the way that asking the Court to remove a licensing condition to make it easier to sell marijuana clearly does relate to that.

And then there are statutes -- obviously some statutes are passed under the commerce power and what are the jurisdictional analyses, but there are many statutes, discrimination laws, Section 1983, for example, if someone claims they've had their constitutional rights violated, they can bring a 1983 claim for damages. Those damages are legal relief, not equitable, so unclean hands wouldn't apply.

And my understanding is 1983 is enacted under the authority of Section 5 of the 14th Amendment. Obviously, that doesn't have anything to do with scope of commerce or the nature of commerce, and so those kinds of laws I don't think are implicated in any way by the argument we're making today.

Ultimately, we're not asking the Court to determine constitutionally the scope of the commerce clause. We're just saying in a market that has been banned and Congress said there should be no interstate engagement in that market; and when you have a labor statute that says we're seeking to protect things affecting commerce, and commerce is defined as commerce between the several states; and both state and federal law says there can be no interstate commerce in cannabis; to somehow turn

around and say that federal statute applies in full force, I'm not going to use the word "disingenuous," but I don't think it makes sense.

And they cite -- they put a lot of reliance on a very old case from the Supreme Court, *NLRB v. Jones & Laughlin Steel*. It was decided in 1937. It was one of the first challenges to the scope of the NLRA. In that case, the steel company, which operated a plant in Pennsylvania, argued the NLRA shouldn't apply to us, we shouldn't be within the scope of the jurisdiction because our steel production is purely local.

And in that opinion, when you read it closely, the Court goes to great lengths to explain how it's not a purely local intrastate production of steel. It talks about the fact that 75 percent of the product that was produced in that steel facility was shipped out of Pennsylvania, and it goes to great lengths to talk about how there was this nationally integrated framework of sellers and buyers.

And then its concluding holding is ultimately there must be, at least in the words of the Supreme Court, a close and substantial relation to interstate commerce for the NLRA to apply, and it has to affect an issue of national concern regarding labor strife.

And they found that in that case, where the intrastate steel production was being shipped out of state and there was this fully integrated national business, that clearly

that affected interstate commerce and fell within the jurisdiction of the NLRA.

But here there is no interstate commerce. If they're shipping cannabis out of state lines, under state and federal law, as I read it, that would be illegal. That would subject them to criminal penalties. And so there isn't this kind of integrated interstate, you know, labor issue in the way that was at issue in *Jones & Laughlin* and other cases.

They next talk about how we don't have an interest in enforcing an unconstitutional law, but they're kind of putting the cart before the horse, right. There's different factors, one of which is irreparable harm. I think there is always a significant interest in the enforcement of laws. There is a presumption both at the federal and state level that laws will be upheld, that they will not be lightly stricken down by courts. When the people have spoken through their legislators, when the governor has signed a law, that is not something that should be easily undone.

And then what I find disingenuous about their harm argument is not simply the fact that we have a state interest. They have now admitted in the words of their own representative in a sworn declaration filed with this Court that they have three-year collective bargaining agreements and that those collective bargaining agreements include all the same terms or at least would mirror anything they would agree to in a labor

peace agreement.

But then what harm could possibly befall them by complying with New Jersey law? If they would enter into a labor peace agreement that had the exact same terms they've already agreed to with a union in a collective bargaining agreement, they'd be in the exact same position tomorrow as they are today.

So to say that the onus is on us or on this Court to strike down the law when all they have to do is comply, as they've complied for the past three years, they complied between April of 2022 and April of 2025, they, in October of 2025, when we moved to dismiss, entered into three-year collective bargaining agreements, those collective bargaining agreements have all the same terms that, according to their own representations, would be in a labor peace agreement, the interest certainly has to be just comply with state law. Why would we strike down the statute if you would simply be entering into an agreement that mirrors what you have done already?

And then the last point I would make, and this isn't so much a response but it's a silence, we've repeatedly pointed out that in the Sixth Circuit they're making the exact opposite argument they're making in this case. In the Sixth Circuit, they've said federal judges cannot issue orders that would facilitate violations of the federal Controlled Substances Act.

There, obviously, they're trying to get out of a contract. Here, they're trying to get out of the state licensing regulations. So I understand why the interests are different.

But neither in their briefing, nor in their rebuttal today, have they ever addressed that contradiction. But I think there is something telling about the fact that they are before two different federal courts, one on appeal, one on the district, who are making diametrically opposite arguments simply because it serves their interest to make different arguments.

THE COURT: Should there be a judicial estoppel at play there?

MR. GERGI: I think estoppel, there are factors that maybe will not be met, but I think it's certainly persuasive. It's persuasive that they've never responded to the contradiction.

I really appreciate that Sixth Circuit brief because it really points out all the ways in which cannabis is not the usual industry like others, that there are certain risks that cannabis businesses take on. They are the ones who pointed out that they don't get federal bankruptcy protection, they don't get federal trademark protection, that they are open to potential, you know, prosecution or civil cases under RICO.

It's true cannabis is a unique industry. This might be a one of one case. We are living in a world where the

federal government has banned and criminalized a certain industry and product and engaging in it, and the state has decided to regulate it for the reasons we've discussed.

The law might one day simplify. One day Congress might change its mind. It might, you know, legalize it, and then we'd be having a very different discussion before Your Honor. But that's not the world we live in.

And, again, I go back to what the Ninth Circuit said in January. I think courts have to respect the declarations of Congress. Even though we might one day get to a point where the law changes, it's not the state's responsibility. We each have a role to play. We shouldn't leapfrog the political process. We should let it play out because ultimately we don't know what the future might hold. Laws can go one way and then another. The federal government tomorrow could decide to enforce it with the full force it enforces other laws. That's ultimately not within our purview or Your Honor's.

Ultimately, what we have to do is say what is the law today. The law is it's federally illegal, and that has significant implications I think both on unclean hands and whether the NLRA applies and I think even on abstention that all weigh in favor of this case being dismissed. I'm happy to answer any other questions Your Honor has.

THE COURT: That's it. I think we're done. Thank you.

Counsel, I want to thank all of you for coming in today and for helping further elaborate on the issues already a part of your papers.

My parting question to you is do you believe that the Court has everything it needs to render a decision? I did hear some reference to matters that were not part of the record, cases that we have not had before. Do you believe that it's necessary to do any supplemental briefing here or do you think we're okay?

Let me hear from Curaleaf first.

MR. MacDONALD: I don't believe we need supplemental briefing, Your Honor. I think the arguments are before you.

THE COURT: Okay. Mr. Gergi.

MR. GERGI: Your Honor, there was a Third Circuit opinion I mentioned that was issued I think the last day of January. That was obviously two months after we briefed the case. I was -- I didn't want to file it last night and surprise Your Honor and opposing counsel. I'd be happy to file a notice of supplemental authority so that opposing counsel can respond to it if they'd like and put it on the docket.

THE COURT: I think that's appropriate. You've incorporated it by reference into your oral argument here today, so I think I'd like to have it officially part of the record. If it's a matter of law, the Court can certainly rely on it, I don't necessarily need it. But if you want to

elaborate your thoughts on how it impacts the case, I think that that's fair territory, and I still think it's fair territory for you to respond to it as well.

So let's just say that today is April 2. By no later than one week from today, the parties should have any and all responses to that Third Circuit case.

Can you put that Third Circuit case on the record for me? What's the name and the citation?

MR. GERGI: Thanks, Your Honor. I have it right here. I also have copies if opposing counsel wants it.

THE COURT: It may be that we already have it, but let me just hear it.

MR. GERGI: It's *Apical Biotek v. Maitri Holdings* and it's unreported from the Third Circuit. The Westlaw citation is 2026 WL 177927.

THE COURT: Okay. To the extent that the parties believe that this case has any significance whatsoever or any bearing upon the Court's ultimate disposition of this case, you should respond by no later than one week from today.

And with that, Counsel, I do thank you for your oral arguments today. I did find it helpful, and the Court will render a decision as soon as we can get all this matter synthesized and into something that is coherent and something that will be useful to the parties going forward.

Thank you so much, Counsel. Everybody have a great

day.

THE DEPUTY CLERK: All rise.

(Proceedings adjourned at 11:11 a.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

/S/Shannan O'Neill, RDR, CRR 4/3/26

Court Reporter/Transcriber

**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CURALEAF HOLDINGS, INC., *et al.*,<br>Plaintiffs,<br>v.<br>NEW JERSEY CANNABIS REGULATORY COMMISSION, *et al.*,<br>Defendants. | Civil Action No. 25-16397 (MAS) (RLS)<br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon two motions: (1) Plaintiffs Curaleaf Holdings, Inc. and Curaleaf NJ, II, Inc.'s (collectively, "Curaleaf" or "Plaintiffs") Motion for an Order to Show Cause and Preliminary Injunction against Defendants New Jersey Cannabis Regulatory Commission (the "Commission"), Chair Diana Houenou ("Houenou"), Commissioners Krista Nash ("Nash") and Amelia Mapp[1] ("Mapp"), and Acting Executive Director Christopher Riggs ("Riggs"), in their official capacities (collectively, "Defendants") (the "PI Motion") (ECF No. 23); and (2) Defendants' Motion to Dismiss[2] (ECF No. 39) Plaintiffs' Complaint (ECF No. 1). Plaintiffs opposed Defendants' Motion to Dismiss and replied to the PI Motion (ECF No. 42) and Defendants subsequently replied (ECF No. 43). Thereafter, both Plaintiffs and Defendants filed notices of supplemental authority and responses to the opposing parties' notices. (ECF Nos. 44-47,

[1] The Court notes that the docket reflects an incorrect spelling, "Ameila Mapp," which was used in Plaintiffs' Complaint. (*See* Compl., ECF No. 1.)

[2] Defendants' Motion to Dismiss also serves as their opposition to Plaintiffs' PI Motion. (*See* Defs.' Mot. to Dismiss, ECF No. 39.)

49-50.) The Court held oral argument on the motions on April 2, 2026. (*See* ECF No. 53.) Following oral argument, Defendants filed another notice of supplemental authority (ECF No. 51) and Plaintiffs filed a response (ECF No. 52). For the reasons below, the parties' motions (ECF Nos. 23, 39) are denied.

## I. BACKGROUND[3]

### A. The Parties

This matter relates to New Jersey's licensing and regulation of the cannabis industry. (*See generally* Compl.) The Commission is the New Jersey agency that, "[a]mong other things, . . . grants or denies licenses to operate adult-use cannabis businesses."[4] (*Id.* ¶ 19.) Curaleaf is a cannabis provider that "operates cannabis facilities in multiple states, including New Jersey" and has "operations [that] include facilities providing medicinal and adult-use cannabis." (*Id.* ¶ 18.) Curaleaf operates three licensed adult-use facilities in New Jersey, employing 195 full-time and 41 part-time employees. (*Id.*) Each of the New Jersey facilities is licensed by Defendants. (*Id.*)

### B. The New Jersey Cannabis, Regulatory, Enforcement Assistance, and Marketplace Modernization Act (the "CREAMM Act")

"In 2020, New Jersey voters approved a voter initiative . . . which legalized adult-use recreational cannabis" and authorized the Commission "to 'oversee' the new market." (*Id.* ¶ 22.)

---

[3] For the purpose of considering Defendants' Motion to Dismiss, the Court accepts all factual allegations in the Complaint as true and considers exhibits attached to the Complaint and matters of public record. *See Phillips v. County of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008); *see also Guidotti v. Legal Helpers Debt Resol., L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (noting that the court can "consider only the complaint, exhibits attached to the complaint, matters of public record, as well as undisputedly authentic documents if the complainant's claims are based upon [those] documents" on a Rule 12(b)(6) motion (citation omitted)).

[4] The Commission is headed by three individuals: (1) Houenou, the Commission's Chair; and (2) Nash and Mapp, the Commissioners. (Compl. ¶¶ 19-20.) Riggs, the Acting Executive Director of the Commission, acts in his official capacity as the Commission's chief administrative officer and is "responsible for carrying out the Commission's decisions and orders." (*Id.* ¶ 21.)

The next year, the New Jersey State legislature passed the CREAMM Act, which among other things, "required all adult-use cannabis businesses to obtain a license." (*Id.* ¶ 23 (citing A.B. 21, 219th Leg., Reg. Sess. (N.J. 2020)).) Pursuant to the CREAMM Act, the Commission is assigned licensing authority and is tasked with considering certain conditions when granting licenses. (*Id.* ¶ 25.) "Licenses come in several forms[,]" including the most common form, an annual license subject to renewal each year. (*Id.* ¶ 24.) If the license is not renewed, the license holder cannot continue to operate. (*Id.* (citing N.J. Stat. Ann. § 24-6I-36).)

As part of its licensing scheme, New Jersey: (1) requires cannabis businesses to sign labor peace agreements (the "LPAs") with labor unions; (2) limits the unions with which those businesses can sign an LPA; and (3) requires the cannabis businesses to negotiate a collective bargaining agreement (the "CBA") with the union within 200 days of opening. (*Id.* ¶ 1 (citing N.J. Stat. Ann. § 24:6I-36.c).) "Under the LPA requirement, when a business applies for most cannabis licenses, it must submit an attestation from a 'bona fide labor organization' stating that the labor organization and the business have an LPA." (*Id.* ¶ 26.) The business is then required to "abide by and maintain" that LPA as an "ongoing and material condition" of the license. (*Id.*) If the cannabis business "violates the LPA or allows [it] to lapse, [its] license could be suspended, revoked, or not renewed." (*Id.*) With respect to the CBA requirement, "the business must enter 'or make a good faith effort to enter' a CBA within 200 days of opening a licensed cannabis establishment." (*Id.* ¶ 27.) If the business fails to do so, its license could be suspended or revoked. (*Id.*)

The CREAMM Act does not define "good faith effort," "collective bargaining agreement," or "labor peace agreement." (*Id.* ¶ 28 (citing N.J. Stat. Ann. § 24:6I-33 (definitions)).) It does, however, define "bona fide labor organization" and requires that "[t]o qualify, a labor organization must be one in which employees participate and that exists in whole or in part to 'collectively

bargain[] or otherwise deal[] with medical or personal use cannabis employers concerning grievances, labor disputes, and terms or conditions of employment.'"[5] (*Id.* ¶ 29 (alterations in original) (quoting N.J. Stat. Ann. § 24:6I-36.c).)

### C. Cannabis Labor Market and LPAs in New Jersey

"[E]stablished unions have dominated the New Jersey cannabis labor market[,]" including the "[m]ost prominent" among those unions, United Food and Commercial Workers and its Local 360 (collectively, "UFCW," "Local 360," or the "Union"). (*Id.* ¶ 31.) According to Curaleaf, "UFCW markets itself as 'the Cannabis Workers' Union' for New Jersey" and advertises that it has "signed 'hundreds' of LPAs in New Jersey alone." (*Id.* ¶ 32.) "Local 360's website describes the terms an LPA must include[,]" namely that the LPA "must 'ensure that the employer stays neutral during a union organizing campaign'" and, "[i]n exchange, the LPA requires a union 'to refrain from any activity that can hurt the employer economically.'" (*Id.*) The Union requires that its LPAs contain certain terms, such as those to:

> (a) require employers to stay neutral to union organizing[;] (b) forbid the employer from making "negative statements" about the union[;] (c) require the employer to give the union access to its premises during work time[;] (d) allow the union to designate any potential bargaining unit[;] (e) require the employer to give the union employees' contact information[;] (f) require the employer to announce its neutral stance to employees in an open meeting[;] and

[5] The labor organization may also be "characterized" by certain criteria:

> (a) being a party to one or more [CBAs] with a cannabis employer; (b) having a written constitution for the prior three years; (c) filing annual financial reports with the U.S. Department of Labor in accordance with federal law; (d) filing at least one audited report in three of the last four years; (e) being affiliated with a regional or national association of unions; [or] (g) [*sic*] being a member of a "national labor organization that has at least 500 general members in a majority of the 50 states of the United States."

(Compl. ¶ 30 (citing N.J. Stat. Ann. § 24:6I-36.c).)

> (h) [*sic*] require the employer to recognize the union based on a showing of signed authorization cards

(the "Standard LPA Terms"). (*Id.* ¶¶ 33, 35.) Curaleaf alleges that such Standard LPA Terms "have become standard in New Jersey's cannabis industry," despite being "uncommon in other industries[.]" (*Id.* ¶ 35.) Moreover, the Union's LPAs "regularly require disputes to be resolved through binding arbitration" and "forbid the employer from asserting its rights before the [National Labor Relations Board (the 'NLRB')] or a court." (*Id.* ¶ 34.)

**D. Curaleaf's Licenses and LPA**

Curaleaf holds annual licenses covering four separate New Jersey facilities in Edgewater Park, Bordentown, Winslow, and Bellmawr (the "Facilities"). (*Id.* ¶ 36.) It has held these licenses since 2022, and all of them are subject to annual renewal. (*Id.*) In order to initially qualify for each license, "Curaleaf was required to negotiate and sign an LPA with a bona fide labor organization." (*Id.* ¶ 37.) Curaleaf did so with the Union on April 6, 2022. (*Id.*)

To negotiate the LPA, Curaleaf "had to waive" certain rights it claims were available to it under the National Labor Relations Act (the "NLRA"), including those contained in certain Standard LPA Terms. (*Id.* ¶ 38 (citing Ex. A to Compl. (the "LPA"), ECF No. 1).) Curaleaf represents that it "did not want any of these terms" and that, "[h]ad it been free to negotiate, it would not have accepted any of them" and would not have signed an LPA at all. (*Id.* ¶ 39.)

After signing the LPA, Local 360 organized Curaleaf's employees in its Facilities. (*Id.* ¶ 41.) In accordance with the LPA's terms, Curaleaf recognized the Union "based on a showing of signed authorization cards" and did not hold any secret-ballot elections in the Facilities. (*Id.*) In October 2022, the Union asked to begin bargaining with Curaleaf for a CBA. (*Id.* ¶ 42.) Curaleaf and the Union reached an agreement, but that agreement was rejected by the employees when sent to them for ratification. (*Id.*)

In anticipation of the LPA's expiration in April 2025, Curaleaf contacted the Union to ask about extending the LPA. (*Id.* ¶ 43.) The parties, however, were unable to agree to terms and the LPA expired without being renewed. (*Id.*) On April 22, 2025, William Wallace, the Director of Labor Compliance and Education for the Commission, sent e-mail correspondence to Curaleaf indicating that: (1) he was informed that Curaleaf's LPA expired; (2) "the LPA was a continuing and material term of Curaleaf's license"; and (3) Curaleaf was required "to provide 'proof, through written verification of a mutual extension of the LPA.'" (*Id.* ¶ 44 (quoting Ex. F to Compl. (Not. from Comm'r), ECF No. 1).)

On May 6, 2025, the Commission issued a Notice of Violation to Curaleaf (the "Violation Notice"), stating that the LPA had expired and that "[m]aintenance of an LPA with a bona fide labor organization is an ongoing condition for any licensed cannabis business." (*Id.* ¶ 45 (quoting Ex. G to Compl. (Not. of Violation), ECF No. 1).) The Violation Notice indicated Curaleaf's noncompliance with the LPA requirement from April 6, 2025, through May 6, 2025, and required Curaleaf to: "(1) remedy the violation within twenty . . . business days of receiving the notice; and (2) provide written confirmation to the Commission, postmarked within the same twenty . . . business-day period, detailing the corrective actions taken." (*Id.* ¶ 46.) In the Violation Notice, the Commission also "reserved the right to impose sanctions on Curaleaf" for its noncompliance with the regulations. (*Id.*)

On August 25, 2025, the Commission sent a Notice of Enforcement Action (the "Enforcement Notice") to Curaleaf, imposing a civil monetary payment of $610,000[6] due to Curaleaf's:

[6] The Enforcement Notice indicated that "Curaleaf had operated a licensed cannabis business for 122 days without an LPA[ and that t]he Commission had voted to [assess] a fine of $5,000 per day for noncompliance[,]" which totaled to the $610,000 fine amount. (Compl. ¶ 48.)

> (1) failure to maintain an LPA as an ongoing material condition of a business' license or permit; (2) failure to provide a new and executed LPA or advise the Commission that an existing agreement . . . had been renewed or extended; (3) failure to provide written verification of a mutual agreement by Curaleaf and another bona fide organization; (4) . . . response to the [Violation Notice] on June 2, 2025[,] admitting that it did not have a valid LPA with a bona fide organization; and (5) . . . failure to maintain an LPA as required by New Jersey law.

(*Id.* ¶ 47 (citing Ex. H to Compl. (Not. of Enforcement), ECF No. 1).) "[O]n September 28, 2025, in response to Curaleaf's application to renew its annual license for its Bordentown facility, the Commission provisionally granted the license application, but did so only upon [the condition] that Curaleaf secure an LPA for the facility on or before October 31, 2025." (*Id.* ¶ 50.)

### E. Procedural Background

On October 9, 2025, Curaleaf filed its Complaint against Defendants, alleging that "Defendants cannot lawfully enforce the LPA requirement against Curaleaf" because "[t]he LPA requirement regulates activity that is[:] (a) arguably protected under the [NLRA;] (b) arguably prohibited by the NLRA[;] and (c) left intentionally unregulated by the NLRA[, and] is therefore preempted and cannot be enforced against Curaleaf." (*Id.* ¶ 3 (citations omitted).) In their Complaint, Curaleaf seeks declaratory and injunctive relief. (*See generally id.*) On October 24, 2025, Curaleaf filed the PI Motion seeking emergent relief preventing Defendants from withholding a license from Curaleaf. (*See generally* Prelim. Inj. Mot. ("PI Mot."), ECF No. 23.) On October 29, 2025, the Court held a telephone conference to discuss the PI Motion. (*See* Oct. 29, 2025, Text Order, ECF No. 28.) That same day, Defendants filed correspondence agreeing to "voluntarily stay the October 30, 2025[,] expiration of the Plaintiffs' Bordentown license pending the adjudication of Plaintiffs' [PI Motion]." (Defs.' Oct. 29, 2025, Correspondence 1, ECF No. 29.) On November 17, 2025, Defendants filed their Motion to Dismiss, which also addressed arguments in opposition to Plaintiffs' PI Motion. (*See generally* Defs.' Mot. to Dismiss; Defs.'

Moving Br., ECF No. 39-1.) Plaintiffs opposed the Motion to Dismiss and included arguments in reply and in support of their own PI Motion. (*See generally* Pls.' Opp'n Br., ECF No. 42.) Defendants subsequently replied. (*See generally* Defs.' Reply, ECF No. 43.) Thereafter, both parties filed notices of supplemental authority and correspondence explaining why the opposing parties' authority was inapplicable to the present matter. (*See generally* Pls.' Jan. 8, 2026, Not. of Supp. Auth., ECF No. 44; Defs.' Jan. 8, 2026, Correspondence, ECF No. 45; Defs.' Feb. 5, 2026, Not. of Supp. Auth., ECF No. 46; Pls.' Feb. 6, 2026, Correspondence, ECF No. 47; Pls.' Mar. 13, 2026, Not. of Supp. Auth., ECF No. 49; Defs.' Mar. 17, 2026, Correspondence, ECF No. 50.) The Court held oral argument on the parties' motions on April 2, 2026. (*See* Minute Entry, ECF No. 53.) Following the oral argument, Defendants filed another notice of supplemental authority (Defs.' Apr. 3, 2026, Not. of Supp. Auth., ECF No. 51) and Plaintiffs filed a response (Pls.' Apr. 8, 2026, Response to Defs.' April. 3, 2026, Not., ECF No. 52).

## II. LEGAL STANDARD

### A. Motion to Dismiss

Federal Rule of Civil Procedure[7] 8(a)(2) "requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).

A district court conducts a three-part analysis when considering a motion to dismiss under Rule 12(b)(6). *See Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). First, the court must identify "the elements a plaintiff must plead to state a claim." *Ashcroft v. Iqbal*, 556 U.S. 662, 675

---

[7] All references to "Rule" or "Rules" hereafter refer to the Federal Rules of Civil Procedure.

(2009). Second, the court must identify all of the plaintiff's well-pleaded factual allegations, accept them as true, and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (citation omitted). The court can discard bare legal conclusions or factually unsupported accusations that merely state the defendant unlawfully harmed the plaintiff. *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Third, the court must determine whether "the [well-pleaded] facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678). On a Rule 12(b)(6) motion, the "defendant bears the burden of showing that no claim has been presented." *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)).

**B. Motion for a Preliminary Injunction**

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances." *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (internal quotation marks and citation omitted). A preliminary injunction or temporary restraining order may be granted only if a plaintiff establishes that: (1) "[it is] likely to succeed on the merits of [its] claims"; (2) "[it is] likely to suffer irreparable harm without relief"; (3) "the balance of harms favors [it]"; and (4) "relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citation omitted). The "plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (citation omitted).

The movant bears the burden of establishing "the threshold for the first two 'most critical' factors." *Reilly v. City of Harrisburg*, 858 F.3d 173, 179 (3d Cir. 2017). "If these gateway factors are met, a court then considers the remaining two factors and determines in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief." *Id.* A court may issue an injunction to a plaintiff "only if the plaintiff produces evidence sufficient to convince the district court that all four factors favor preliminary relief." *AT&T v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994) (citation omitted); *see also P.C. Yonkers, Inc. v. Celebrations the Party & Seasonal Superstore, LLC*, 428 F.3d 504, 508 (3d Cir. 2005) ("The burden lies with the plaintiff to establish every element in its favor, or the grant of a preliminary injunction is inappropriate." (citation omitted)).

## III. DISCUSSION

The parties bring two separate motions concerning whether New Jersey's state law requiring an LPA and CBA should be allowed as an ongoing material condition of licensure for a cannabis business in New Jersey: (1) Defendants' Motion to Dismiss (*see generally* Defs.' Mot. to Dismiss); and (2) Plaintiffs' PI Motion (*see generally* PI Mot.). The Court first turns to Defendants' Motion to Dismiss before addressing Plaintiffs' PI Motion.

### A. Defendants' Motion to Dismiss

Defendants move to dismiss the Complaint in its entirety on two grounds: (1) "the equitable doctrine of unclean hands bars Curaleaf from using federal equity to rewrite a state licensing regime so it can operate more freely in a market that federal law declares criminal"; and (2) the Court should abstain in light of ongoing state proceedings. (Defs.' Moving Br. 1.) For the reasons discussed below, the Court denies Defendants' motion.

### *1. Unclean Hands*

Defendants first contend that Plaintiffs' claims should be dismissed because "this Court should not use its equitable authority to enjoin the very state licensing safeguards that Curaleaf must satisfy to operate in a federally unlawful market." (*Id.* at 13; *see also* Defs.' Reply Br. 5-6 (arguing that "Curaleaf asks this Court to exercise its equitable authority to remove a condition of licensure so that the company may continue operating a business Congress has declared illegal").) Plaintiffs disagree, arguing that the unclean hands doctrine is "narrower than Defendants say" and "does not bar a court from granting relief to any plaintiff who has allegedly committed some collateral or unrelated wrong in another context."[8] (Pls.' Opp'n Br. 1-2.) Rather, Plaintiffs contend that the relief they seek is from the "unlawful conditions imposed on [them] by a state" and not a "benefit from [their] own closely[-]related wrongdoing[.]" (*Id.* at 4.)

"The unclean hands doctrine is 'derived from the unwillingness of a court, originally and still nominally one of conscience, to give its peculiar relief to a suitor who in the very controversy has so conducted himself as to shock the moral sensibilities of the judge.'" *Scherer Design Grp., LLC v. Ahead Eng'g LLC*, 764 F. App'x 147, 149-50 (3d Cir. 2019) (quoting *Gaudiosi*, 269 F.2d at 882). "As an equitable doctrine, application of unclean hands rests within the sound discretion

---

[8] Plaintiffs also argue that the declaratory judgment relief they seek is legal in nature and therefore cannot be barred by the doctrine of unclean hands. (Pls.' Opp'n Br. 2, 11-12.) Plaintiffs' argument on this point, however, is not persuasive because the declaratory relief request is accompanied by a request for injunctive relief. *See AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213, 223-24 (3d Cir. 2009) (holding that if a declaratory judgment action "is the counterpart of a suit in equity," the matter is equitable in nature); *Amgen Inc. v. Hospira, Inc.*, No. 15-839, 2016 WL 4183748, at *3 (D. Del. Aug. 5, 2016) (stating that "[w]here, as here, '[a] declaratory judgment action seek[s] . . . injunctive relief, [it] is clearly equitable in nature'" (second, third, and fourth alterations in original) (citation omitted)); *Gaudiosi v. Mellon*, 269 F.2d 873, 875, 879, 881 (3d Cir. 1959) (noting "conduct constituted the 'unclean hands' which barred [plaintiff's] prayers for equitable relief[,]" including a declaratory judgment).

of the trial court."[9] *In re New Valley Corp.*, 181 F.3d 517, 525 (3d Cir. 1999) (citing *Ciba-Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 844, 855 (3d Cir. 1984)).

Under Third Circuit precedent, "the primary principle guiding application of the unclean hands doctrine is that the alleged inequitable conduct must be connected, *i.e.*, have a relationship, to the matters before the court for resolution." *Id.* Thus, the doctrine "applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation." *Highmark, Inc. v. UPMC Health Plan, Inc.*, 276 F.3d 160, 174 (3d Cir. 2001) (quoting *Keystone*, 290 U.S. at 245). This "requires an 'immediate and necessary' relationship between the claims at issue." *In re New Valley Corp.*, 181 F.3d at 526 (citing *Keystone*, 290 U.S. at 245); *see also Highmark*, 276 F.3d at 174 ("The nexus 'between the misconduct and the claim must be close.'" (citation omitted)).

Here, the Court finds that the conduct giving rise to Plaintiffs' claims is not "immediate[ly] and necessar[il]y" related to Plaintiffs' illegal conduct. *See In re New Valley Corp.*, 181 F.3d at 525. Rather, the relief Plaintiffs seek stems from the LPA requirement under the CREAMM Act and whether that LPA requirement is preempted by the NLRA. (*See* Compl., Prayer for Relief 22-23.) As Plaintiffs argue, the alleged wrongdoing Defendants identify—"operating in a business regulated by state law but illegal under the [Controlled Substance Act ('CSA')]"—is collateral to the LPA requirement at issue. (Pls.' Opp'n Br. 8.) In fact, the LPA does not directly give Plaintiffs the ability to operate in the cannabis industry and, as a result, violate federal law, as Defendants

---

[9] Moreover, it is within the court's discretion "to limit the reach of the doctrine to only some of the claims." *In re New Valley Corp.*, 181 F.3d at 525; *see also Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 244 (1933) (explaining when a "plaintiff is shown to have come with unclean hands in respect of only one of [the claims], the others will not be dismissed").

contend. (*See generally* LPA.) The agreed-upon 2022 LPA also does not mention cannabis except for the "UFCW" logo which reads "Cannabis Workers Rising." (*See id.*)

Moreover, the cases that Defendants rely upon are readily distinguishable. For example, in *Ctrl Alt Destroy v. Elliott*, No. 24-753, 2025 WL 790963 (S.D. Cal. Mar. 12, 2025), the Southern District of California tackled a similar issue regarding whether a cannabis-retailer's complaint seeking to enjoin a state's LPA requirement is barred by the unclean hands doctrine. *Id.* at *5-7; (*see also* Defs.' Moving Br. 13-14 (analogizing *Ctrl Alt Destroy*); Defs.' Reply 4-5, 7 n.6 (same).) The court in that case granted the defendant's motion to dismiss, and "decline[d] to use its equitable power to encourage participation in activities that Congress has expressly prohibited" where plaintiff came to the court with unclean hands because its business "exist[ed] solely for the purpose of making money through repeated and ongoing violations of federal law." *Ctrl Alt Destroy*, 2025 WL 790963, at *5-6, *8 (quotation marks and citation omitted). The Third and Ninth Circuits, however, apply different tests for unclean hands.[10] *Compare Northbay Wellness Grp., Inc. v. Beyries*, 789 F.3d 956, 960 (9th Cir. 2015) (noting Ninth Circuit's unclean hands test "requires balancing the alleged wrongdoing of the plaintiff against that of the defendant, and 'weigh[ing] the substance of the right asserted by [the] plaintiff against the transgression which, it is contended, serves to foreclose that right'" (alterations in original) (citation omitted)), *with In re New Valley Corp.*, 181 F.3d at 523 (noting Third Circuit's unclean hands doctrine requires "that

[10] Additionally, on appeal in *Ctrl Alt Destroy*, the defendant disavowed the district court's reasoning, stating that "the proper disposition would be for the [c]ourt to vacate and remand for further proceedings including . . . factual development on the unclean hands doctrine." Answering Br., *Ctrl Alt Destroy, Inc. v. Elliot*, Case No. 25-2419, Dkt. No. 41.1 at 16 (9th Cir. Mar. 4, 2026). The Court notes that if the district court's decision in *Ctrl Alt Destroy* is vacated and remanded for further "factual development," the Ninth Circuit's balancing test for unclean hands would apply. *See Northbay Wellness Grp.*, 789 F.3d at 960.

there be an 'immediate and necessary relationship' between the conduct and the matters in litigation" (citation omitted)).

Additionally, in *Apical Biotek, LLC v. Maitri Holdings, LLC*, No. 25-1396, 2026 WL 177927 (3d Cir. Jan. 22, 2026), a case flagged in Defendants' notice of supplemental authority (*see* Defs.' Apr. 3, 2026, Not. of Supp. Auth.), the Third Circuit addressed an appeal of a motion for summary judgment on breach of contract and unjust enrichment claims where "the contract at issue may involve conduct that violates federal law[.]" *Apical Biotek*, 2026 WL 177927, at *1. In its analysis, the Third Circuit made clear that if a business "cultivates, manufactures, or distributes a federally controlled substance, then claims based on a contract to provide such . . . services should be dismissed because enforcement would require th[e] [c]ourt to 'stamp its approval on the parties' unlawful activities[.]'" *Id.* at * 2 (quoting *CCH Acquisitions, LLC v. J&J&D Holdings LLC*, No. 23-2983, 2025 WL 601249, at *6 (S.D. Ohio Feb. 25, 2025)). That case, however, is distinct from the facts here. This matter does not involve a contract "that contemplates distribution of a controlled substance in violation of federal law[,]" and instead concerns whether a labor requirement (the LPA) is preempted by federal labor law.[11] *Apical*, 2026 WL 177927, at *1; (*see* Compl., Prayer for Relief 22-23; LPA.)

The Court will not accept Defendants' invitation to stretch the limitations of the doctrine of unclean hands under Third Circuit precedent. *See, e.g.*, *Keystone*, 290 U.S. at 245 (noting that courts "do not close their doors because of plaintiff's misconduct . . . that has no relation to anything involved in the suit, but only for such violations of conscience . . . [that] affect the

[11] Defendants also note that Curaleaf recently filed a brief in the Sixth Circuit arguing that "'courts cannot issue orders that facilitate illegal activity, namely violations of the CSA.'" (Defs.' Reply Br. 2 (quoting Defendants-Appellants' Br., *Hello Farms Licensing MI, LLC v. CURA MI, LLC*, Case No. 25-1759, Dkt. No. 19 at 30-34 (6th Cir. Nov. 6, 2025)).)

equitable relations between the parties" with respect to "something brought before the court for adjudication"). To be sure, the Court recognizes that the *collateral conduct* that Plaintiffs engage in concerns distribution of a controlled substance in violation of the CSA. (*See, e.g.*, Compl. ¶ 18 ("Curaleaf is one of the world's premiere cannabis companies and a leading provider of cannabis" with multiple cannabis facilities.).) What is squarely at issue in this case, however, is whether the LPA requirement under the CREAMM Act is in violation of federal labor law, and the Court fails to see how that issue has a sufficient nexus to the federally-illegal conduct to warrant the application of the unclean hands doctrine here. The Court, accordingly, declines to apply the unclean hands doctrine to Plaintiffs' claims. *See Scherer Design Grp.*, 764 F. App'x at 153 (finding that district court "did not abuse its discretion in declining to apply the unclean hands doctrine to deny [plaintiff's] request for equitable relief" where the "allegedly unclean conduct is not directly related to [d]efendants' breach of the duty of loyalty" at issue); *but see Apical*, 2026 WL 177927, at *3 (Matey, J., concurring) (noting that "if . . . the case and controversy *turns on* controlled substances, a prompt dismissal" is required (emphasis added)).

### 2. *Abstention*

Defendants next argue that the Court should abstain under both the *Younger* and *Burford* abstention doctrines. (*See* Defs.' Moving Br. 15-20.) Plaintiffs argue that abstention is not appropriate here. (*See* Pls.' Opp'n Br. 12-15.)

To begin, the Court notes that "a federal court's 'obligation' to hear and decide a case is 'virtually unflagging.'" *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). "Parallel state-court proceedings do not detract from that obligation." *Id.* Exceptions to that general rule, including those under the *Younger* and *Burford* abstention doctrines, however, do exist. *See generally*

*Younger v. Harris*, 401 U.S. 37 (1971); *Burford v. Sun Oil Co.*, 319 U.S. 315 (1943). The Court addresses each of these abstention doctrines below.

**a. *Younger* Abstention**

Under the *Younger* abstention doctrine, "only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States." *New Orleans Pub. Serv., Inc. v. Council of New Orleans* ("*NOPSI*"), 491 U.S. 350, 368 (1989) (citations omitted). Such "exceptional circumstances" exist in three types of proceedings: (1) "federal intrusion into ongoing state criminal prosecutions"; (2) "civil enforcement proceedings"; and (3) "pending 'civil proceedings involving certain orders . . . uniquely in furtherance of the state courts' ability to perform their judicial functions.'" *Sprint*, 571 U.S. at 78 (alteration in original) (citations omitted).

Here, the Court finds that abstention under *Younger* is not appropriate. Defendants contend that the pending underlying state matter "qualifies as a 'civil enforcement proceeding' involving the would-be federal plaintiff—that is, Curaleaf." (Defs.' Moving Br. 16.) Defendants, however, overlook the fact that "not all state civil enforcement proceedings are treated equally, nor do all require federal abstention." *Gonzalez v. Waterfront Comm'n of N.Y. Harbor*, 755 F.3d 176, 180-81 (3d Cir. 2014). Rather, "abstention generally is appropriate only where the state civil enforcement proceeding is akin to a criminal prosecution in important respects."[12] *Id.* at 180 (quotation marks omitted) (quoting *Sprint*, 571 U.S. at 79).

---

[12] Such "important respects" include "several distinguishing features": (1) "[t]hey are characteristically initiated to sanction the federal plaintiff, *i.e.*, the party challenging the state action, for some wrongful act"; (2) "[a] state actor is routinely a party to the state proceedings and often initiates the action"; and (3) "they often begin with internal investigations that culminat[e] in the filing of a formal complaint or charges." *Gonzalez*, 755 F.3d at 181 (third alteration in original) (quotation marks omitted) (quoting *Sprint*, 571 U.S. at 79-80).

The Court recognizes that there is a pending proceeding in front of the New Jersey Office of Administrative Law regarding the "imposition of [a] civil monetary penalty in the amount of $610,000." (*See* Ex. 1 to Defs.' Moving Br., ECF No. 39-2.) That proceeding, however, does not resemble the type of quasi-criminal proceeding contemplated under the *Younger* doctrine, because, among other things, "there is [no] close relationship between the underlying administrative . . . proceeding and any analogous state criminal law." *McNamara v. Grewal*, No. 19-173, 2019 WL 8261868, at *5 (D.N.J. Oct. 29, 2019) ("After all, the 'civil enforcement' must be 'quasi-criminal' in nature." (citation omitted)). In light of the Supreme Court's "dominant instruction that, even in the presence of parallel state proceedings, abstention from the exercise of federal jurisdiction is the 'exception, not the rule[,]'" the Court finds that abstention under *Younger* is not appropriate. *Sprint*, 571 U.S. at 81-82 (quoting *Haw. Hous. Auth. v. Midkiff*, 467 U.S. 229, 236 (1984)); *see also NOPSI*, 491 U.S. at 373 ("But there is no doctrine that the availability or even the pendency of state judicial proceedings excludes federal courts.").

**b. *Burford* Abstention**

"The purpose of *Burford* is to avoid federal intrusion into matters of local concern and which are within the special competence of local courts." *Matusow v. Trans-Cnty. Title Agency, LLC*, 545 F.3d 241, 247 (3d Cir. 2008) (quotation marks omitted) (quoting *Hi Tech Trans, LLC v. New Jersey*, 382 F.3d 295, 303-04 (3d Cir. 2004)). "*Burford* is concerned with protecting complex state administrative processes from undue federal interference, [but] it does not require abstention whenever there exists such a process, or even in all cases where there is a 'potential for conflict' with state regulatory law or policy." *NOPSI*, 491 U.S. at 362 (citation omitted). In analyzing whether abstention is appropriate under this doctrine, the Third Circuit instructs courts to consider a two-step analysis: (1) "whether timely and adequate state law review is available"; and

(2) whether "the case . . . involves difficult questions of state law impacting on the state's public policy or whether the district court's exercise of jurisdiction would have a disruptive effect on the state's efforts to establish a coherent public policy on a matter of important state concern." *Matusow*, 545 F.3d at 247-48 (alteration in original) (quotation marks and citations omitted).

The Court similarly finds that abstention under *Burford* is not appropriate here. Defendants argue that the Court should also abstain under *Burford* because both steps are satisfied and because "the cannabis licensing framework epitomizes the kind of complex, technical regime that *Burford* protects." (Defs.' Moving Br. 18-19.) The matter here, however, does not involve "difficult questions of state law or implicate any complex state policies" that are contemplated by the *Burford* abstention doctrine. *Matusow*, 545 F.3d at 248. Rather, as Plaintiffs point out, "Curaleaf asks this Court to apply settled NLRA preemption principles . . . and enjoin enforcement of one provision of state law." (Pls.' Opp'n Br. 13.) The Court will, therefore, not abstain under *Burford*. *See McNamara*, 2019 WL 8261868, at *7 ("*Burford* has no application when the Court is called upon . . . to interpret uncomplicated state statutes that are intertwined with federal laws.").

Defendants' motion is, accordingly, denied.

**B. Plaintiffs' PI Motion**

Because the Court denies Defendants' Motion to Dismiss, the Court now turns to Plaintiffs' PI Motion. In their motion, Plaintiffs seek to:

> enjoin Defendants from imposing any penalties, licensing consequences, or other adverse actions for Curaleaf's alleged failure to enter into a[n] [LPA] or otherwise restricting Curaleaf's engaging in conduct protected under the [NLRA], including but not limited to the right to resort to economic weapons, to speak about issues related to unionization, to refuse access to its property, and to insist on a secret-ballot election according to the procedures established by federal law.

(PI Mot. 1-2.) Plaintiffs argue that they "face[] imminent and irreparable harm" including "fines [Curaleaf] cannot recover from the state, the loss of [Curaleaf's] licenses (including the license for its Bordentown facility, effective October 31, 2025), and permanent harm to [their] business." (Pls.' Moving Br. 2, ECF No. 23-1.) For the reasons discussed below, the Court denies Plaintiffs' PI Motion.

### *1. Likelihood of Success on the Merits*

The Court first turns to whether Plaintiffs have shown a likelihood of success on the merits that the NLRA preempts the LPA requirement. *See Issa*, 847 F.3d at 131. As a preliminary matter, the Court starts its analysis of the PI Motion by providing an overview of the NLRA and the applicable preemption doctrines, before turning to its preemption analysis.

#### a. NLRA and Preemption Standards

"Passed in 1935, the NLRA 'encourag[es] the practice and procedure of collective bargaining' between labor and management to resolve 'industrial disputes arising out of differences as to wages, hours, or other working conditions.'" *Davis v. Benihana, Inc.*, 772 F. Supp. 3d 524, 533 (D.N.J. 2025) (alteration in original) (quoting 29 U.S.C. § 151). Its purpose is to "protect[] the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own choosing, for the purpose of negotiating the terms and conditions of their employment." *Grane Health Care v. NLRB*, 712 F.3d 145, 147 (3d Cir. 2013) (quoting 29 U.S.C. § 151). "Though the NLRA contains no express preemption provision," the Supreme Court "has carved out two distinct implied-preemption doctrines around the NLRA": (1) "*Garmon* preemption"; and (2) "*Machinists* preemption." *Hotel Emps. & Rest. Emps. Union, Loc. 57 v. Sage Hosp. Res., LLC*, 390 F.3d 206, 211-12 (3d Cir. 2004); *see San Diego Bldg. Trades*

*Council v. Garmon* ("*Garmon*"), 359 U.S. 236, 245 (1959); *Lodge 76, Int'l Ass'n of Machinists & Aerospace Workers v. Wis. Emp. Rels. Comm'n* ("*Machinists*"), 427 U.S. 132, 140 (1976).

*Garmon* preemption "forbids state and local regulation of activities that are 'protected by [Section] 7 of the [NLRA], or constitute an unfair labor practice under [Section] 8.'"[13] *Hotel Emps. & Rest. Emps.*, 390 F.3d at 211 (second alteration in original) (quoting *Garmon*, 359 U.S. at 245). Under *Garmon* preemption, "[s]tates may not regulate activity that the NLRA protects, prohibits, or arguably protects or prohibits[,]" and, as a result, "the *Garmon* rule prevents [s]tates not only from setting forth standards of conduct inconsistent with the substantive requirements of the NLRA, but also from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by the [NLRA]." *Wis. Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986) (citations omitted).

*Machinists* preemption "precludes state and municipal regulation concerning those aspects of labor-management relations that Congress intended 'to be controlled by the free play of economic forces.'" *Hotel Emps. & Rest. Emps.*, 390 F.3d at 212 (quoting *Machinists*, 427 U.S. at 140). "This form of preemption recognizes Congress's desire to balance the power between employers and workers." *Id.* As a result, "[s]tates are . . . prohibited from imposing additional restrictions on economic weapons of self-help, such as strikes or lockouts, unless such restrictions presumably were contemplated by Congress." *Golden State Transit Corp. v. City of Los Angeles*, 475 U.S. 608, 614-15 (1986) (citation omitted).

---

[13] Section 7 details the rights of employees to organize and collectively bargain, and Section 8 details unfair labor practices. *See* 29 U.S.C. §§ 157, 158; *Glacier Nw., Inc. v. Int'l Bhd. of Teamsters Loc. Union No. 174*, 598 U.S. 771, 775 (2023) (summarizing NLRA Sections 7 and 8).

The Court further discusses the application of each preemption doctrine below,[14] but first turns to the threshold matter of whether the NLRA applies or arguably applies to the cannabis industry.

**b. Application of the NLRA to the Cannabis Industry**

Before the Court can analyze whether the LPA requirement is preempted, it must consider whether the NLRA applies, *or arguably applies*, to the cannabis industry. *See Gould*, 475 U.S. at 286 (noting "that [s]tates may not regulate activity that the NLRA protects, prohibits, *or arguably protects or prohibits*" (emphasis added)). Defendants urge this Court to find that the NLRA does not apply because: (1) "there is no interstate trade in cannabis"; and (2) "the NLRA only reaches unfair labor practices 'affecting' *inter*state commerce, the statute does not apply to the *intra*state regulation and sale of cannabis in New Jersey at issue here." (Defs.' Moving Br. 23 (emphasis in original).) Plaintiffs, however, disagree, arguing that: (1) "[t]he NLRA's reach is broad" and "covers any activity that 'burdens or obstructs' commerce, including purely intrastate labor activity"; (2) "the NLRB has consistently asserted jurisdiction over cannabis workers and employers"; and (3) "Defendants' basic error is to conflate the cannabis product market with the labor market" even though "the two are distinct" and "the labor market is both fully lawful and fully regulated by federal law – specifically, by the NLRA." (Pls.' Opp'n Br. 23-25.)

"The NLRA is remarkably broad in scope and power." *FDLRST Media, LLC v. NLRB*, 35 F.4th 108, 119 (3d Cir. 2022). Moreover, the Supreme Court has "consistently declared that in passing the [NLRA], Congress intended to and did vest in the [NLRB] the fullest jurisdictional

[14] The Court notes that it need only determine that either *Garmon* or *Machinists* preemption applies in order to find that Plaintiffs have shown a likelihood of success on the merits. The Court, however, addresses both doctrines of preemption to provide a complete analysis.

breadth constitutionally permissible under the Commerce Clause." *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226 (1963) (collecting cases).

Here, the Court finds that the NLRA's reach arguably extends and applies to cannabis businesses. *See Gould*, 475 U.S. at 286. In reaching this decision, the Court finds persuasive the fact that other courts have similarly found that the NLRA at least arguably applies to the labor market that exists within the cannabis industry.[15] *See, e.g.*, *Casala, LLC v. Kotek*, 789 F. Supp. 3d 1025, 1037-38 (D. Ore. 2025) (noting "support [for] the conclusion that the NLRA applies to the cannabis industry in a way that is not 'plainly contrary' to the NLRA's text and that has not been 'authoritatively rejected'" and finding that "the NLRA at least arguably applies to cannabis businesses"); *Absolute Healthcare v. NLRB*, 103 F.4th 61, 67 (D.C. Cir. 2024) (analyzing NLRB's decision regarding a medical marijuana dispensary's unfair labor practices); *see also* NLRB GC Advice Mem., Ne. Patients Grp. d/b/a Wellness Connection of Me., Case Nos. 01-CA-104979, 01-CA-106405, at 8 (Oct. 25, 2013) (determining that "a labor dispute involving the [cannabis] industry could have a substantial effect on interstate commerce" and noting that the NLRB "has the authority to regulate the marijuana industry, even where production and consumption is intended to be wholly intrastate").

Because the Court finds that the NLRA at least arguably applies to the cannabis industry, *see Garmon*, 359 U.S. at 245-46, it next turns to its *Garmon* preemption analysis.

[15] The Court further notes that courts have also found that other federal laws extend their reach to the workers and labor market within the cannabis industry. *See, e.g.*, *Kenney v. Helix TCS, Inc.*, 939 F.3d 1106, 1110, 1113 (10th Cir. 2019) (finding employees of cannabis businesses are not "categorically excluded" from protections under the Fair Labor Standards Act); *Smith v. 116 S Mkt. LLC*, 831 F. App'x 355, 356 (9th Cir. 2020) (rejecting challenge that compliance with the Americans with Disabilities Act does not extend to businesses selling cannabis); *Casala*, 789 F. Supp. 3d at 1038 (noting that "the Occupational Safety and Health Administration ('OSHA') also has resolved cases involving cannabis processing and growing facilities" (citations omitted)).

### c. *Garmon* Preemption

Plaintiffs argue that the LPA requirement is preempted under *Garmon* for multiple reasons, including because the LPA requirement: (1) forces employers to agree to an LPA; (2) "impermissibly intrudes upon th[e] exclusive federal domain [of uniform national labor policy], particularly in the areas of collective bargaining and union organizing, which are regulated solely by the NLRA"; and (3) "purports to layer on new penalties, including financial penalties and the loss of a license, for conduct otherwise governed by federal law." (Pls.' Moving Br. 8-20; Pls.' Opp'n Br. 17-18.) Defendants disagree, arguing that "Curaleaf does not dispute[,] . . . New Jersey has a deeply rooted interest in regulating a state-created cannabis market that remains federally illegal" and, as such, an exception to the *Garmon* preemption doctrine applies. (Defs.' Reply 19-23; Defs.' Moving Br. 2.)

*Garmon* preemption encompasses activity that the NLRA "arguably protects or prohibits" as it is "designed to prevent 'conflict in its broadest sense' with the 'complex and interrelated federal scheme of law, remedy, and administration.'" *Gould*, 475 U.S. at 286 (quoting *Garmon*, 359 U.S. at 243). "As the party asserting preemption, [Curaleaf] bears the burden of[:] (1) advancing an interpretation of the [NLRA] that is not plainly contrary to its language and that has not been authoritatively rejected by the courts or the [NLRB;] and then (2) putting forth enough evidence to enable the court to find that the NLRA arguably protects [the complained of] conduct." *Glacier Nw.*, 598 U.S. at 779 (third alteration in original) (quotation marks omitted) (quoting *Int'l Longshoremen's Ass'n, AFL-CIO v. Davis*, 476 U.S. 380, 395 (1986)).

Here, Plaintiffs identify that the CREAMM Act makes the LPA requirement an ongoing material condition for a cannabis business to have a license. (*See* Pls.' Moving Br. 3, 6); N.J. Stat. Ann. § 24:6I-36. Without a valid LPA, Plaintiffs face suspension of their licenses and fines.

(*See, e.g.*, Compl. ¶ 47 (citing Ex. H to Compl.).) Moreover, as Plaintiffs note, the LPA requirement itself either "short-circuits" normal processes provided under the NLRA or "forces" negotiation over matters not required by Congress by, for example: (1) "denying Curaleaf the option to insist on a[n NLRB]-supervised election when employees seek representation" (Pls.' Moving Br. 14 (first citing Ex. I to Compl.; and then citing N.J. Stat. Ann. § 24-6I-36.c)); (2) "conditioning licensure on the execution of an LPA, . . . compel[ling] negotiation over a topic that federal law leaves optional and thus conflicts with federal labor policy" (*id.* at 15 (first citing N.J. Stat. Ann. § 24-6I-36.c; then citing 29 U.S.C. § 158(d); and then citing *520 S. Mich. Ave. Assocs., Ltd. v. Shannon*, 549 F.3d 1119, 1134 (7th Cir. 2008))); and (3) "forc[ing] Curaleaf to surrender other rights in the collective bargaining process" (*id.*). As such, Plaintiffs have shown that the LPA requirement "impermissibly conditions a state license on an employer 'refraining from conduct protected by federal labor law,' which 'chills one side of the "robust debate which has been protected under the NLRA."'" *Casala*, 789 F. Supp. 3d at 1039 (quoting *Chamber of Com. of U.S. v. Brown*, 554 U.S. 60, 73 (2008)). The Court finds that Plaintiffs have shown that *Garmon* preemption applies. *See id.* (noting party "met its burden on the merits of *Garmon* preemption").

The Court's inquiry cannot stop there, however, because, even if a party has met its burden in showing that *Garmon* preemption applies, there are exceptions to the rule in certain cases. *See Garmon*, 359 U.S. at 243-44. These carved out exceptions for which "preemption is inappropriate" include: (1) "when a state law relates to a 'merely peripheral concern of the [NLRA]'[;] or [(2)] when it 'touche[s] interests so deeply rooted in local feeling and responsibility that, in the absence of compelling congressional direction, [a court] could not infer that Congress had deprived the States of the power to act.'" *Davis*, 772 F. Supp. 3d at 535 (first, fourth, and fifth alterations in

original) (quoting *Garmon*, 359 U.S. at 243-44). For a court to evaluate the latter exception—the "local interest" exception—it must "first determine if adjudicating the state law claims would present a 'risk of interference with the regulatory jurisdiction of the [NLRB]" and then "determine whether the state law regulates 'a significant state interest' 'so deeply rooted in local feeling and responsibility.'" *Id.* at 535-36 (citations omitted). "What the Supreme Court had in mind [for this local feeling exception] and specifically considered were state laws regulating 'conduct marked by violence and imminent threats to the public order.'"[16] *Id.* at 548 (quoting *Garmon*, 359 U.S. at 247).

Defendants argue that the local interest exception: (1) "defeats Curaleaf's claim because [the LPA] requirement protects interests 'deeply rooted in local feeling and responsibility' by ensuring that cannabis licensees in a federally illicit market engage with bona fide labor organizations" (Defs. Moving Br. 2); and (2) applies because "th[e] States may keep the peace through regulation in the very industries they have chosen to legalize but the federal government has not[,]" (*id.* at 28). The Court, however, finds that the LPA requirement under the CREAMM Act is not related to violence or threats of violence which would make the local feeling exception applicable. Instead, the CREAMM Act was "designed to eliminate the problems caused by the unregulated manufacturing, distribution, and use of illegal marijuana within New Jersey[.]" N.J.

[16] In fact, in the cases since *Garmon*, the Supreme Court:

> has only applied the local interest exception "in cases where the conduct alleged concerned activity traditionally recognized to be the subject of local regulation, most often involving threats to public order such as violence, threats of violence, intimidation and destruction of property[,]" . . . cases involving trespass on private property[,] and "certain personal torts . . . ."

*Davis*, 772 F. Supp. 3d at 548 (collecting cases).

Stat. Ann. § 24:6I-32c. Further included in the CREAMM Act's reasoning was that "[c]ontrolling and legalizing cannabis . . . will free up precious resources to allow [the state's] criminal justice system to focus on serious criminal activities and public safety issues" as well as "strike a blow at the illegal enterprises that profit from New Jersey's current, unregulated illegal marijuana market[.]" N.J. Stat. Ann. §§ 24:6I-32g, 24:6I-32h.

Defendants also assert that "[b]efore [the] CREAMM[ Act], cannabis enterprises operated unlawfully and without regulatory oversight, resulting in violence, exploitation of vulnerable workers, and threats to the public." (Defs.' Reply Br. 19.) This assertion, however, is neither supported by citations to case law (*see generally* Defs.' Reply Br.), nor supported by the "[l]egislative findings and declarations relating to regulation of cannabis for personal use" detailed in the CREAMM Act itself, *see* N.J. Stat. Ann. § 24:6I-32. The Court, therefore, finds that the CREAMM Act does not regulate "conduct marked by violence and imminent threats to the public order[,]" and is therefore not subject to the *Garmon* local feeling exception. *Garmon*, 359 U.S. at 247 (citations omitted); *see also Casala*, 789 F. Supp. 3d at 1040 (finding local feeling exception does not apply in cannabis-related matter).

The Court, accordingly, finds that *Garmon* preemption applies, and next turns to *Machinists* preemption.

**d. *Machinists* Preemption**

As both Defendants and Plaintiffs recognize, the *Machinists* doctrine "rests on the premise that Congress intentionally left certain aspects of labor-management relations 'unregulated,' to be 'controlled by the free play of economic forces.'" (Defs.' Moving Br. 23 (quoting *Machinists*, 427 U.S. at 140); *see also* Pls.' Moving Br. 10 ("In the NLRA, Congress intentionally left parties free to resolve labor disputes by resorting to so-called economic weapons – strikes, lockouts, and other

work stoppages.").) Plaintiffs argue that "the LPA requirement undermines the federal system in two ways": (1) "it forces employers into negotiations over a permissive subject – the LPA itself"; and (2) it "restricts a party's resort to economic weapons even though they are considered to be a part of the natural collective bargaining process." (Pls.' Opp'n Br. 19 (citation omitted).) Plaintiffs contend that by signing an LPA, they give up their right "to resort to weapons such as contracting out work or locking out employees" and "[t]he [U]nion in turn, gives up its right to disrupt the employer's business with tactics like picketing and other protests." (*Id.*) Such an LPA requirement, according to Plaintiffs, "tilts the field and frustrates Congress's design." (*Id.*) The Court agrees.

The LPA requirement at issue provides Defendants "with the assurance that, should an entity [such as Plaintiffs] be licensed, its operations will not be shut down due to labor-dispute or labor-related work stoppages." (Ex. I to Compl. 4-5, ECF No. 1.) As a result, although the term itself is not defined, such an agreement clearly requires Curaleaf to give up the right to utilize economic weapons. (*See id.*) The right to "[r]esort to economic weapons should more peaceful measures not avail" and "the use of economic pressure by the parties to a labor dispute is . . . part and parcel of the process of collective bargaining[,]" and the state may not prohibit the parties' ability to use such weapons. *Machinists*, 427 U.S. at 144, 147, 149 (alterations in original) (first quoting *Am. Ship Bldg. Co. v. NLRB*, 380 U.S. 300, 317 (1965); and then quoting *NLRB v. Ins. Agents' Int'l Union, AFL-CIO*, 361 U.S. 477, 495 (1960)). Defendants, in "conditioning license renewal on signing an LPA, . . . seek[] to regulate the relationship between unions and employers. This upsets the balance Congress struck in passing the NLRA." *Casala*, 789 F. Supp. 3d at 1041 (finding measure requiring licensee to sign an LPA preempted under *Machinists*).

Moreover, the Court is not persuaded by Defendants' argument that "there is nothing 'unregulated' about a market that federal law bans" and, as a result, "there is no plausible claim

that Congress meant to keep the cannabis industry free from state regulation." (Defs.' Moving Br. 32; *see also id.* at 33 (arguing that "*Machinists* preemption does not apply [to the LPA] because Congress has clarified that it does not intend to leave the cannabis industry 'to be controlled by the free play of economic forces'") (quoting *Ctrl Alt Destroy*, 2025 WL 790963, at *7 n.8)).) "[T]he balancing that *Machinists* seeks to protect refers only to the *labor relations* context, not to regulation of the underlying market. [Therefore,] [t]he 'balance of power designed by Congress' in labor relations has no effect on Congress's ban on cannabis." *Casala*, 789 F. Supp. 3d at 1041 (emphasis in original) (rejecting defendants' argument relying on *Ctrl Alt Destroy* to reach the opposite conclusion). Additionally, although Congress declared cannabis federally illegal, federal law has been applied many times to workers and the labor market within the cannabis industry. *See, e.g.*, *Casala*, 789 F. Supp. 3d at 1038 (collecting cases).

The Court, accordingly, finds that the LPA requirement is preempted under *Machinists*, as well as *Garmon*, and that Plaintiffs have therefore shown a likelihood of success on the merits. The Court next turns to its analysis of whether Plaintiffs have shown a likelihood of irreparable harm.

***2. Likelihood of Irreparable Harm***

"A plaintiff seeking a preliminary injunction must prove irreparable harm is 'likely' in the absence of relief." *Issa*, 847 F.3d at 142 (citation omitted). "[P]reliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights." *Lanin v. Borough of Tenafly*, 515 F. App'x 114, 117-18 (3d Cir. 2013) (alteration in original) (citation omitted). "Delay in seeking enforcement of those rights . . . tends to indicate at least a reduced need for such drastic, speedy action." *Id.* at 118 (alteration in original) (citation omitted).

Here, Plaintiffs contend that, absent a preliminary injunction, they will be irreparably harmed because: (1) without a new LPA, "Curaleaf would be forced to cease operations at the dispensary"; (2) "the LPA requirement will continue to interfere with Curaleaf's rights under the NLRA, including its right to refuse to bargain over optional subjects, to decline to bargain with a union not properly certified by the NLRB or designated by employees, and to exercise economic weapons if it chooses"; and (3) Defendants have imposed "$610,000 in fines on Curaleaf for failing to secure an LPA and under the Eleventh Amendment, those funds cannot be recovered once paid into the state treasury and would be irretrievably lost[.]" (Pls.' Moving Br. 22.)

As Defendants note, however, there is a lack of urgency in Plaintiffs' request for a preliminary injunction. (*See* Defs.' Moving Br. 35-38.) The CREAMM Act was enacted in 2021, and Plaintiffs have held several licenses in New Jersey since at least April of 2022. (Compl. ¶¶ 22-23, 36.) To initially comply with the licensing regime under the CREAMM Act, Curaleaf signed an LPA in 2022, but that LPA expired in April 2025. (*Id.* ¶¶ 2, 25, 43.) Defendants subsequently issued a Violation Notice to Curaleaf in May 2025 (*id.* ¶ 45), and followed up in August 2025 with an Enforcement Notice imposing a $610,000 penalty (*id.* ¶ 47). It was not until October 9, 2025, however, that Plaintiffs filed their Complaint and subsequently sought a preliminary injunction two weeks later.[17] (*See generally id.*; PI Mot.) Such an unexplained[18] and

---

[17] The Court recognizes that in late September 2025, the Commission "provisionally granted" Curaleaf's application to renew its license, subject to confirmation that Curaleaf secured an LPA. (*See* Compl. ¶ 50.) Notably, however, by this point, Curaleaf had already been aware of its LPA violation for months, was warned of consequences related to not fulfilling the LPA requirement, and had been fined. (*See id.* ¶¶ 2, 45, 47.)

[18] Curaleaf does not address in reply why the delay is excusable here. (*See generally* Pls.' Reply Br.); *H-1 Auto Care, LLC v. Lasher*, No. 21-18110, 2022 WL 13003468, at *4 (D.N.J. Oct. 21, 2022) (finding that plaintiff failed to "make the requisite showing of irreparable harm" where "[p]laintiff [made] no effort in its briefing to explain why it did not act sooner").

"tremendous delay" of multiple months (*see* Defs.' Moving Br. 35), shows a lack of urgency on Plaintiffs' behalf, *see Lanin*, 515 F. App'x at 117-18. The Court finds that this alone is fatal to Plaintiff's PI Motion and is reason for the Court to find no irreparable harm.[19] *See, e.g.*, *Messina v. Coll. of N.J.*, 566 F. Supp. 3d 236, 249 (D.N.J. 2021) ("[A]ny purported harm [p]laintiffs may face is a consequence of their own delay because they waited over four months to request injunctive relief." (citations omitted)); *H-1 Auto Care*, 2022 WL 13003468, at *4 ("Many courts have found that a delay of just weeks or months precludes a showing of irreparable harm." (citing *Logic Tech. Dev. LLC v. Levy*, No. 17-4630, 2021 WL 3884287, at *3 (D.N.J. Aug. 31, 2021))); *New Dana Perfumes Corp. v. The Disney Store, Inc.*, 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) ("[T]here is an unexplained delay of two months in presenting a cease and desist letter, and another unexplained delay of five months in moving for injunctive relief. Under these circumstances, plaintiffs' delay, alone, precludes a finding of irreparable harm . . . ."); *Pharmacia Corp. v. Alcon Lab'ys, Inc.*, 201 F. Supp. 2d 335, 383 (D.N.J. 2002) (noting that a lengthy delay "knocks the bottom out of any claim of immediate and irreparable harm" (citation omitted)).

The Court, accordingly, finds that Plaintiffs have not met their burden of establishing irreparable injury that warrants a preliminary injunction.[20] Plaintiffs' PI Motion is denied.

---

[19] The Court also notes that any resulting injury is a result of Plaintiffs' own actions, notably their willing choice to delay bringing this issue to the Court, which does not constitute the type of irreparable injury required under the preliminary injunction standard. *See, e.g.*, *Caplan v. Fellheimer Eichen Braverman & Kaskey*, 68 F.3d 828, 839 (3d Cir. 1995) ("If the harm complained of is self-inflicted, it does not qualify as irreparable." (citation omitted)).

[20] The Court need not reach the remaining two factors in the preliminary injunction analysis. *See In re Revel AC, Inc.*, 802 F.3d 558, 571 (3d Cir. 2015) ("[I]f the movant does not make the requisite showings on either of these [first] two factors, the [ ] inquiry into the balance of harms [and the public interest] is unnecessary, and the stay should be denied without further analysis.'" (second, third, and fourth alterations in original) (citation omitted)).

## IV. CONCLUSION

For the reasons set forth above, the parties' motions are denied. The Court will issue an Order consistent with this Memorandum Opinion.

MaShipp

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: May 27th, 2026

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

CURALEAF HOLDINGS, INC., *et al.*,

Plaintiffs,

v.

NEW JERSEY CANNABIS REGULATORY COMMISSION, *et al.*,

Defendants.

Civil Action No. 25-16397 (MAS) (RLS)

**ORDER**

This matter comes before the Court upon two motions: (1) Plaintiffs Curaleaf Holdings, Inc. and Curaleaf NJ, II, Inc.'s (collectively, "Plaintiffs") Motion for an Order to Show Cause and Preliminary Injunction against Defendants New Jersey Cannabis Regulatory Commission, Chair Diana Houenou, Commissioners Krista Nash and Amelia Mapp,[1] and Acting Executive Director Christopher Riggs, in their official capacities (collectively, "Defendants") (the "PI Motion") (ECF No. 23); and (2) Defendants' Motion to Dismiss[2] (ECF No. 39) Plaintiffs' Complaint (ECF No. 1). Plaintiffs opposed Defendants' Motion to Dismiss and replied to the PI Motion (ECF No. 42) and Defendants subsequently replied (ECF No. 43). Thereafter, both Plaintiffs and Defendants filed notices of supplemental authority and responses to the opposing parties' notices. (ECF Nos. 44-47, 49-50.) The Court held oral argument on the parties' motions on April 2, 2026. (*See* ECF No. 53.) Following the oral argument, Defendants filed another notice of supplemental authority (ECF

[1] The Court notes that the docket reflects an incorrect spelling, "Ameila Mapp," which was used in Plaintiffs' Complaint. (*See* Compl., ECF No. 1.)

[2] Defendants' Motion to Dismiss also served as their opposition to Plaintiffs' PI Motion. (*See* Defs.' Mot. to Dismiss, ECF No. 39.)

No. 51) and Plaintiffs filed a response (ECF No. 52). For the reasons outlined in the accompanying Memorandum Opinion,

**IT IS**, on this 27th day of May 2026, **ORDERED** as follows:

1. Plaintiffs' PI Motion (ECF No. 23) is **DENIED**.

2. Defendants' Motion to Dismiss (ECF No. 39) is **DENIED**.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CURALEAF HOLDINGS, INC., *et al.*<br><br>Plaintiffs,<br><br>v.<br><br>NEW JERSEY CANNABIS REGULATORY COMMISSION, *et al.*,<br><br>Defendants. | No. 25-cv-16397 (MAS) (RLS)<br><br>**JOINT CORRESPONDENCE** |

The parties have conferred in light of the Court's May 27, 2026 Order and Memorandum Opinion (ECF Nos. 55 & 56) and now write to say as follows:

1. Plaintiffs sought injunctive and declaratory relief on a single claim in this case: that the National Labor Relations Act (NLRA) preempts the labor-peace agreement (LPA) requirement of the New Jersey Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act (CREAMMA) and its implementing regulations as applied against Plaintiffs. *See* ECF No. 1 at ¶¶ 52-82; N.J. Stat. Ann. § 24:6I-36(c).

2. Although the Court denied Plaintiffs' preliminary-injunction motion due to a lack of irreparable harm (as well as Defendants' motion to dismiss), the Memorandum Opinion (the "Opinion") ruled on all of the parties' arguments—including Defendants' arguments and defenses as to why the Complaint should be dismissed—and the Court appears to have reached a determination on the merits, ultimately finding that the LPA requirement as applied against Plaintiffs "is preempted [by the NLRA] under *Machinists*, as well as *Garmon*." ECF No. 55 at 28.

3. Because preemption is a "predominantly legal" issue, the parties believe no further factual development is necessary in this case to rule on the merits of the preemption claim. *See Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983); *Surrick v. Killion*, 449 F.3d 520, 528 (3d Cir. 2006); *New Jersey Civ. Just. Inst. v. Grewal*, No. 19-17518, 2020 WL 4188129, at *7 (D.N.J. July 21, 2020). And the core facts are not disputed. Both parties submitted declarations/certifications as part of the prior motion practice (*see* ECF Nos. 1-2, 39-2, 42-1) that supplied the relevant facts, and the Court already considered those facts in its prior ruling.

4. Plaintiffs have also now decided, and represent to the Court, that they no longer seek an injunction and limit their request for relief on their single preemption count to declaratory relief.

5. Given that the parties have had an opportunity to submit any relevant facts and legal briefing previously, the Court has already considered those facts and ruled on the legal issues in the Opinion, and no further factual development is necessary, the parties agree that the Court may convert its prior ruling in the Opinion into a final judgment.

6. The parties further agree that such a final judgment can be limited solely to declaratory relief based on the Court's reasoning in the Opinion. So the Court may issue a final judgment under Federal Rules of Civil Procedure 56 and 57. *See Anderson v. Wachovia Mortg. Corp.*, 621 F.3d 261, 280 (3d Cir. 2010) (noting that summary judgment under Rule 56(f) is appropriate where a court has issued a "previous decision" on a claim and nothing would change based on "an opportunity to submit further evidence or briefing").

7. The parties submit this joint correspondence in order to suggest an efficient resolution to the proceedings in this Court so that Defendants may appeal to the Third Circuit. The parties remain adverse. Indeed, Defendants continue to dispute the Court's ruling and expressly reserve their right to appeal. Upon entry of final judgment, Defendants intend to seek appellate review of this Court's ruling, arguing among other things that (1) the complaint should have been dismissed because it is barred by the doctrine of unclean hands; (2) the Court should have abstained and dismissed the complaint under *Younger* and *Burford* abstention; and (3) the NLRA cannot and does not preempt New Jersey's LPA requirement, including under both *Garmon* and *Machinists*. Plaintiffs likewise intend to maintain their positions on appeal, including that (1) the doctrine of unclean hands does not apply to Plaintiffs' claims or requested relief; (2) neither *Younger* nor *Burford* abstention is appropriate; and (3) the NLRA preempts the LPA requirement under both *Garmon* and *Machinists*.

8. The proposed Final Judgment attached as **Exhibit A** may be entered in this matter if the Court deems it appropriate.

From:

JENNIFER DAVENPORT
ATTORNEY GENERAL OF NEW JERSEY

s/Alexander T. MacDonald
Alexander T. MacDonald
LITTLER MENDELSON, P.C.

*Attorneys for Plaintiffs*

By: s/ Bassam F. Gergi
Bassam F. Gergi
Deputy Attorney General

*Attorneys for Defendants*

Dated: August 7, 2026

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| CURALEAF HOLDINGS, INC., *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>NEW JERSEY CANNABIS REGULATORY COMMISSION, *et al.*,<br><br>Defendants. | No. 25-cv-16397 (MAS) (RLS)<br><br>**FINAL JUDGMENT** |

**THIS MATTER** comes before the Court in light of the prior proceedings and rulings in this case and following correspondence from the parties; and

**WHEREAS**, Plaintiffs having filed a Complaint for Injunctive and Declaratory Relief on October 9, 2025, asserting a single count that the National Labor Relations Act (NLRA) preempts the labor-peace agreement (LPA) requirement in the New Jersey Cannabis Regulatory, Enforcement Assistance, and Marketplace Modernization Act (CREAMMA) and its implementing regulations as applied against Plaintiffs. *See* ECF No. 1 at ¶¶ 52-82; N.J. Stat. Ann. § 24:6I-36(c);

**WHEREAS**, the Court having denied Plaintiffs' Motion for a Preliminary Injunction and Defendants' Motion to Dismiss by Memorandum Opinion dated May 27, 2026, *see* ECF No. 55 (the "Opinion");

**WHEREAS**, the Court having found in the Opinion, following briefing and argument by the parties, that the LPA requirement as applied against Plaintiffs "is preempted [by the NLRA] under *Machinists*, as well as *Garmon*." (ECF No. 55 at 28);

**WHEREAS**, the Court having rejected Defendants' arguments and affirmative defenses for the reasons given in the Opinion;

**WHEREAS**, Defendants expressly reserve their right to appeal and continue to maintain that Plaintiffs' Complaint should have been dismissed and that the LPA requirement is not preempted by the NLRA;

**WHEREAS**, the Court finding that whether the NLRA preempts the LPA requirement as applied against Plaintiffs is a legal question as to which there is no genuine dispute of material fact;

**WHEREAS**, the Court finding that the analysis set forth in the Opinion establishes, as a matter of law, that Plaintiffs are entitled to judgment on the merits of their claim;

**WHEREAS**, the parties have represented, and the Court agrees, that no further factual development is necessary to rule on the legal question in this case;

**WHEREAS**, the parties have had a full and fair opportunity to argue the relevant issues in their briefing and at oral argument;

**WHEREAS**, the Court finds that it can and should enter final judgment based on the Opinion, with Defendants having a right to appeal to the Third Circuit;

**WHEREAS**, Plaintiffs have represented, and the Court agrees, that solely declaratory relief can resolve their sole claim, with Plaintiffs reserving the ability, pursuant to 28 U.S.C. § 2202, to seek "[f]urther necessary or proper relief based on a declaratory judgment," should it be necessary;

**WHEREAS**, the Court being authorized under Federal Rules of Civil Procedure 56 and 57 to grant final judgment after it has made a legal conclusion that resolves the only claim in the case and grants the only relief requested;

**IT IS** on this ___ day of _________ 2026, **ORDERED**, **ADJUDGED**, and **DECREED** as follows:

1. Plaintiffs' request for declaratory judgment on Count One is **GRANTED**, and the Court declares that the LPA requirement in CREAMMA and its implementing regulations as applied against Plaintiffs is preempted by the NLRA for the reasons stated in the Opinion.
2. Final judgment is hereby **GRANTED** to Plaintiffs, and this Judgment hereby constitutes a final, appealable judgment under 28 U.S.C. § 1291.
3. The parties are to bear their own costs and expenses.
4. The Clerk of Court is directed to enter Final Judgment and to administratively close this case.

______________________________
**MICHAEL A. SHIPP**
**UNITED STATES DISTRICT JUDGE**

# U.S. District Court
# District of New Jersey [LIVE] (Trenton)
# CIVIL DOCKET FOR CASE #: 3:25-cv-16397-MAS-RLS

CURALEAF HOLDINGS, INC. et al v. NEW JERSEY CANNABIS REGULATORY COMMISSION et al
Assigned to: Judge Michael A. Shipp
Referred to: Magistrate Judge Rukhsanah L. Singh
Case in other court: Third Circuit, 26-03067
Cause: 29:151 Labor: Review of Agency Action

Date Filed: 10/09/2025
Date Terminated: 08/11/2026
Jury Demand: None
Nature of Suit: 720 Labor: Labor/Mgt. Relations
Jurisdiction: Federal Question

**Plaintiff**

**CURALEAF HOLDINGS, INC.**
*a British Columbia corporation*

represented by

**ALAN I. MODEL**
LITTLER MENDELSON, PC
ONE NEWARK CENTER
EIGHTH FLOOR
NEWARK, NJ 07102
(973) 848-47040
Fax: (973) 643-5626
Email: amodel@littler.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ANASTASIA ANNE STYLIANOU**
LITTLER MENDELSON P.C.
ONE NEWARK CENTER
1085 RAYMOND BOULEVARD
8TH FLOOR
NEWARK, NJ 07102
973-848-4761
Email: astylianou@littler.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEX MACDONALD**
COUNSEL NOT ADMITTED TO USDC - NJ BAR
LITTLER MENDELSEON P.C.
815 CONNECTICUT AVENUE NW
SUITE 400
WASHINGTON DC, VA 20006-4046
Email: amacdonald@littler.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**CHRISTOPHER S. PORRINO**
LOWENSTEIN SANDLER LLP
ONE LOWENSTEIN DRIVE
ROSELAND, NJ 07068
973-597-2500

Fax: 973-597-2400
Email: cporrino@lowenstein.com
*ATTORNEY TO BE NOTICED*

**DINORA OROZCO**
COUNSEL NOT ADMITTED TO USDC - NJ BAR
LITTLER MENDELSON, P.C.
321 N CLARK ST.
SUITE 1100
CHICAGO, IL 60654
312-795-3232
Email: dorozco@littler.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PETER MATTHEW SLOCUM**
Lowenstein Sandler LLP
65 Livingston Avenue
Roseland, NJ 07068
973-422-6708
Fax: 973-422-6709
Email: pslocum@lowenstein.com
*ATTORNEY TO BE NOTICED*

**STEFAN MARCULEWICZ**
COUNSEL NOT ADMITTED TO USDC - NJ BAR
LITTLER MENDERLSON P.C.
815 CONNECTICUT AVENUE NW
SUITE 400
WASHINGTON DC, VA 20006-4046
Email: smarculewicz@littler.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**KEITH J. ROSENBLATT**
LITTLER MENDELSON, P.C.
ONE NEWARK CENTER
8TH FLOOR
NEWARK, NJ 07102
(973) 848-4700
Fax: (973) 643-5626
Email: krosenblatt@littler.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**CURALEAF NJ, II, INC.**
*a Delaware corporation*

represented by **ALAN I. MODEL**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ANASTASIA ANNE STYLIANOU**
(See above for address)

*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**ALEX MACDONALD**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**CHRISTOPHER S. PORRINO**
(See above for address)
*ATTORNEY TO BE NOTICED*

**DINORA OROZCO**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**PETER MATTHEW SLOCUM**
(See above for address)
*ATTORNEY TO BE NOTICED*

**STEFAN MARCULEWICZ**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**KEITH J. ROSENBLATT**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**NEW JERSEY CANNABIS REGULATORY COMMISSION** represented by **BASSAM GERGI**
NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
25 MARKET STREET
P.O. Box 080
TRENTON, NJ 08625
973-979-2954
Email: bassam.gergi@njoag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RACHEL E. THOMPSON**
Office of the Attorney General, Division of Law
State Police, Employment and Corrections
25 Market Street
P.O. Box 112
State Police, Employment and Corrections
Trenton, NJ 08625
609-376-2364

Email: rachel.thompson@law.njoag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN EHRLICH**
NEW JERSEY ATTORNEY GENERAL'S OFFICE
R.J. HUGHES JUSTICE COMPLEX
25 MARKET STREET, P.O. BOX 112
TRENTON, NJ 08625
609-250-8412
Email: stephen.ehrlich@njoag.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHAIR DIANA HOUENOU** represented by **BASSAM GERGI**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RACHEL E. THOMPSON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN EHRLICH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**COMMISSIONER KRISTA NASH** represented by **BASSAM GERGI**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RACHEL E. THOMPSON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN EHRLICH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**COMMISSIONER AMEILA MAPP** represented by **BASSAM GERGI**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RACHEL E. THOMPSON**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN EHRLICH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Defendant**

**CHRISTOPHER RIGGS**
*ACTING EXECUTIVE DIRECTOR, in their official capacities*

represented by **BASSAM GERGI**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**RACHEL E. THOMPSON**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**STEPHEN EHRLICH**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 10/09/2025 | 1 | COMPLAINT against CHAIR DIANA HOUENOU, COMMISSIONER AMEILA MAPP, COMMISSIONER KRISTA NASH, NEW JERSEY CANNABIS REGULATORY COMMISSION, ACTING EXECUTIVE DIRECTOR CHRISTOPHER RIGGS, in their official capacities ( Filing and Admin fee $ 405 receipt number ANJDC-16720447), filed by CURALEAF NJ, II, INC., a Delaware corporation, CURALEAF HOLDINGS, INC., a British Columbia corporation. (Attachments: # 1 Civil Cover Sheet, # 2 Declaration of Peter Clateman)(ROSENBLATT, KEITH) (Entered: 10/09/2025) |
| 10/09/2025 | 2 | Corporate Disclosure Statement by CURALEAF HOLDINGS, INC., a British Columbia corporation, CURALEAF NJ, II, INC., a Delaware corporation. (ROSENBLATT, KEITH) (Entered: 10/09/2025) |
| 10/09/2025 | 3 | NOTICE of Appearance by KEITH J. ROSENBLATT on behalf of CURALEAF HOLDINGS, INC., a British Columbia corporation, CURALEAF NJ, II, INC., a Delaware corporation (ROSENBLATT, KEITH) (Entered: 10/09/2025) |
| 10/09/2025 | 4 | NOTICE of Appearance by ALAN I. MODEL on behalf of CURALEAF HOLDINGS, INC., a British Columbia corporation, CURALEAF NJ, II, INC., a Delaware corporation (MODEL, ALAN) (Entered: 10/09/2025) |
| 10/09/2025 | | Judge Michael A. Shipp and Magistrate Judge Rukhsanah L. Singh added. (mlh) (Entered: 10/09/2025) |
| 10/09/2025 | 5 | SUMMONS ISSUED as to DIANA HOUENOU, AMEILA MAPP, KRISTA NASH, NEW JERSEY CANNABIS REGULATORY COMMISSION, and CHRISTOPHER RIGGS. Attached is the official court Summons, please fill out Defendant and Plaintiffs attorney information and serve. (mlh) (Entered: 10/09/2025) |

| | | |
|---|---|---|
| 10/09/2025 | 6 | NOTICE of Appearance by ANASTASIA ANNE STYLIANOU on behalf of CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC. (STYLIANOU, ANASTASIA) (Entered: 10/09/2025) |
| 10/20/2025 | 7 | AFFIDAVIT of DUE DILIGENCE as to the NEW JERSEY CANNABIS REGULATORY COMMISSION re 5 Summons Issued, 1 Complaint, by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC.. (ROSENBLATT, KEITH) (Entered: 10/20/2025) |
| 10/20/2025 | 8 | AFFIDAVIT of DUE DILIGENCE as to DIANA HOUENOU re 5 Summons Issued, 1 Complaint, by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC.. (ROSENBLATT, KEITH) (Entered: 10/20/2025) |
| 10/20/2025 | 9 | AFFIDAVIT of DUE DILIGENCE as to KRISTA NASH re 5 Summons Issued, 1 Complaint, by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC.. (ROSENBLATT, KEITH) (Entered: 10/20/2025) |
| 10/20/2025 | 10 | AFFIDAVIT of DUE DILIGENCE as to AMEILA MAPP re 5 Summons Issued, 1 Complaint, by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC.. (ROSENBLATT, KEITH) (Entered: 10/20/2025) |
| 10/20/2025 | 11 | AFFIDAVIT of DUE DILIGENCE as to CHRISTOPHER RIGGS re 5 Summons Issued, 1 Complaint, by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC.. (ROSENBLATT, KEITH) (Entered: 10/20/2025) |
| 10/20/2025 | 12 | AFFIDAVIT of Service for SUMMONS AND COMPLAINT, EXHIBITS, CIVIL COVER SHEET, DECLARATION OF PETER CLATEMAN served on NEW JERSEY CANNABIS REGULATORY COMMISSION on 10/15/2025, filed by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC.. (ROSENBLATT, KEITH) (Entered: 10/20/2025) |
| 10/20/2025 | 13 | AFFIDAVIT of Service for SUMMONS AND COMPLAINT, EXHIBITS, CIVIL COVER SHEET, DECLARATION OF PETER CLATEMAN served on DIANA HOUENOU on 10/15/2025, filed by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC.. (ROSENBLATT, KEITH) (Entered: 10/20/2025) |
| 10/20/2025 | 14 | AFFIDAVIT of Service for SUMMONS AND COMPLAINT, EXHIBITS, CIVIL COVER SHEET, DECLARATION OF PETER CLATEMAN served on KRISTA NASH on 10/15/2025, filed by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC.. (ROSENBLATT, KEITH) (Entered: 10/20/2025) |
| 10/20/2025 | 15 | AFFIDAVIT of Service for SUMMONS AND COMPLAINT, EXHIBITS, CIVIL COVER SHEET, DECLARATION OF PETER CLATEMAN served on AMEILA MAPP on 10/15/2025, filed by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC.. (ROSENBLATT, KEITH) (Entered: 10/20/2025) |
| 10/20/2025 | 16 | AFFIDAVIT of Service for SUMMONS AND COMPLAINT, EXHIBITS, CIVIL COVER SHEET, DECLARATION OF PETER CLATEMAN served on CHRISTOPER RIGGS on 10/15/2025, filed by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC.. (ROSENBLATT, KEITH) (Entered: 10/20/2025) |
| 10/20/2025 | 17 | NOTICE of Appearance by RACHEL E. THOMPSON on behalf of DIANA HOUENOU, AMEILA MAPP, KRISTA NASH, NEW JERSEY CANNABIS REGULATORY COMMISSION, CHRISTOPHER RIGGS (THOMPSON, RACHEL) (Entered: 10/20/2025) |
| 10/20/2025 | 18 | Application and Proposed Order for Clerk's Order to extend time to answer as to Defendants. Attorney RACHEL E. THOMPSON for DIANA HOUENOU,RACHEL E. THOMPSON for AMEILA MAPP,RACHEL E. THOMPSON for KRISTA |

| | | |
|---|---|---|
| | | NASH,RACHEL E. THOMPSON for NEW JERSEY CANNABIS REGULATORY COMMISSION,RACHEL E. THOMPSON for CHRISTOPHER RIGGS added. (THOMPSON, RACHEL) (Entered: 10/20/2025) |
| 10/20/2025 | | Clerk`s Text Order - The 18 Application for a Clerk's Order Extending Time to Answer submitted by AMEILA MAPP, DIANA HOUENOU, NEW JERSEY CANNABIS REGULATORY COMMISSION, CHRISTOPHER RIGGS and KRISTA NASH on 10/20/2025 has been GRANTED. The answer due date has been set for 11/19/2025. (kht) (Entered: 10/20/2025) |
| 10/21/2025 | 19 | Letter from Keith J. Rosenblatt, Esq. re: pro hac vice admissions. (ROSENBLATT, KEITH) (Entered: 10/21/2025) |
| 10/21/2025 | 20 | MOTION for Leave to Appear Pro Hac Vice *of Alex MacDonald, Esq.* by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC.. (Attachments: # 1 Certification of Alex MacDonald, Esq. ISO Pro Hac Admission, # 2 Text of Proposed Order)(ROSENBLATT, KEITH) (Entered: 10/21/2025) |
| 10/21/2025 | 21 | MOTION for Leave to Appear Pro Hac Vice *of Stefan J. Marculewicz, Esq.* by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC.. (Attachments: # 1 Certification of Stefan J. Marculewicz, Esq. ISO Pro Hac Admission, # 2 Text of Proposed Order)(ROSENBLATT, KEITH) (Entered: 10/21/2025) |
| 10/21/2025 | 22 | MOTION for Leave to Appear Pro Hac Vice *of Dinora Orozco, Esq.* by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC.. (Attachments: # 1 Certification of Dinora Orozco, Esq. ISO Pro Hac Admission, # 2 Text of Proposed Order)(ROSENBLATT, KEITH) (Entered: 10/21/2025) |
| 10/22/2025 | | CLERK'S QUALITY CONTROL MESSAGE - A "NOTICE OF MOTION" was not submitted with 22 "MOTION" submitted by KEITH ROSENBLATT on 10/21/2025. PLEASE SUBMIT THE MISSING DOCUMENT(S) ONLY USING THE EVENT: Civil Events -> Other Filings -> Other Documents -> Exhibit (to Document). (mlh) (Entered: 10/22/2025) |
| 10/22/2025 | | Set Deadlines as to 22 MOTION for Leave to Appear Pro Hac Vice *of Dinora Orozco, Esq.*. Motion set for 11/17/2025 before Magistrate Judge Rukhsanah L. Singh. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (mlh) (Entered: 10/22/2025) |
| 10/22/2025 | | Set Deadlines as to 21 MOTION for Leave to Appear Pro Hac Vice *of Stefan J. Marculewicz, Esq.*, 20 MOTION for Leave to Appear Pro Hac Vice *of Alex MacDonald, Esq.*. Motion set for 11/17/2025 before Magistrate Judge Rukhsanah L. Singh. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (amv) (Entered: 10/22/2025) |
| 10/24/2025 | 23 | MOTION for Order to Show Cause , MOTION for Preliminary Injunction by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC.. (Attachments: # 1 Brief in Support of Plaintiffs' Order to Show Cause and Motion for a Preliminary Injunction, # 2 Text of Proposed Order)(ROSENBLATT, KEITH) (Entered: 10/24/2025) |
| 10/27/2025 | | Set Deadlines as to 23 MOTION for Order to Show Cause MOTION for Preliminary Injunction . Motion set for 11/17/2025 before Judge Michael A. Shipp. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and |

| | | |
|---|---|---|
| | | does not supersede any previous or subsequent orders from the Court. (jal, ) (Entered: 10/27/2025) |
| 10/28/2025 | 24 | Letter from Keith J. Rosenblatt, Esq. re 23 MOTION for Order to Show Cause MOTION for Preliminary Injunction . (ROSENBLATT, KEITH) (Entered: 10/28/2025) |
| 10/28/2025 | | Set Hearings: Telephone Status Conference set for 10/29/2025 at 3:30 PM before Judge Michael A. Shipp. (jab) (Entered: 10/28/2025) |
| 10/29/2025 | 25 | ORDER granting 21 Motion for Leave to Appear Pro Hac Vice as to Stefan J. Marculewicz, Esq.. Signed by Magistrate Judge Rukhsanah L. Singh on 10/28/2025. (aji, ) (Entered: 10/29/2025) |
| 10/29/2025 | 26 | ORDER granting 22 Motion for Leave to Appear Pro Hac Vice as to Dinora Orozco, Esq.. Signed by Magistrate Judge Rukhsanah L. Singh on 10/28/2025. (aji, ) (Entered: 10/29/2025) |
| 10/29/2025 | 27 | ORDER Granting 20 Motion for Leave to Appear Pro Hac Vice as to ALEX MACDONALD, ESQ. Signed by Magistrate Judge Rukhsanah L. Singh on 10/28/2025. (kes, ) (Entered: 10/29/2025) |
| 10/29/2025 | 28 | TEXT ORDER: For the reasons discussed on the record during today's telephone conference, any actions regarding this matter are temporarily stayed pending completion of the expedited briefing schedule the Court provided regarding Plaintiffs' Motion for an Order to Show Cause and Preliminary Injunction (ECF No. 23 ) and the Court's consideration of the Motion or further order of the Court. Defendants must file their opposition brief by November 3, 2025 at 4:00 p.m., and Plaintiffs must reply by November 10, 2025 at 4:00 p.m. With the current briefing schedule, the Court will issue an opinion no later than November 17, 2025, to resolve the emergent dispute between the parties. Defendants are directed to e-file correspondence by October 31, 2025, at 5:00 p.m. confirming whether Defendants will consent to allowing Plaintiffs to maintain their licenses through the date of the Court's decision on the motion if the Court were to adjourn the motion for one cycle based upon Defendants' request for an extended briefing schedule. Following review of Defendants' correspondence, the Court will, if appropriate, enter an updated briefing schedule. So Ordered by Judge Michael A. Shipp on 10/29/2025. (jab) (Entered: 10/29/2025) |
| 10/29/2025 | 29 | Letter from Defendants. (THOMPSON, RACHEL) (Entered: 10/29/2025) |
| 10/29/2025 | 31 | Minute Entry for proceedings held before Judge Michael A. Shipp: Motion Hearing held on 10/29/2025 re 23 MOTION for Order to Show Cause MOTION for Preliminary Injunction filed by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC., Curaleaf Holdings, Inc. Order to be entered. (Court Reporter, Shannan O'Neill (609-815-2750)) (jab) (Entered: 10/30/2025) |
| 10/30/2025 | 30 | TEXT ORDER: The Court is in receipt of Defendants' correspondence (ECF No. 29 ) representing that Defendants will voluntarily stay the expiration of Plaintiffs' Bordentown license pending the adjudication of Plaintiffs' Motion for an Order to Show Cause and Preliminary Injunction (ECF No. 23 ). In light of that agreement, Defendants' request for a one-cycle adjournment is granted. Defendants' opposition is due November 17, 2025, and Plaintiffs shall reply by November 24, 2025. The Court will issue a ruling expeditiously once the matter has been fully briefed. So Ordered by Judge Michael A. Shipp on 10/30/2025. (jab) (Entered: 10/30/2025) |
| 10/30/2025 | | Reset Deadlines as to 23 MOTION for Order to Show Cause MOTION for Preliminary Injunction . Motion reset for 12/1/2025 before Judge Michael A. Shipp. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and |

| | | |
|---|---|---|
| | | does not supersede any previous or subsequent orders from the Court. (jab) (Entered: 10/30/2025) |
| 10/30/2025 | 32 | NOTICE of Appearance by CHRISTOPHER S. PORRINO on behalf of CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC. (PORRINO, CHRISTOPHER) (Entered: 10/30/2025) |
| 10/30/2025 | 33 | NOTICE of Appearance by PETER MATTHEW SLOCUM on behalf of CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC. (SLOCUM, PETER) (Entered: 10/30/2025) |
| 11/04/2025 | | Pro Hac Vice fee received for Dinora Orozco, Esq.: $250, receipt number 146491. (gxh) (Entered: 11/04/2025) |
| 11/04/2025 | 34 | Notice of Request by Pro Hac Vice Dinora Orozco, Esq. to receive Notices of Electronic Filings. (ROSENBLATT, KEITH) (Entered: 11/04/2025) |
| 11/05/2025 | | Pro Hac Vice counsel, DINORA OROZCO for CURALEAF HOLDINGS, INC.,DINORA OROZCO for CURALEAF NJ, II, INC., has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (amv) (Entered: 11/05/2025) |
| 11/06/2025 | | Pro Hac Vice fee: STEFAN J. MARCULEWICZ and ALEX MACDONALD $ 500, receipt number TRE146521. (mlh) (Entered: 11/06/2025) |
| 11/06/2025 | 35 | Notice of Request by Pro Hac Vice Alex MacDonald, Esq. to receive Notices of Electronic Filings. (ROSENBLATT, KEITH) (Entered: 11/06/2025) |
| 11/06/2025 | 36 | Notice of Request by Pro Hac Vice Stefan Marculewicz, Esq. to receive Notices of Electronic Filings. (ROSENBLATT, KEITH) (Entered: 11/06/2025) |
| 11/07/2025 | | Pro Hac Vice counsel, ALEX MACDONALD,STEFAN MARCULEWICZ for CURALEAF HOLDINGS, INC.,ALEX MACDONALD,STEFAN MARCULEWICZ for CURALEAF NJ, II, INC., has been added to receive Notices of Electronic Filing. Pursuant to L.Civ.R. 101.1, only local counsel are entitled to sign and file papers, enter appearances and receive payments on judgments, decrees or orders. (jal, ) (Entered: 11/07/2025) |
| 11/14/2025 | 37 | NOTICE of Appearance by BASSAM GERGI on behalf of All Defendants (GERGI, BASSAM) (Entered: 11/14/2025) |
| 11/14/2025 | 38 | NOTICE of Appearance by STEPHEN EHRLICH on behalf of All Defendants (EHRLICH, STEPHEN) (Entered: 11/14/2025) |
| 11/17/2025 | 39 | MOTION to Dismiss *and Opposition to Plaintiffs' Motion for Preliminary Injunction* by All Defendants. Responses due by 12/15/2025. (Attachments: # 1 Brief in Support of Defendants' Motion to Dismiss and Opposition to Plaintiffs' Motion for Preliminary Injunction, # 2 Certification of Rachel E. Thompson, Esq., # 3 Text of Proposed Order to Dismiss)(GERGI, BASSAM) (Entered: 11/17/2025) |
| 11/18/2025 | | Set Deadlines as to 39 MOTION to Dismiss *and Opposition to Plaintiffs' Motion for Preliminary Injunction*. Motion set for 12/15/2025 before Judge Michael A. Shipp. Unless otherwise directed by the Court, this motion will be decided on the papers and no appearances are required. Note that this is an automatically generated message from the Clerk`s Office and does not supersede any previous or subsequent orders from the Court. (mlh) (Entered: 11/18/2025) |
| 11/20/2025 | 40 | Proposed Order *Extending Deadlines* by DIANA HOUENOU, AMEILA MAPP, KRISTA NASH, NEW JERSEY CANNABIS REGULATORY COMMISSION, CHRISTOPHER RIGGS. (THOMPSON, RACHEL) (Entered: 11/20/2025) |

| | | |
|---|---|---|
| 11/21/2025 | 41 | CONSENT ORDER Extending Deadlines for replies and responses for Motion to Dismiss. Signed by Judge Michael A. Shipp on 11/21/2025. (amv) (Entered: 11/21/2025) |
| 12/08/2025 | 42 | REPLY BRIEF to Opposition to Motion filed by CURALEAF HOLDINGS, INC., CURALEAF NJ, II, INC. re 23 MOTION for Order to Show Cause MOTION for Preliminary Injunction , 39 MOTION to Dismiss *and Opposition to Plaintiffs' Motion for Preliminary Injunction Plaintiffs' Reply Brief In Further Support of Their Motion for Preliminary Injunction and In Opposition to Defendants' Motion to Dismiss* (Attachments: # 1 Declaration of Michael J. Mauro, # 2 Certificate of Service)(ROSENBLATT, KEITH) (Entered: 12/08/2025) |
| 12/19/2025 | 43 | REPLY to Response to Motion filed by All Defendants re 39 MOTION to Dismiss *and Opposition to Plaintiffs' Motion for Preliminary Injunction Reply Brief in Support of Defendants' Motion to Dismiss* (GERGI, BASSAM) (Entered: 12/19/2025) |
| 01/08/2026 | 44 | Letter from Keith J. Rosenblatt, Esq. and Alexander T. MacDonald. (ROSENBLATT, KEITH) (Entered: 01/08/2026) |
| 01/08/2026 | 45 | Letter from Defendants in Response to Plaintiffs' Notice of Supplemental Authority. (GERGI, BASSAM) (Entered: 01/08/2026) |
| 02/05/2026 | 46 | NOTICE by All Defendants *of Supplemental Authority* (GERGI, BASSAM) (Entered: 02/05/2026) |
| 02/06/2026 | 47 | Letter from Keith J. Rosenblatt, Esq. and Alexander T. MacDonald, Esq. re 46 Notice (Other). (ROSENBLATT, KEITH) (Entered: 02/06/2026) |
| 02/26/2026 | 48 | TEXT ORDER: The Court will hold oral argument on the parties' pending motions (ECF Nos. 23 & 39 ) on April 2, 2026 at 10:00 a.m. in Trenton - Courtroom 5W. So Ordered by Judge Michael A. Shipp on 2/26/2026. (jab) (Entered: 02/26/2026) |
| 03/13/2026 | 49 | Letter from Keith J. Rosenblatt and Alexander T. MacDonald. (ROSENBLATT, KEITH) (Entered: 03/13/2026) |
| 03/17/2026 | 50 | Letter from Defendants in Response to Plaintiffs' Notice of Supplemental Authority. (GERGI, BASSAM) (Entered: 03/17/2026) |
| 04/02/2026 | 53 | Minute Entry for proceedings held before Judge Michael A. Shipp: Motion Hearing held on 4/2/2026 re 23 MOTION for Order to Show Cause & MOTION for Preliminary Injunction filed by Plaintiffs, and 39 MOTION to Dismiss *and Opposition to Plaintiffs' Motion for Preliminary Injunction* filed by Defendants. (Court Reporter, Shannan O'Neill (609-815-2750)) (jab) (Entered: 04/27/2026) |
| 04/03/2026 | 51 | NOTICE by All Defendants *of Supplemental Authority* (GERGI, BASSAM) (Entered: 04/03/2026) |
| 04/08/2026 | 52 | Letter from Keith J. Rosenblatt, Esq. re 51 Notice (Other). (ROSENBLATT, KEITH) (Entered: 04/08/2026) |
| 04/28/2026 | 54 | Transcript of ORAL ARGUMENT held on 4/2/2026, before Judge Michael A. Shipp. Court Reporter/Transcriber Shannan ONeill (609-815-2750). **NOTICE REGARDING (1) REDACTION OF PERSONAL IDENTIFIERS IN TRANSCRIPTS AND (2) MOTION TO REDACT AND SEAL:** The parties have seven (7) calendar days to file with the Court a Notice of Intent to Request Redaction of this Transcript to comply with Fed.R.Civ.P.5.2(a) (personal identifiers). Parties seeking to redact and seal this Transcript, or portions thereof, pursuant to L.Civ.R. 5.3(g) must e-file a Motion to Redact and Seal utilizing the event \`Redact and Seal Transcript/Digital Recording\`. Redaction Request to Court Reporter/Transcription Agency due, but not filed, by 5/19/2026. Redacted Transcript |

| | | |
|---|---|---|
| | | Deadline set for 5/29/2026. Release of Transcript Restriction set for 7/27/2026. (dmr3) (Entered: 04/28/2026) |
| 05/27/2026 | 55 | MEMORANDUM OPINION. Signed by Judge Michael A. Shipp on 5/27/2026. (adc, ) (Entered: 05/27/2026) |
| 05/27/2026 | 56 | ORDER denying 39 Motion to Dismiss; denying 23 Motion for Order to Show Cause. Signed by Judge Michael A. Shipp on 5/27/2026. (adc, ) (Entered: 05/27/2026) |
| 06/05/2026 | 57 | Letter from Defendants. (THOMPSON, RACHEL) (Entered: 06/05/2026) |
| 06/09/2026 | 58 | LETTER ORDER granting two-week extension of time to respond to complaint through 6/24/2026. Signed by Magistrate Judge Rukhsanah L. Singh on 6/9/2026. (lag, ) (Entered: 06/09/2026) |
| 06/24/2026 | 59 | *Defendants'* ANSWER to Complaint by All Defendants.(THOMPSON, RACHEL) (Entered: 06/24/2026) |
| 06/24/2026 | 60 | ORDER Scheduling Conference for 7/28/2026 at 03:00 PM in Trenton - Courtroom 7W before Magistrate Judge Rukhsanah L. Singh. Signed by Magistrate Judge Rukhsanah L. Singh on 6/24/2026. (mj) (Entered: 06/24/2026) |
| 06/24/2026 | | CLERK'S QUALITY CONTROL MESSAGE - Please be advised, pursuant to Fed. R. Civ. P. 7.1, a disclosure statement is required to be filed by a nongovernmental corporate party or intervenor. Please refer to the Court's website at www.njd.uscourts.gov for a form and filing instructions. (arm) (Entered: 06/24/2026) |
| 07/20/2026 | 61 | Letter from Defendants Requesting Adjournment of Initial Scheduling Conference and Proposed Joint Discovery Plan. (GERGI, BASSAM) (Entered: 07/20/2026) |
| 07/20/2026 | 62 | TEXT ORDER: The Court is in receipt of the letter dated July 20, 2026. The Rule 16 Conference set for July 28, 2026, is hereby RESCHEDULED to August 25, 2026 at 1:30 p.m. before Magistrate Judge Rukhsanah L. Singh. Kindly mark your calendars accordingly. Please refer to the Order at Doc. No. 60 , which terms are incorporated herein. So Ordered by Magistrate Judge Rukhsanah L. Singh on 7/20/2026. (mm) (Entered: 07/20/2026) |
| 08/07/2026 | 63 | Letter from Parties Regarding Final Judgment. (Attachments: # 1 Text of Proposed Order Proposed Final Judgment)(GERGI, BASSAM) (Entered: 08/07/2026) |
| 08/10/2026 | 64 | FINAL JUDGMENT ORDER. Signed by Judge Michael A. Shipp on 8/10/2026. (ld) (Entered: 08/10/2026) |
| 08/11/2026 | | ***Civil Case Terminated. (jab) (Entered: 08/11/2026) |
| 08/13/2026 | 65 | NOTICE OF APPEAL by DIANA HOUENOU, AMEILA MAPP, KRISTA NASH, NEW JERSEY CANNABIS REGULATORY COMMISSION, CHRISTOPHER RIGGS. Filing fee $ 605, receipt number ANJDC-17797022. The Clerk's Office hereby certifies the record and the docket sheet available through ECF to be the certified list in lieu of the record and/or the certified copy of the docket entries. (Attachments: # 1 Exhibit Final Judgment, # 2 Exhibit Opinion)(GERGI, BASSAM) (Entered: 08/13/2026) |
| 08/13/2026 | 66 | USCA Case Number 26-3067 for 65 Notice of Appeal (USCA), filed by AMEILA MAPP, CHRISTOPHER RIGGS, DIANA HOUENOU, KRISTA NASH, NEW JERSEY CANNABIS REGULATORY COMMISSION. USCA Case Manager Stephanie (Document Restricted - Court Only) (ca3sb, ) (Entered: 08/13/2026) |

**PACER Service Center**

| Transaction Receipt | | | |
|---|---|---|---|
| 11/10/2026 11:36:33 | | | |
| **PACER Login:** | bassamgergi | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:25-cv-16397-MAS-RLS Start date: 1/1/1980 End date: 11/10/2026 |
| **Billable Pages:** | 11 | **Cost:** | 1.10 |